# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOHN DOE and JOHN DOE #2** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:16-cv-02862** |
| | ) | **& 3:17-cv-00264** |
| **WILLIAM E. HASLAM, Governor of** | ) | **CHIEF JUDGE CRENSHAW** |
| **the State of Tennessee, and MARK** | ) | |
| **GWYN, Director of the Tennessee** | ) | |
| **Bureau of Investigation, in their official** | ) | |
| **capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Before the Court are Motions to Dismiss (Doc Nos. 10 & 26) filed by Defendants Governor

William E. Haslam and Tennessee Bureau of Investigation ("TBI") Director Mark Gwyn in two

cases that have been consolidated for the purposes of case management, discovery, and pretrial

motions. For the reasons below, the Motions will be **GRANTED in part** and **DENIED in part**.

Count 2, 3, 6, and 7 of the Complaints will be **DISMISSED**. Counts 8 and 9 will be **DISMISSED**

only insofar as they challenge Tennessee's restrictions on where Plaintiffs may obtain treatment,

and Defendants' requests to dismiss those claims and Count 1 will otherwise be **DENIED**.

## I. BACKGROUND[1]

### A. Plaintiffs' Convictions

In early 1994, John Doe ("Doe #1") pleaded *nolo contendere* to two counts of attempted

aggravated sexual battery against his daughter and was sentenced to five years of probation. (Doc.

---

[1] Because this matter comes before the Court on motions to dismiss, the Court must accept the Plaintiffs' well-pleaded allegations as true. The below facts accordingly reflect the allegations of the Complaints.

No. 1 at ¶¶ 17–18.) He completed his sentence in 1999, and since then has lived what he characterizes as a productive life as a commercial landlord and commercial real estate developer. (Id. at ¶¶ 18–19.) He has not been convicted of any crime since his conviction in 1994. (Id. at ¶ 21.) Doe maintains that he was innocent of the crimes with which he was charged and that he accepted a plea in order to spare his daughter the ordeal of a trial. (Id. at ¶ 17.) For the purposes of this matter, it suffices to say that he was convicted of the crimes at issue and that any actions forming the factual predicates of his convictions took place prior to May of 1994.

In 2000, John Doe #2 pleaded either *nolo contendere* or guilty—he says that he does not recall which—to three counts of sexual battery of his ex-wife's niece, who had been under the age of thirteen at the time. (Case No. 3:17-cv-00264, Doc. No. 1 at ¶ 17.[2]) The alleged battery occurred almost ten years before Doe #2's plea. (Id.) Doe #2 was sentenced to six years of probation, which he completed in 2006. (Id. at ¶ 18.) Since his conviction, Doe #2 has provided accounting and management services and led what he characterizes as a productive life. (Id. at ¶ 19.) Like Doe #1, Doe #2 maintains his innocence, but, as with Doe #1, it suffices to say that he was convicted of the crimes at issue and that any conduct underlying his convictions occurred prior to May of 1994.

## B. Tennessee's Adoption and Amendment of Sexual Offender Registration Statutes

On May 10, 1994, Governor Ned Ray McWherter signed into law Tennessee's Sexual Offender Registration and Monitoring Act ("SORMA"). 1994 Tenn. Pub. Laws, ch. 976. SORMA required TBI to "establish, maintain, and update a centralized record system of sexual offender registration and verification information." Id. § 7(a). "Sexual offender" was defined as an individual who had been convicted of one of a number of enumerated offenses under Tennessee criminal law—or who was convicted of committing the equivalent behavior in another state—

---

[2] The Complaint and early pleadings related to Doe #2 are available under the docket number assigned to his case prior to Doe #1 and Doe #2's cases being consolidated.

unless the offender had been wholly released without supervision from incarceration, probation, or parole prior to January 1, 1995. Id. § 3(2)–(3). Accordingly, SORMA applied to some, but not all, qualifying offenders whose criminal acts occurred before the law's enactment.

SORMA required any individual convicted of a sexual offense to register within ten days of release without supervision from probation, parole, or incarceration. Id. § 4. TBI was then instructed to send the registrant a verification and monitoring form every ninety days, which the registrant was required to complete and return within ten days of receipt. Id. § 5. In addition to these periodic updates, a registrant had an ongoing duty to complete a new form within ten days of any change of residence or entry into a municipality or county for temporary residence or domicile. Id. § 4. SORMA imposed no in-person registration or reporting duty, relying instead on the prescribed paper forms. Id. The information in the SORMA registry was expressly designated as confidential, with the exception that TBI or a local law enforcement agency could "release relevant information deemed necessary to protect the public concerning a specific sexual offender." Id. § 7(c). An offender registered under SORMA was permitted to petition a court for relief from its requirements ten years after his or her release from supervision. Id. § 8(a). The court, upon consideration of several factors including the age of the offender's victims and the behavior of the offender since his offense, was required to grant the petition if it found the registrant had complied with the Act, was rehabilitated, and did not pose a threat to public safety. Id. § 8(c). If the petition was granted, the TBI was required to expunge the registrant's data from its registry. Id.

In the ensuing decade, the General Assembly repeatedly amended SORMA either to expand its scope, increase the reporting requirements placed on registered offenders, or reduce the level of confidentiality of registry information. See 1996 Tenn. Pub. Acts, ch. 834, § 1 (extending

SORMA to individuals charged with sex offenses but placed on pre-trial and judicial diversion); 1997 Tenn. Pub. Acts, ch. 455, § 3 (extending SORMA to individuals who had completed diversion and had their records expunged); 1997 Tenn. Pub. Acts, ch. 461, § 2 (making public registry information for offenders whose offenses were committed after July 1, 1997); 1997 Tenn. Pub. Acts, ch. 466, § 1 (extending SORMA to individuals convicted of certain non-sexual offenses against minors and permitting TBI to require that registrants provide current photographs); 2000 Tenn. Pub. Acts, ch. 882, § 1 (imposing mandatory 180-day sentence for falsification of registration forms); 2000 Tenn. Pub. Acts, ch. 997, § 1–2 (imposing mandatory lifetime registration for offenders with multiple convictions for sexual offenses or a single conviction of a "violent sexual offense," defined as actual or attempted aggravated rape, rape, aggravated sexual battery, or rape of a child); 2000 Tenn. Pub. Acts, ch. 997, § 3 (requiring registered offender to report within ten days of coming to a municipality or county in which they work or are students); 2002 Tenn. Pub. Acts, ch. 469, §§ 3, 5, and 11 (requiring registered offenders to report within ten days of being employed or becoming a student or volunteer at an institution of higher learning in the county or municipality in which they reside, and providing that the name and address of that institution will be made public for registered offenders who committed offenses after October 27, 2002).

SORMA did not expressly restrict where a registrant could live, work, or travel until 2003. (Doc. No. 1 at ¶ 55; Case No. 3:17-cv-00264, Doc. No. 1 at ¶ 39.) In 2003, however, the General Assembly enacted legislation prohibiting a SORMA registered offender from: establishing a residence or accepting employment with 1,000 feet of a school, a child care facility, or the home of their victim or the victim's immediate family member; coming within 100 feet of the victim; establishing a residence or other living accommodation with a minor who was not the registered

offender's own child; and establishing a residence with the registered offender's own minor child, if any child of the offender had been the offender's victim or if the offender's parental rights had been or were being terminated. 2003 Tenn. Pub. Acts, ch. 95, § 1. A violation of any of the 2003 prohibitions was a Class A misdemeanor. Id.

In 2004, the Tennessee General Assembly repealed SORMA and replaced it with the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act ("Act"), which continues, in amended form, today. 2004 Tenn. Pub. Laws, ch. 921. The Act continued the State's registration system, albeit with some changes. Carrying on a distinction first introduced to SORMA in 2000, the Act classifies registrants as either "sexual offenders" or "violent sexual offenders," depending on the offense of which that registrant was convicted. Individuals classified as sexual offenders include those convicted of sexual battery, statutory rape, aggravated prostitution, sexual exploitation of a minor, incest, indecent exposure (upon the third such conviction), and false imprisonment of a minor who was not the offender's own child—an offense that, in and of itself, contains no expressly sexual element, see Tenn. Code Ann. § 39-13-302 ("A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."). Id. § 1(16). Also included as sexual offenders are any offenders convicted of attempt, solicitation, conspiracy, criminal responsibility, facilitation, or being an accessory after the fact with regard to any of the qualifying offenses. Id. Individuals classified as violent sexual offenders include those convicted of rape, aggravated rape, rape of a child, aggravated sexual battery, aggravated or especially aggravated sexual exploitation of a minor, aggravated or especially aggravated kidnapping of a minor other than the offender's own child, sexual battery by an authority figure, solicitation of a

minor, and attempt, solicitation, or conspiracy with regard to any of the aforementioned qualifying offenses. Id. §1(24).

Under the Act, sexual offenders must verify their registration information on an annual basis, and violent sexual offenders must do so quarterly. Tenn. Code Ann. § 40-39-204(b)–(c). In contrast to SORMA's system of TBI-propagated forms, the Act requires offenders to register and report in person to a designated law enforcement agency. Tenn. Code Ann. §§ 40-39-203(a), 40-39-204(b). Reports based on certain triggering events, such as a change of residence or employment, must be made within forty-eight hours. Tenn. Code Ann. § 40-39-203(a)(3)–(6). The Act increased the amount of information required to be reported, Tenn. Code Ann. § 40-39-203(h), and offenders are required to pay administrative fees related to their ongoing inclusion in the registry, Tenn. Code Ann. § 40-39-204(b)(1) and (c). Some offenders remain eligible for removal from the registry after ten years, but the authority to make an initial removal decision has been vested in the TBI, with a right to appeal to a chancery court. Tenn. Code Ann. § 40-39-207(b), (g). A violation of the Act's requirements is now a felony, as opposed to a misdemeanor under SORMA. Tenn. Code Ann. § 40-39-208(b).

Like SORMA, the Act has been repeatedly revised to increase its restrictions and requirements and to make more information about registered offenders publicly available. See 2005 Tenn. Pub. Acts, ch. 316, § 1 (adding to events and information that must be reported and increasing administrative fees); 2006 Tenn. Pub. Acts, ch. 890, § 20 (forbidding registrants whose victims were minors from living, obtaining sexual offender treatment, or working within 1,000 feet of a school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public); 2007 Tenn. Pub. Acts, ch. 126, § 1 (adding to events triggering a 48-hour reporting obligation); 2007 Tenn. Pub. Acts, ch. 531, § 1 (making public all

registrants' information, regardless of date of offense); 2008 Tenn. Pub. Acts, ch. 979, § 1 (adding information required to be reported and making information, including registrant e-mail addresses, available to qualifying businesses); 2008 Tenn. Pub. Acts, ch. 1164, § 13 (restricting employment permitted to registrants whose victims were minors and forbidding said registrants from wearing certain costumes—such as clowns or fictional characters—in the presence of minors); 2009 Tenn. Pub. Acts, ch. 597, § 1 (forbidding all registrants, regardless of age of victim, from the premises of school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public if they have reason to believe children are present, or from standing or sitting idly within 1,000 feet of such locations unless the registrant is responsible for a child or a "specific or legitimate reason" for their presence); 2010 Tenn. Pub. Acts, ch. 1138, §§ 7, 13 (increasing information required to be reported and requiring registrants to maintain and carry photo identification); 2010 Tenn. Pub. Acts, ch. 1145, § 1 (forbidding more than two registrants from living in the same residence); 2011 Tenn. Pub. Acts, ch. 266, § 1 (imposing reporting restrictions related to international travel); 2011 Tenn. Pub. Acts, ch. 287, § 1 (permitting public library directors to ban registrants from library premises); 2014 Tenn. Pub. Acts, ch. 992, § 1 (prohibiting registrants, regardless of age of victim, from living or working within 1,000 feet of a school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public); 2014 Tenn. Pub. Acts, ch. 751, § 1 (authorizing local governments to establish community notification systems designed to notify residents, schools, and child care facilities when a registrant lives within a certain distance); 2014 Tenn. Pub. Acts, ch. 770, §§ 1, 2 (imposing lifetime registration requirement on all offenders whose victims were twelve or younger); 2015 Tenn. Pub. Acts, ch. 516, § 1 (increasing information required to be reported and prohibiting registrants being alone with a minor in a "private area").

## C. Effect of Registration on Doe #1

Doe #1 was required to register as a sexual offender under the original version of SORMA and is now required, based on his original offense, to register as a violent sexual offender. (Doc. No. 1 at ¶ 24.) Accordingly, he is required to comply with the reporting, residence, travel, and employment restrictions imposed on violent sexual offenders under the Act on an ongoing basis. (<u>Id.</u>) Because SORMA originally granted confidentiality to registrants and, in subsequent amendments, retained that confidentiality for registrants whose offenses occurred before a certain date, knowledge of Doe #1's status was not easily accessible to the public until the Act was adopted in 2004. (<u>Id.</u>)

In 2011, Doe #1 was living in one half of a duplex he owned in Davidson County, and his son and daughter-in-law were living with their children in the other half. Doe #1 was not permitted to reside with minors pursuant to Tenn. Code Ann. § 40-39-211(c), but he believed himself to be in compliance with that requirement because his minor grandchildren lived on the other side of the duplex and the arrangement had continued with the knowledge of local authorities. (Doc. No. 1 at ¶ 28.) Doe #1 describes being forced to move out of his home on forty-five minutes' notice due to a threat of arrest and prosecution by the Metropolitan Nashville Police Department ("MNPD") and the office of the Davidson County District Attorney General ("DA's Office"). (<u>Id.</u>) Doe #1 offered to seal any interior connecting passages between the two sides of the duplex, but the DA's Office maintained that he would still not be in compliance. (<u>Id.</u> at ¶ 31.) To avoid prosecution, Doe #1 moved into a building in an industrial park that he owned. (<u>Id.</u> at ¶ 32.) Doe #1 eventually filed an action for declaratory judgment against the Tennessee Attorney General and State of Tennessee in Davidson County Criminal Court, seeking to vindicate his right to live in the duplex while his minor grandchildren lived on the other side. (<u>Id.</u> at ¶ 33.) Doe #1 also challenged the position,

taken by MNPD, that he could not have overnight visitations with his own minor children without violating the prohibition on his residing with them. (Id.)

Following an evidentiary hearing, the Honorable Seth Norman granted judgment in favor of Doe #1, concluding that the Act's residence restrictions were unconstitutionally vague as applied to his residence in the duplex and overnight visitation with his children. (Doc. No. 1-1 at 7.) Judge Norman noted that Doe #1 and his grandchildren had resided on their respective sides of the duplex for years with the full knowledge of MNPD, and that an MNPD detective had told Doe #1 that the arrangement was permissible, only for another MNPD detective to threaten Doe #1 with arrest under an alternate interpretation of the same statutory language. (Id. at 5.) Though not necessary to the court's vagueness holding, the court also concluded that the Act, as applied to Doe #1, "appear[ed] to have a punitive effect" for the purpose of a challenge under the Constitution's Ex Post Facto Clause, U.S. Const., Art. I, § 10, cl. 1. (Id.) The State of Tennessee did not appeal the judgment in Doe #1's favor. (Doc. No. 1 at ¶ 33.)

On March 31, 2016, Doe #1 faced a deadline both to come to a designated MNPD office for his required quarterly report under the Act and to pay his required annual $150 fee. (Id. at ¶¶ 35–36.) He had attempted to pay the fee early in December of 2015, but MNPD refused to accept it. (Id. at ¶ 36.) He came to the designated MNPD office during its posted hours on Thursday, March 31, 2016, but found it closed. He tried again on Friday, April 1, 2016, but the office again was closed. (Id. at ¶¶ 38–39.) MNPD obtained a warrant for Doe #1's arrest for noncompliance with the Act, and Doe #1, facing two felony charges, turned himself in, posted bond, and obtained counsel. (Id. at ¶¶ 38–39.) Davidson County General Sessions Court dismissed the charges against Doe #1 for a lack of probable cause. (Id. at ¶ 39)

Doe #1 has also identified some ways in which he is forced to restrict his ongoing behavior to conform to the Act. For example, if Doe's own child is at any school, child care facility, public park, playground, recreation center or public athletic field, Doe cannot enter the premises except to attend a conference with relevant officials, and only after receiving written permission or a request from the school's principal or facility's administrator, or to drop off or pick up the child at school, and only after notifying the school's principal or administrator that he is a registered sex offender. (Doc. No. 1 at ¶ 84 (citing Tenn. Code Ann. § 40-39-211(d)).) School officials often deny that permission, preventing Doe from taking part in activities such as parent-teacher conferences and school orientation. (Id. at ¶ 85.) He is also unable to attend his children's extracurricular events, even with permission of relevant administrators. (Id. at ¶ 86.)

Doe #1 is a frequent international traveler, and the Act requires twenty-one days' notice of any international travel unless the registrant qualifies for one of two exceptions. Tenn. Code Ann. § 40-39-204(h). Although Doe, based on his allegations, appears potentially to qualify for one such exception—for routine, frequent travel for a legitimate purpose—he states that MNPD has declined to approve his requests and therefore he can only travel with less than twenty-one days' notice in the event of an emergency. (Doc. No. 1 at ¶ 92.) Some countries also bar his entry based on his registered sexual offender status. (Id. at ¶ 98.) Under a recently enacted federal law, the United States is obligated to disclose to a foreign country when a U.S. registered sexual offender is traveling to that country, which Doe #1 cites as likely to result in further denials of entry. (Id. at ¶ 99.)

Doe #1 is also generally forbidden from knowingly "stand[ing]" or "sitting idly" within 1,000 feet of "any building owned or operated by any public school, private or parochial school, licensed day care center, other child care facility, public park, playground, recreation center or

public athletic field available for use by the general public in this state when children under eighteen (18) years of age are present," unless he has "a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there." Tenn. Code Ann. § 40-39-211(d)(1)(B). The result, as Doe #1 describes it, is the establishment of sizable "Exclusion Zones" in which Doe #1 risks criminal liability for sitting or standing without an undefined "legitimate reason." (Doc. No. ¶ 134.) Doe # 1 complains of the difficulty of knowing, mapping, and complying with the Exclusion Zones, which would require complete knowledge of the location of, *inter alia,* all day care centers, parks, and playgrounds, as well as their specific distance from other locations, in any neighborhood Doe #1 entered.

Finally, of course, Doe #1 must comply with the core registration and reporting requirements of the Act, and he must do so by appearing in person to MNPD on at least a quarterly basis. (Doc. No. 1 at ¶¶ 70, 92.) He must also pay an annual $150 fee. (Id. at ¶ 35.) Doe notes, in particular, the potentially expansive nature of his reporting obligations related to his use of internet services. Doe #1 is required to provide TBI a "complete listing of the [his] electronic mail address information, including usernames, any social media accounts the offender uses or intends to use, instant message, other Internet communication platforms or devices, and the offender's username, screen name, or other method by which the offender accesses these accounts or web sites." Tenn. Code Ann. § 40-39-203(i)(17). If he obtains a new such account, he must report it within three days. Tenn. Code Ann. § 40-39-203(a)(7). Doe #1 argues that the Act does not provide sufficient guidance with regard to which online accounts trigger his reporting requirements, and notes the large array of everyday online activities—such as paying bills or shopping online—that require the creation of an account and username. (Doc. No. 1 at ¶ 102.) To avoid an inadvertent violation, Doe #1 refrains from using the internet. (Id. at ¶ 103.)

**D. Effect of Registration on Doe #2**

Doe #2 is required to register as a sexual offender under the Act. (Case No. 3:17-cv-00264, Doc. No. 1 at ¶ 21.) Although Doe #2 is not classified as a violent sexual offender, the ongoing restrictions on his behavior are similar to those noted by Doe #1. He is required to periodically register in person, albeit annually rather than quarterly, and, despite his registration initially have been confidential, it is now available to the public. (Id. at ¶¶ 21-22) He also pays a $150 annual fee. (Id. at ¶ 23.) Doe #2 is subject to the same restrictions on internet use and travel. (Id. at ¶¶ 78–89.) Like Doe #1, Doe #2 is required to comply with the Act's ban on sitting or standing idly in Exclusion Zones. (Id. at ¶ 113.)

Doe #2 cannot live with his minor step-grandchildren. (Id. at ¶ 68.) He also must exit his house any time his own children have minor friends as visitors, unless another adult is present. Tenn. Code Ann. § 40-39-211(c), (k). (Case No. 3:17-cv-00264, Doc. No. 1 at ¶ 69.)

After Doe #2's registry status was made public, he was fired by his employer when an angry former employee brought his registered sexual offender status to his employer's attention. His family's YMCA membership was terminated, and a cruise line excluded Doe #2 and his wife from a planned cruise trip. (Id. at ¶ 92.)

Unlike Doe #1, Doe #2 no longer resides in a house that is exempt from the Act under its grandfather clause. (Id. at ¶¶ 74–75.) Although the Complaint provides limited information about his current home, that home presumably was selected in part due to its location in an area not prohibited by the Act, as any future home would also have to be. (Id. at ¶ 75.) The Complaint, however, does not identify a present or future intention or desire to relocate to a restricted area.

**E. Procedural History**

On November 8, 2016, Doe #1 filed this case seeking relief from various burdens of the Act, naming Governor Haslam and TBI Director Gwyn as defendants. "The governor is an elected official, invested with the supreme executive power of the state, among whose duties is the duty to 'take care that the laws be faithfully executed.'" Tenn. Op. Att'y Gen. No. 11-42 (May 5, 2011) (citing Tenn. Const., Art. III, §§ 1, 2, 10). Under the Act, the TBI has various duties related to the administration and maintenance of the State's sexual offender registry and the dissemination of information therein. See Tenn. Code Ann. §§ 40-39-203(i), 40-39-204(a) & (d), 40-39-205(a) & (f), 40-39-206.

Doe #1's Complaint pleads the following claims:

- **Count 1** pleads that Doe #1 has been retroactively made subject to the various restrictions of the Act in violation of the Ex Post Facto Clause, U.S. Constitution, Art. I, § 10, cl. 1 (Doc. No. 1 at ¶ 143);

- **Count 2** pleads that the Act violates Doe #1's fundamental right to travel under the Due Process Clause, U.S. Const. Amend. 14, § 1 (Id. at ¶¶ 144–47);

- **Count 3** pleads that the Act violates Doe #1's fundamental right to "engage in the common occupations of life" under the Due Process Clause (Id. at ¶¶ 148–52);

- **Count 4** pleads that the Act violates Doe #1's fundamental right to direct the upbringing of his children under the Due Process Clause (Id. at ¶¶ 153–56);

- **Count 5** pleads that the Act's restrictions and disclosure obligations regarding internet activity violate Doe #1's right to free speech under the First Amendment, U.S. Const. Amend. 1 (Id. at ¶¶ 157–59);

- **Count 6** pleads that the Act's retroactive application deprives Doe #1 of due process (Id. at ¶¶ 160–62);

- **Count 7** pleads that the imposition of the Act amounts, effectively, to a repudiation of his original plea bargain in violation of due process (Id. at ¶¶ 163–5);

- **Count 8** pleads that the Act, and in particular the Exclusion Zone regime, violates due process by imposing criminal liability on wholly passive conduct without appropriately apprising Doe #2 of his duty to comply (Id. at ¶¶ 166–67);

- **Count 9** pleads that the Act violates due process by imposing restrictions that are unconstitutionally vague and/or render compliance impossible (Id. at ¶¶ 168–73).

Doe #1 seeks declaratory and injunctive relief. (Id. at PageID 54–56.) Defendants moved to dismiss Doe #1's claims on December 16, 2016. (Doc. No. 10.)

On February 8, 2017, Doe #2 filed his Complaint, which uses the same claim numbering as Doe #1's. (Case No. 3:17-cv-00264, Doc. No. 1 at ¶¶ 125–54.) The parties filed a motion to consolidate the two matters for the purposes of case management, discovery, and pretrial motions, which the Court granted on March 15, 2017. (Doc. No. 22.) On April 18, 2017, Defendants moved to dismiss Doe #2's claims.

## II. ANALYSIS

### A. Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007); see also Inge v. Rock Fin. Corp., 281 F.3d 613, 619 (6th Cir. 2002). Plaintiff need only provide "a short and plain statement of the claim that will give the defendant fair notice of what

the plaintiff's claim is and the grounds upon which it rests," Conley v. Gibson, 355 U.S. 41, 47 (1957), and the Court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Nevertheless, the allegations "must be enough to raise a right to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). In short, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679; see also Twombly, 550 U.S. at 556.

## B. Standing

Defendants argue that the Plaintiffs respectively lack standing to challenge the relevant provisions identified in Counts 2, 3, 8, and 9, because they have not sufficiently pled injuries related to those provisions. Specifically, the Defendants argue that neither Plaintiff has pled facts sufficient to establish standing to challenge the scheme's residence, employment, and travel restrictions. See Tenn. Code Ann. §§ 40-39-211, 40-39-204(h). Plaintiffs argue that they have been injured by their need to comply with the provisions and that, in any event, the State of Tennessee's imposition and threatened enforcement of the provisions is sufficient to meet the requirements of standing.

"Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" required to establish standing. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)). "To satisfy Article III's standing requirements, a plaintiff must show: '(1) [he] has suffered an 'injury-in-fact' that is (a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Soehnlen v. Fleet Owners Ins. Fund, 844 F.3d 576, 581 (6th Cir. 2016) (quoting Loren v. Blue Cross & Blue Shield of Mich., 505 F.3d 598, 606–07 (6th Cir. 2007)). The Supreme Court has recently emphasized that the requirement that an injury-in-fact be "concrete and particularized" encompasses two distinct requirements. Spokeo, 136 S. Ct. at 1548. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 n.1 (1992)). "A 'concrete' injury," on the other hand, "must be 'de facto'; that is, it must actually exist"—in either tangible or intangible form. Id. at 1548–49. Unless an alleged injury satisfies both requirements, it cannot give rise to standing under Article III.

In accordance with Tenn. Code Ann. § 40-39-211, neither Doe #1 nor Doe #2 may either "knowingly establish a . . . living accommodation" or "knowingly accept employment within one thousand feet (1,000′) of the property line of any public school, private or parochial school, licensed day care center, other child care facility, public park, playground, recreation center or public athletic field available for use by the general public." Tenn. Code Ann. § 40-39-211(a). Plaintiffs allege that these so-called Exclusion Zones put a significant percentage of cities and towns off-limits, offering, as an example, that "Davidson County has hundreds of parks and greenways covering thousands of acres, dozens of public community centers, hundreds of public and private schools, and hundreds of day care centers." (Doc. No. 1 at ¶ 138.) Taking Plaintiffs' allegations as true, the Court can reasonably infer that the Act's Exclusion Zones significantly restrict the opportunities for dwelling and employment available to Plaintiffs, as compared to what

is available either to the general public or to non-incarcerated individuals who were convicted of crimes other than those subject to Tennessee's sexual offender registration system.

Defendants argue that Plaintiffs must show more specific harms—by, for example, pleading an intent or desire to move into a home rendered off limits by the state's restrictions or to pursue a job that the state forbids Plaintiffs from pursuing. Doe #1, in response, relies on the Supreme Court's holding, in <u>Susan B. Anthony List v. Driehaus</u>, 134 S. Ct. 2334 (2014), that "a credible threat of enforcement" is sufficient to create an injury-in-fact under Article III. <u>Id.</u> at 2343. The petitioners in <u>Driehaus</u>, however, "alleged 'an intention to engage in a course of conduct'" that was "arguably . . . proscribed" by the prohibition they challenged. <u>Id.</u> Similarly, in <u>Jones v. Coleman</u>, 848 F.3d 744 (6th Cir. 2017), the Sixth Circuit held that a plaintiff can establish standing by alleging that it "refrained from" a relevant protected activity due to the "specter of" enforcement of a challenged statute. <u>Id.</u> at 749. In both cases, the courts based standing on the plaintiff's allegation of some actual concrete effect of the relevant restriction—not merely the restriction's existence.

Accordingly, for Plaintiffs to have standing with regard to their claims that raise standalone challenges to specific aspects of the registration regime, they must plead facts sufficient to establish an actual concrete effect of each relevant restriction. For example, Count 2 alleges infringement on each Plaintiff's fundamental right to travel. Doe #1 has alleged that he routinely travels internationally and that he must comply with the Act's reporting requirements when doing so. The imposition of those requirements to activity that Doe #1 has pled that he regularly performs is a sufficiently real injury to confer standing. Doe #2's travel-related allegations, on the other hand, appear to be fundamentally conjectural, at least as related to international travel. (<u>See</u> Case

No. 3:17-cv-00264, Doc. No. 1 at ¶¶ 78-84.) The Court will accordingly dismiss Doe #2's Count 2 for lack of standing insofar as it challenges requirements related to international travel.

Count 3 alleges a violation of Plaintiffs' fundamental right to "engage in the common occupations in life." It appears that Doe #1 has successfully built a career in the commercial real estate business. Doe #2 has alleged at least one past instance where his registry status caused him to lose a job. Construed in the light most favorable to Plaintiffs, the Court can infer that they both would like to at least search other jobs, but refrain from doing so because they fear prosecution under the Act. This is sufficient injury to have standing to raise Count 3. Jones, 848 F.3d 744.

Defendants argue that Plaintiffs also lack standing to raise Counts 8 and 9. Count 8 challenges the Act's alleged imposition of criminal liability on passive conduct via its regime of Exclusion Zones. Count 9 more generally challenges the Act for vagueness and impossibility, although, as the Court reads the Complaints, the Exclusion Zones will presumably also feature prominently in that claim. Insofar as Counts 8 and 9 challenge the prohibitions on living and working, Plaintiffs again have pleaded sufficient facts to allege that they have standing to bring this suit. Both Plaintiffs state that if they were to move from their current homes, they would be severely restricted in where they could move. Taking all inferences in favor of Plaintiffs, this is sufficient to show that they would like to move, but the fear of prosecution under the Act keeps them from searching for houses. Plaintiffs' standing to bring the challenge regarding the prohibitions on working is the same in Counts 8 and 9 as their standing to bring Count 3.

Plaintiffs have also alleged sufficient injury with regard to the restrictions on sitting or standing idly in the Exclusion Zones. Exclusions for the purposes of work and residence affect only those who wish to work or live in the relevant areas. Restrictions on merely standing and sitting, however, inevitably affect any covered person who attempts to navigate the world as part

of everyday life. Under the facts pled by the Plaintiffs, they are required to organize virtually all travel or activities outside their homes around the fact that even briefly pausing in a forbidden area could submit them to criminal liability. The Court will not require a Plaintiff to identify the particular spot of sidewalk where he expects to pause to catch his breath or the particular parking lot where he wishes to park his car to make a phone call. The burden of avoiding such violations at all times is sufficient to confer standing. Plaintiffs therefore have standing to raise Counts 8 and 9.

## C. *Ex Parte Young*

In Defendants' second Motion to Dismiss, they argue, for the first time, that the Plaintiffs' claims should be dismissed because neither Haslam nor Gwyn is an appropriate defendant in this matter under Ex parte Young, 209 U.S. 123, 157 (1908). Plaintiffs respond that this argument is waived as to Doe #1 and without merit as to Doe #2.

Ex parte Young "carves out an exception to Eleventh Amendment [sovereign] immunity" normally enjoyed by states and state officers sued in their official capacities. Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1414 (6th Cir. 1996). Under Ex parte Young,

> individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

209 U.S. at 155–56. In order to avail himself of Ex parte Young, a plaintiff must identify a state officer or officers appropriate to his particular claim. "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." Deters, 92 F.3d at 1416 (quoting 1st Westco Corp. v. School Dist. of Philadelphia, 6 F.3d 108, 113 (3d Cir. 1993)).

The Sixth Circuit, however, has also recognized the special role served by governors as Ex parte Young defendants in actions to challenge the constitutionality of state laws, particularly where there is no clear alternative defendant who bears sole responsibility for the law's administration. In Allied Artists Picture Corp. v. Rhodes, 679 F.2d 656 (6th Cir. 1982), the Sixth Circuit held that an Ex parte Young action may properly be brought against a governor to challenge an unconstitutional law, "[e]ven in the absence of specific state enforcement provisions," if "the substantial public interest in enforcing [the unconstitutional law] places a significant obligation upon the Governor to use his general authority to see that state laws are enforced." Id. at 665 & n.5. Defendants concede that the Tennessee General Assembly has "recognized the substantial interest in protecting the public from sexual offenders, especially those who are repeat offenders," and Defendants characterize the sexual offender registration and monitoring scheme as directly related to that substantial interest. (Doc. No. 20-1 at 10.) Certainly, nothing filed by the Defendants in this case has suggested that the Defendants consider the enforcement of Tennessee's scheme to be of anything other than the utmost importance. Accordingly, the laws at issue here appear to be of the type sufficient to expose the governor to suit under Allied Artists.

Defendants have provided no argument against applying Allied Artists here, other than their original general argument that Governor Haslam is not an appropriate defendant. In LensCrafters, Inc. v. Sundquist, 184 F. Supp. 2d 753, 759 (M.D. Tenn. 2002) (Trauger, J.), however, another judge in this District suggested that Allied Artists may not authorize a suit against a governor where the plaintiff could have sued "a separate body"—there, the Tennessee Board of Optometry—"that has been clothed with exactly the enforcement responsibility that Ex parte Young describes." Id. at 759. As Defendants' own briefing establishes, however, there is no single body or administrator who bears full responsibility for the Tennessee registration scheme. Much

of the administrative responsibility falls on the TBI, but the responsibility of case-by-case enforcement is shared by various local police and prosecutors. (Doc. No. 27 at 5–6.) Plaintiffs have alleged injuries arising out of the actions of all these officials: they allege stigma and onerous reporting and disclosure requirements associated with TBI's registry; they allege potential unconstitutional criminal liability for Act violations that would be pursued by local prosecutors; and they allege the possibility of arbitrary and/or unconstitutional arrest by local police. There is, accordingly, no single alternative defendant who would make an <u>Allied Artists</u> suit unnecessary. Where enforcement and administration responsibilities are diffused among different agencies and levels of state and local government, it is appropriate, under <u>Allied Artists</u>, to sue the governor, who bears the ultimate constitutional responsibility to "take care that the laws be faithfully executed." Tenn. Const., Art. III, § 10.

Defendants' contention that Director Gwyn is not an appropriate <u>Ex parte Young</u> defendant is wholly without merit. The TBI's duties in the administration of Tennessee's statutory scheme are numerous and significant. TBI creates, maintains, and administers the sexual offender registry. Tenn. Code Ann. § 40-39-206(a); Tenn. Code Ann. § 38-6-110(a). It has a statutory mandate to inform local prosecutors and probation and parole officials "[w]henever there is a factual basis to believe that an offender has not complied with" some requirement of the Act. Tenn. Code Ann. § 40-39-206(b). It makes registry information available to criminal justice agencies, Tenn. Code Ann. § 40-39-204(a), as well as social service entities, volunteer organizations, agencies that perform background checks, and any other "organization, company or individual who requests such notifications pursuant to procedures established by TBI," Tenn. Code Ann. § 40-39-214(a)(4)–(7). While TBI may not have standalone authority to prosecute violations of the registry requirements, those prosecutions are merely the tip of a long spear that TBI itself constructs and

provides. Gwyn, as Director of TBI, is an appropriate defendant in a challenge to the scheme as a whole.

Because Defendants are appropriate defendants in this matter, the Court need not determine whether they waived these arguments with regard to Doe #1. The request to dismiss all claims on these grounds will be denied.

## D. Statute of Limitations

Defendants argue that all of Plaintiffs' claims are untimely because they were not filed within one year of the state's imposition of the various challenged restrictions and requirements. Plaintiffs argue that the challenges are timely because the ongoing imposition of those restrictions and requirements represents a continuing, fresh deprivation of constitutional rights.

The statute of limitations for a § 1983 action is the "state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claims arises." Eidson v. Tenn. Dep't of Children's Servs., 510 F.3d 631, 634 (6th Cir. 2007). The limitations period for § 1983 actions arising in Tennessee is the one-year period for personal injury actions found in Tennessee Code Annotated § 28–3–104(a). Porter v. Brown, 289 F. App'x 114, 116 (6th Cir. 2008). "[T]he accrual date of a § 1983 cause of action," on the other hand, "is a question of federal law that is not resolved by reference to state law." Wallace v. Kato, 549 U.S. 384, 388 (2007).

The determination of when a § 1983 cause of action accrued is "governed by federal rules conforming in general to common-law tort principles." Id. (citing Heck v. Humphrey, 512 U.S. 477,483 (1994); Carey v. Piphus, 435 U.S. 247, 257–58 (1978)). Among the principles guiding the Court is "the standard rule that [accrual occurs] when the plaintiff has 'a complete and present cause of action,' that is, when 'the plaintiff can file suit and obtain relief.'" Id. (quoting Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997)).

In some situations, however, common law principles dictate that a cause of action will accrue on some date later than the first moment when the plaintiff suffered an injury. For example, in Wallace v. Kato, 549 U.S. 384, the Supreme Court held that the statute of limitations for a § 1983 claim based on false imprisonment accrues at the end of the plaintiff's detention without legal process, rather than its beginning. Id. at 391–92.

Defendants argue that Plaintiffs' causes of action based on registration scheme restrictions and requirements accrued, at the latest, on the effective date of the last applicable amendment to Tennessee's statutory registration scheme. Defendants admit that Tennessee's registration scheme was repeatedly amended over the years to subject Plaintiffs to additional restrictions, but identifies the effective date of the last such amendment as July 1, 2015. Accordingly, the Complaints—filed respectively in November of 2016 and February of 2017—would be untimely. Plaintiffs counter that, because they are subject to the individual and cumulative restrictions of Tennessee's registration regime on a continuing basis, they have been injured anew every day, with each new injury triggering the accrual of fresh cause of action. They point out that they are not seeking any redress for constitutional harms incurred over a year ago, but rather protection from ongoing and future constitutional harms arising out of the unlawful enforcement of the Act against them.

What Plaintiffs have articulated is a "continuing violation" theory of when their causes of action accrued. "Th[e Sixth] Circuit employs the continuing violations doctrine most commonly in Title VII cases," but the precedents of the Circuit do provide that the doctrine may, in "rare [cases] extend[] . . . to § 1983 actions." Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir. 2003) (citation omitted). Defendants concede that a § 1983 plaintiff may, in some cases, proceed under a continuing violation theory, and identify the following test for determining whether such a theory is appropriate:

First, the defendant's wrongful conduct must continue after the precipitating event that began the pattern. . . . Second, injury to the plaintiff must continue to accrue after that event. Finally, further injury to the plaintiff[] must have been avoidable if the defendants had at any time ceased their wrongful conduct.

Eidson, 510 F.3d at 635 (quoting Tolbert v. State of Ohio Dep't of Transp., 172 F.3d 934, 940 (6th Cir. 1999)).

The Defendants do not appear to dispute that the injuries that the Plaintiffs allege are themselves "continuing"—after all, any aspect of the Act that burdened registered offenders on the first day it was in effect was also burdensome on the hundredth or the thousandth day it was in effect. For claims to be timely, however, it is not sufficient for Plaintiffs' injuries to be continuing: Defendants' violations must also be continuing. How to draw the line between "continuing injury" and "continuing violation" in the § 1983 context has, unfortunately, sometimes eluded easy distillation. Even the test offered in Eidson adds only limited clarity: it provides that a violation is continuing if "the defendant's wrongful conduct" is continuing, but that leaves entirely open the question of what constitutes the defendant's "wrongful conduct"—a question not necessarily much easier than determining what constitutes its "violation." The Court will therefore look to Sixth Circuit precedents and persuasive authority for guidance.

In Kuhnle Brothers., Inc. v. County of Geauga, 103 F.3d 516 (6th Cir. 1997), a trucking company filed a § 1983 claim challenging, under several theories, the constitutionality of a county resolution that banned truck traffic from a particular stretch of road. The relevant Ohio statute of limitations was two years, and the company had filed its complaint more than two years after the resolution was adopted but less than two years after the county had stopped enforcing it. Id. at 518–19. The Court held that two of the plaintiff's constitutional claims—under the Takings Clause and for deprivation of property without due process—were barred as having accrued on the date of the resolution's enactment. Id. at 520–21. The Court held that the plaintiff's claim for a violation

of "liberty interests assertedly created by a fundamental constitutional right to intrastate travel," however, was timely, because "each day that the invalid resolution remained in effect, it inflicted 'continuing and accumulating harm.'" Id. at 522 (quoting Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n. 15 (1968)). The Court wrote that "[a] law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within two years of its enactment," and therefore "[t]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations." Id. (quoting Virginia Hosp. Ass'n v. Baliles, 868 F.2d 653, 663 (4th Cir. 1989)).

In Eidson, the Sixth Circuit considered the timeliness of a § 1983 due process claim brought by a father who had been temporarily deprived of custody of his children due to a later-recanted allegation of sexual abuse. 510 F.3d at 633–34. The plaintiff's children were originally removed from his custody in November of 2003, and the State of Tennessee, in apparent violation of state law, did not hold a juvenile court hearing until May of 2004. That hearing resulted in temporary custody of the children being formally awarded to Tennessee's Department of Children's Services ("DCS"), based in part, the plaintiff alleged, on the false testimony of a DCS investigator. Shortly thereafter, the plaintiff's daughter recanted her allegations and the children were returned to him for a "trial period" beginning in July of 2004. The plaintiff's full custody was restored in October of 2004, and he filed his action one year later. Id. The Sixth Circuit held that the plaintiff's claims were untimely because they were filed more than a year after the May 2004 hearing:

> By the time the [May 2004] hearing was conducted . . . injury resulting from the alleged denial of procedural due process had ceased to accrue, as plaintiff had, by then, been afforded notice and a hearing. Further, the court properly recognized that, by the conclusion of the May 2004 hearing, the premises of plaintiff's substantive due process claims, i.e., [the investigator's] allegedly perjured testimony and the finding of probable cause to remove the daughters, were certainly known to plaintiff.

Id. at 636. The Court concluded that "[a]ny harmful effects resulting from actions allegedly taken by defendants after the juvenile court proceeding are appropriately characterized as 'continuing ill effects,' which do not make out a continuing violation." Id. at 637.

The contrast between Kuhnle and Eidson shows that the question of what constitutes a defendant's "wrongful conduct" for the purpose of accrual of the statute of limitations is closely related to the nature of the constitutional protection at issue. In Eidson, the plaintiff alleged a denial of due process, and therefore the wrongful conduct lasted only as long as the deprivation directly attributable to the stage of proceedings at which due process was denied. The plaintiff in Kuhnle, however, argued that the enforcement of the provisions of the law at issue amounted to an ongoing unconstitutional deprivation of liberty interests, and therefore the Court concluded that the violation itself was ongoing. Kuhnle in particular demonstrates that the same general government policy may be subject to different dates of accrual depending on the type of constitutional violation alleged.

With regard to Plaintiffs' Ex Post Facto Clause challenges, the relevant question is whether the Defendants' allegedly wrongful conduct under the Clause was merely the initial adoption of the challenged restrictions and requirements, or whether the wrongful conduct has continued as long as the Plaintiffs have been subject to those restrictions and requirements. Neither party has identified binding Sixth Circuit authority affirmatively resolving that question. Other Circuit Courts of Appeals, however, have addressed analogous issues. In Lovett v. Ray, 327 F.3d 1181 (11th Cir. 2003), the Eleventh Circuit held, in a brief *per curiam* opinion, that an inmate's ex post facto challenge based on a change to the frequency with which he would be entitled to a parole hearing had accrued, at the latest, when he became aware of the relevant change in law.[3] Id. at

---

[3] The Sixth Circuit has applied a similar rule with regard to the accrual of a habeas corpus claim based on the Ex Post Facto Clause. See Alexander v. Birkett, 228 F. App'x 534, 536 (6th Cir. 2007). That holding, however, was based on

1182–83; <u>see also</u> <u>Taylor v. Nix</u>, 240 F. App'x 830, 835 (11th Cir. 2007) (applying <u>Lovett</u>). The Tenth Circuit has held similarly with regard to an ex post facto challenge based on a change to the frequency of parole reconsideration. <u>See</u> <u>Jones v. Henry</u>, 260 F. App'x 130, 131 (10th Cir. 2008) (unpublished). The Tenth Circuit, moreover, later extended the same reasoning to an ex post facto challenge based on the plaintiff's classification as a sex offender. <u>Romero v. Lander</u>, 461 F. App'x 661, 667 (10th Cir. 2012) (unpublished).

The logic of the Tenth and Eleventh Circuits' cases, however, is by no means inexorable. The Eastern District of Michigan, for example, has held that a § 1983 ex post facto claim based on a change in parole procedures could proceed under a continuing violation theory because "a violation of the Ex Post Facto Clause would occur every time [the allegedly unconstitutional procedures] are used to deny Plaintiffs parole." <u>Foster-Bey v. Rubitschun</u>, No. 05-71318, 2005 WL 2010181, at *7 (E.D. Mich. Aug. 18, 2005), <u>aff'd on other grounds sub nom.</u> <u>Foster v. Booker</u>, 595 F.3d 353 (6th Cir. 2010); <u>contra</u> <u>Jones</u>, 260 F. App'x at 131 ("We reject Plaintiff's argument that each denial of parole consideration is a separate cause of action for statute of limitations purposes."). Moreover, it is debatable whether Plaintiffs' allegations should be considered under the same rubric applied to claims challenging changes to parole procedures. Those petitioners are still incarcerated pursuant to their original, lawfully imposed sentences and merely challenge the procedures associated with determining their release. The Plaintiffs' challenges involve the imposition of wholly new burdens unrelated to their initial, lawful sentences.

Faced with conflicting persuasive authority, the Court must be guided by the fundamental nature of the protection embodied by the Ex Post Facto Clause. The Ex Post Facto Clause "forbids

---

the express statutory terms of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), not the general common law principles governing § 1983 claims. <u>Id.</u> (citing 28 U.S.C. § 2244(d)(1)(D); <u>Souter v. Jones</u>, 395 F.3d 577, 586-87 (6th Cir. 2005)).

the [legislature] . . . to enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." United States v. Kruger, 838 F.3d 786, 790 (6th Cir. 2016) (quoting Weaver v. Graham, 450 U.S. 24, 28 (1981)). "[T]he very essence of the constitutional protection against ex-post-facto laws" is "that a defendant . . . who was charged with a criminal violation . . . cannot be punished for conduct occurring before the [relevant] criminal regulation of that conduct." United States v. Utesch, 596 F.3d 302, 312–13 (6th Cir. 2010). In other words, the Ex Post Facto Clause does not merely protect a defendant from some specific procedurally improper conduct at the time his punishment is set down—it protects him from the punishment itself. The "wrongful conduct" challenged is therefore the ongoing infliction of that punishment. Insofar as the requirements of the Act are, as Plaintiffs allege, a punishment, it is a punishment that is inflicted on Plaintiffs every day and will continue to be inflicted every day in the foreseeable future.

The Sixth Circuit has considered the question of when a cause of action accrues based on the unconstitutional infliction of a punishment in the context of a challenge to a state's method of execution in capital cases. In Cooey v. Strickland, 479 F.3d 412 (6th Cir. 2007), the Sixth Circuit held that, once the underlying criminal proceedings have concluded, a method-of-execution claim accrues when the plaintiff knows or has reason to know about the method of execution that he is challenging. Id. at 421. The Court, however, made clear that it selected that date as the best available option because "the 'date' the [execution] protocol is imposed is infeasible." Id. In other words, because an individual executed by an unconstitutional method will not survive to raise his challenge, "the point of infliction is not a viable option" for the accrual of his claim, and the Sixth Circuit was required to select an alternative. Id. The punishments Plaintiffs have alleged, in contrast, are not confined to an unchallengeable future; they are inflicted and re-inflicted whenever

the Plaintiffs are burdened by the substantial restrictions and requirements that the State of Tennessee has placed on them. Insofar as the "point of infliction" is the preferred date of accrual, it would seem that the date in this case would be ongoing and re-accruing.

Because the infliction of an alleged ex post facto punishment on Plaintiffs is ongoing, the "wrongful conduct" required for the <u>Eidson</u> test is also ongoing. Plaintiffs, on an ongoing and continuing basis, face the very real possibility of criminal prosecution by the State if they do not rigidly conform their behavior to the requirements of the Act. It is this continuing imposition of restrictions that allegedly violates the Ex Post Facto Clause. Plaintiffs moreover easily meet the other two requirements of the <u>Eidson</u> test, because their injuries are continuing and the cessation of the enforcement of the registration regime would put an end to those harms. Plaintiffs' claims pursuant to the Ex Post Facto clause are therefore timely, and Count 1 will not be dismissed on this ground.

Counts 2, 3, 4, 5, 8, and 9 are similarly timely. Each of those claims challenges some particular aspect of the Act that prospectively exposes Plaintiffs to potential criminal liability. These claims are not premised on some procedural deprivation that occurred at the time that those requirements were imposed, but on the threat of significant consequences for future conduct. Defendants have identified no case suggesting that a statute imposing a prospective criminal prohibition must be challenged within a year of its enactment or left forever on the books. "A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within [one year] of its enactment." <u>Kuhnle</u>, 103 F.3d at 522. Because Plaintiffs face ongoing and future risk of criminal liability under the relevant provisions, these claims are timely.

Counts 6 and 7, however, are directed not at the ongoing effects of the registration regime requirements on Plaintiffs, but the original imposition of those requirements. Count 6 pleads that the Act's retroactive application deprives Doe #1 of due process, and Count 7 pleads that the imposition of the Act amounts to a repudiation of his original plea bargain. Both of these alleged procedural violations occurred at the time the challenged requirements were initially imposed. Counts 6 and 7, accordingly, will be dismissed as untimely.

## E. Mootness of Doe #1's Count 4

Defendants argue next that Doe #1's Count 4, which alleges violations of his parenting rights, is moot because any violation of those rights was already ended by his victory in the state court litigation vindicating his right to remain in his duplex and have overnight visitation with his children. Doe #1 responds that his challenge is not limited to the Act's residence requirements, but also to its other restrictions on his ability to direct the education and upbringing of his children, such as through participation in school-related matters, events, and meetings. He also argues that the state court proceeding vindicated only his right to overnight visitation, not his right to cohabitate with his children full time.

"The mootness doctrine is a critical component of" the requirement that federal courts decide only cases and controversies. Green Party of Tennessee v. Hargett, 700 F.3d 816, 822 (6th Cir. 2012). Even where a plaintiff had, at one time, standing to bring suit, the complaint may be dismissed at any time for mootness, which "occurs 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Midwest Media Prop., L.L.C. v. Symmes Tp., 503 F.3d 456, 460 (6th Cir. 2007) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)). The Supreme Court has described mootness as "the doctrine of standing set in a time frame," Arizonans for Official English v. Arizona, 520 U.S. 43, 67, n. 22 (1997) (quoting United

States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)), because it looks not only at whether a plaintiff ever bore a sufficient injury, but whether the interest arising out of that injury exists and continues to exist throughout the litigation.

As pled, Doe #1 has alleged ongoing injuries that go beyond the rights covered by the state court disposition. That ruling allowed him to stay in his duplex and to have his minor children stay overnight. It did not remove any restrictions on his participation in his children's education or his ability to live with them on a more permanent basis. His Count 4, therefore, will not be dismissed as moot.

## F. Right to Travel

Defendants argue that the Court should dismiss Count 2, based on his right to travel, because the fundamental constitutional right to travel applies only to interstate, not international travel. Doe #1 argues that the right to travel internationally, though distinct from the right to interstate travel, is nevertheless entitled to at least some level of heightened constitutional protection. He also argues that Count 2 alleges not just a violation of his right to international travel, but his right to local travel.

"The Supreme Court has recognized that '[f]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution.'" Beydoun v. Sessions, No. 16-2168, 2017 WL 4001336, at *5 (6th Cir. Sept. 12, 2017) (quoting Dunn v. Blumstein, 405 U.S. 330, 338 (1972)). The fundamental right to interstate travel, however, is "subject to reasonable governmental regulation" and "will only be implicated by government action that, at a minimum, '*significantly* interferes with the exercise'" thereof. Id. (quoting Haig v. Agee, 453 U.S. 280, 306 (1981); Zablocki v. Redhail, 434 U.S. 374, 388 (1978) (emphasis added)). For example, a

restriction on travel that merely imposes "a delay of ten minutes, thirty minutes, or even an hour" is incidental and does not infringe on the right to travel. Id. at *6

Tenn. Code Ann. § 40-39-204(h) requires Doe #1 to "report to the designated law enforcement agency at least twenty-one (21) days before traveling out of the country," but imposes no corresponding duty when Doe #1 is only traveling to another state. Accordingly, Doe #1 cannot challenge that provision based on the constitutional right to travel unless that right extends to travel out of the United States, not merely within its territory. In support of his argument that such constitutional restrictions do exist, Doe #1 relies primarily on two cases, Kent v. Dulles, 357 U.S. 116 (1958), and Zemel v. Rusk, 381 U.S. 1 (1965).

In Kent, the Supreme Court struck down policies by the Secretary of State denying passports to individuals believed to be traveling abroad to further Communist causes and requiring individuals suspected of traveling for such purposes to provide affidavits denying Communist Party membership. 357 U.S. at 118, 130. Although the Court noted that "[f]reedom to travel is, indeed, an important aspect of a citizen's 'liberty,'" it expressly did not reach the constitutional question of "the extent to which [that right] can be curtailed." Id. at 127. Rather, the Court held that the Secretary's actions exceeded his statutory power. Id. at 129–30. At most, then, Kent offers dicta suggesting that the right to constitutional international travel is entitled to some protection, but leaving open the question of how much protection that is.

In Zemel, the Court more closely approached that constitutional question by considering whether the Secretary of State's refusal to validate passports of United States citizens to travel to Cuba violated the Constitution. 381 U.S. at 3. The Court upheld the Secretary's action but either acknowledged or assumed arguendo that "[t]he right to travel [internationally] is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth

Amendment." Id. at 14. Concluding that an individual cannot be deprived of his right to travel internationally without due process, however, falls far short of holding that the right to leave the country is on par with the right to interstate travel within it.

In the intervening decades, "the Supreme Court has strongly implied, though it has not explicitly stated, that there is no fundamental right to international travel." Mohamed v. Holder, No. 1:11CV0050 (AJT/MSN), 2017 WL 3086644, at *7 (E.D. Va. July 20, 2017) (citing Haig, 453 U.S. at 307). The Supreme Court has acknowledged that, insofar as such a right is protected by the Constitution, it is subject to less protection than the right to travel between states:

> The constitutional right of interstate travel is virtually unqualified. By contrast the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment. As such this 'right,' the Court has held, can be regulated within the bounds of due process."

Califano v. Aznavorian, 439 U.S. 170, 176 (1978) (citing United States v. Guest, 383 U.S. 745, 757–58 (1966); Griffin v. Breckenridge, 403 U.S. 88, 105–06 (1971)). Insofar as the Court recognizes a constitutional right to international travel, that right is not so highly protected that it is violated by the passage of a 21-day notification requirement based on the important public purposes underlying the Act.

The Sixth Circuit has, on the other hand, recognized that the Constitution protects "[t]he right to travel locally through public spaces and roadways." Johnson v. City of Cincinnati, 310 F.3d 484, 498 (6th Cir. 2002). The Exclusion Zones established under the Act, however, are not restrictions on what areas a registered offender may pass through, but on what he can do within those areas. They accordingly do not, on their faces, directly restrict or significantly burden the right to local travel. Count 2 will be dismissed.

## G. Right to Private Employment

Defendants move to dismiss Count 3 because there is no constitutional right to private employment and Plaintiffs do not allege any injury. The Court addressed the lack of injury argument in the standing section of this Opinion. Plaintiffs counter that there is a fundamental liberty interest to engage in the common occupations of life, and any government restriction of that right should be subject to heightened scrutiny.

Plaintiffs do not cite a Sixth Circuit case that recognizes the right to engage in the common occupations of life as a fundamental liberty interest. The out-of-circuit cases Plaintiffs cite also do not hold that the restriction on the right to engage in the common occupations of life is subject to heightened scrutiny. See DiMartini v. Ferrin, 906 F.2d 465, 467 (9th Cir. 1990) (discussing that the plaintiff has a right to be free from unreasonable government interference with his private employment if the plaintiff demonstrates "a claim of entitlement to continued employment"); Waddell v. Forney, 108 F.3d 889 (8th Cir. 1997) (same when plaintiff had a contract for continued employment); see also Mead v. Independence Ass'n, 684 F.3d 226 (1st Cir. 2012) (summarily affirming the unreasonable government interference in private employment claim because the government did not interfere with the plaintiff's private employment). Instead, the United States District Court for the Eastern District of Michigan has held in an analogous factual situation that "there is no 'general right to private employment.'" John Does 1-4 v. Snyder, 932 F. Supp. 2d 803, 817 (E.D. Mich. 2013) (Cleland, J.) (quoting Cutshall v. Sundquist, 193 F.3d 466, 479 (6th Cir. 1999)). The Court agrees, and applies a rational basis test to Defendants' restrictions on employment. Washington v. Glucksberg, 521 U.S. 702, 728 (1997). Defendants have asserted a rational basis for the restriction, to "serve the legitimate interest of the State of inhibiting future sexual offenses, particularly against children, while not limiting the ability of Plaintiffs to seek and

obtain any type of employment" that does not require Plaintiffs to come into contact with children (such as a clown at a birthday party or an ice cream truck driver). <u>John Does 1-4</u>, 932 F. Supp. 2d at 817. As such, the Court will dismiss Count 3.

## H. First Amendment

Defendants next ask the Court to dismiss Count 5 on the ground that the restrictions placed on Plaintiffs' internet activities do not violate the First Amendment. Plaintiffs urge the Court to adopt the reasoning of the Ninth Circuit in <u>Doe v. Harris</u>, 772 F.3d 563 (9th Cir. 2014), which held that certain California requirements similar to those employed by Tennessee violated the First Amendment.

The Act requires a registered offender to provide law enforcement a "complete listing of the offender's electronic mail address information, including usernames, any social media accounts the offender uses or intends to use, instant message, other Internet communication platforms or devices, and the offender's username, screen name, or other method by which the offender accesses these accounts or web sites." Tenn. Code Ann. § 40-39-203(i)(17). The language of this statutory requirement is confusing, but, grammatical imprecision aside, it appears that the intent of the requirement is to for a registered offender to disclose any username or account he uses for an "Internet communication platform[]."

Defendants argue that this portion of the Act is subject only to rational basis review, citing <u>Liberty Coins, LLC v. Goodman</u>, 748 F.3d 682 (6th Cir. 2014). <u>Liberty Coins</u>, however, involved a regulatory licensing scheme that did not "implicate[]" or "burden[] a fundamental right." <u>Id.</u> at 693. The Sixth Circuit's analysis in that case, moreover, was based in the courts' longstanding recognition of the State's power to impose licensing regimes on commercial activities without running afoul of the First Amendment. <u>Id.</u> at 692–93 (citing <u>Dent v. West Virginia</u>, 129 U.S. 114,

122 (1889); <u>Thomas v. Collins</u>, 323 U.S. 516, 545 (1945) (Jackson, J., concurring)). In contrast, the Act's internet account disclosure requirements apply to Plaintiffs' use of internet platforms for any reason, including wholly noncommercial purposes such as corresponding with adult family members or engaging in political speech.

A reporting requirement related to those purposes is a burden on a fundamental right, and there is at least an open factual question with regard to how significant that burden is. Plaintiffs not only bear the logistical burdens related to reporting, but they face the chilling effects of knowing that they cannot, or at least cannot easily, engage in many forms of electronic speech free from monitoring by law enforcement. For example, Plaintiffs have a First Amendment right, if they so desire, to engage in political speech critiquing the Act and the State's administration thereof. Indeed, it would be difficult to imagine a right more fundamental than the right to complain of the government's deprivation of one's own rights. If Plaintiffs cannot raise their complaints anonymously, they may understandably have concerns about antagonizing the authorities charged with administering and enforcing the Act—authorities who have a substantial amount of practical power and discretion to subject the Plaintiffs to increased scrutiny. <u>See</u> <u>Doe</u>, 772 F.3d at 574 ("The Act also has the inevitable effect of burdening sex offenders' ability to engage in *anonymous* online speech."). None of this is to say that registered offenders necessarily have a right to communicate anonymously—merely that regulation of those communications must comport with the First Amendment.

Although the Act does place some burden on Plaintiffs' exercise of their rights to free speech, it does so without targeting any particular speech by its content. "[G]overnment action that merely regulates the time, place, and manner of protected speech, that is, 'regulations that are unrelated to the content of speech[,] are subject to an intermediate level of scrutiny.'" <u>Planet Aid</u>

v. City of St. Johns, MI, 782 F.3d 318, 326 (6th Cir. 2015) (quoting Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 642 (1994)). "In order for [laws] to withstand intermediate scrutiny, they have to be 'narrowly tailored to serve a significant governmental interest, and [] leave open ample alternative channels for communication of the information.'" Crookston v. Johnson, 841 F.3d 396, 403 (6th Cir. 2016) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Even assuming that the Act serves a significant governmental interest, the Court is unable to conclude that it is sufficiently narrowly tailored without the benefit of a full factual record. At this stage, the Court can only speculate as to the real-world effect of the Act on internet use, as well as the efficacy of alternative requirements in furthering the government's significant interests. The Court accordingly will not dismiss Count 5.

## I. Vagueness/Impossibility/Criminalization of Passive Behavior

Defendants argue that the Court should dismiss Counts 8 and 9, which raise due process challenges to the Act's Exclusion Zones, because the relevant provisions of the Act comply with due process. Plaintiffs argue that the extensive and ever-shifting nature of the Exclusion Zones violates due process by (1) failing to give a person of ordinary intelligence fair notice of the conduct punished (Count 8) and (2) imposing requirements that are functionally impossible (Count 9). Plaintiffs also note other aspects of the Act that allegedly suffer from unconstitutional vagueness.

Defendants concede that a criminal statute that fails to give a person of ordinary intelligence fair notice of the conduct it punishes, or that is so devoid of standards that it leads to arbitrary enforcement, violates the Due Process Clause's notion of fair play. See Johnson v. United States, 135 S. Ct. 2551, 2556 (2015). Defendants argue, however, that the Act's Exclusion Zones

are constitutionally sound because the formula for identifying Exclusion Zones is well-defined and the Act clearly states which actions are prohibited therein.

At least one aspect of the Exclusion Zones, however, is far less clear than Defendants contend. Tenn. Code Ann. § 40-39-211(d)(1)(B) provides that a registered offender cannot knowingly "[s]tand, sit idly, whether or not the offender is in a vehicle, or remain within" an Exclusion Zone. It is unclear to the Court where the line would be drawn between standing or sitting idly versus standing or sitting non-idly. Defendants suggest that "idly" means "for no apparent reason," but it is not clear to the Court why it matters that the reason be apparent, or to whom. Nor is it clear what relationship there must be between the required apparent reason and the registered offender's presence in the Exclusion Zone. Does the offender need an apparent reason to be standing or sitting, or an apparent reason for standing or sitting in that particular spot? And how long must a registered offender be in the Zone before he is considered idle, rather than passing through? The prohibitions placed on Plaintiffs are sufficiently unclear on their face that the Court will not dismiss Count 8 outright.[4] Cf. Morales v. City of Chicago, 527 U.S. 41, 64 (1999) (finding unconstitutional a city ordinance that prohibited "criminal street gang members" from loitering in public places); Kolender v. Lawson, 461 U.S. 352, 360 (1983) (finding unconstitutional a statute requiring loiterers to provide "credible and reliable" identification); Doe v. Cooper, 842 F.3d 833, 844 (4th Cir. 2016) (finding unconstitutional a law forbidding sexual offenders from knowingly being within 300 feet of a place where minors gather for scheduled educational, recreational, or social programs). Moreover, the Court's consideration of this claim will be substantially aided by the creation of a factual record. Key to this challenge is whether the

---

[4] Because this issue comes before the Court on Motions to Dismiss, and Plaintiffs' identifying a single valid claim under the vagueness theory is sufficient to defeat those Motions, the Court need not prematurely parse the statute to rule on the vagueness of every challenged provision therein.

relevant portions of the Act are "so devoid of standards that it leads to arbitrary enforcement." Johnson, 135 S. Ct. at 2556. Plaintiffs are entitled to the opportunity to build a record establishing, insofar as they can, that such arbitrary enforcement has occurred.

Plaintiffs' claims based on impossibility are similarly, if not more, fact-dependent. "Holding an individual criminally liable for failing to comply with a duty imposed by statute, with which it is legally impossible to comply, deprives that person of his due process rights." Doe v. Snyder, 101 F. Supp. 3d 722, 724 (E.D. Mich. 2015). The question of whether complying with the Exclusion Zones is functionally impossible is simply too fact-dependent to resolve at this stage. Without a full picture of how extensive those Zones are and how greatly they burden a registered offender's ability to engage in ordinary, unavoidable life activities, the Court cannot rule on Count 9. That claim, therefore, will not be dismissed.

## J. Punitive Character of the Act

Finally, Defendants argue that Counts 1 and 8 should be dismissed because the requirements of the Act do not impose punishment and therefore do not violate due process or the Ex Post Facto clause.

The Ex Post Facto Clause "forbids the [legislature] . . . to enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Kruger, 838 F.3d at 790 (quoting Weaver, 450 U.S. at 28). The Ex Post Facto Clause does not, however, prevent the state from enacting purely civil laws that happen to increase the consequences of a criminal conviction. Accordingly, when a legislature adopts a law imposing new requirements based on a conviction for acts that took place prior to the law's enactment, the Court must determine whether, for constitutional purposes, the law is civil or punitive. "If the intention of the legislature was to impose punishment, that ends the

inquiry." Smith v. Doe, 538 U.S. 84, 92 (2003). If, however, the legislature did not act with punitive intent, the Court must "examine whether the statutory scheme is 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it civil.'" Id. (quoting Kansas v. Hendricks, 521 U.S. 346, 361 (1997)). It is well-settled that the state may adopt some retroactive registration and reporting requirements for sexual offenders without categorically violating the Ex Post Facto clause. Id. at 105–06 (upholding Alaska's registration scheme). That rule, however, does not grant a state *carte blanche* to impose whatever restrictions it wishes under the guise of a civil registration scheme. Rather, a particular regime's constitutionally permissible retroactivity must be determined via a situation-specific evaluation of its particular effects. See Doe v. Snyder, 834 F.3d 696, 706 (6th Cir. 2016) (holding that Michigan's sex offender statutes violated the Ex Post Facto Clause), reh'g denied (Sept. 15, 2016).

The Sixth Circuit has twice upheld Tennessee's sexual offender registration and monitoring scheme against Ex Post Facto Clause challenges, in Cutshall v. Sundquist, 193 F.3d 466 (6th Cir. 1999), and Doe v. Bredesen, 507 F.3d 998 (6th Cir. 2007). Those cases, however, do not conclude the Court's inquiry for three reasons: first, Tennessee's scheme has been amended in meaningful respects since those cases were decided, see 2015 Tenn. Pub. Acts, ch. 516, § 1; 2014; 2014 Tenn. Pub. Acts, ch. 751, § 1; 2014 Tenn. Pub. Acts, ch. 770, §§ 1, 2; 2014 Tenn. Pub. Acts, ch. 992, § 1; 2011 Tenn. Pub. Acts, ch. 287, § 1; 2011 Tenn. Pub. Acts, ch. 266, § 1; 2010 Tenn. Pub. Acts, ch. 1145, § 1; 2010 Tenn. Pub. Acts, ch. 1138, §§ 7, 13; 2009 Tenn. Pub. Acts, ch. 597, § 1; 2008 Tenn. Pub. Acts, ch. 1164, § 13; second, the Sixth Circuit's decision in last year's Doe v. Snyder, 834 F.3d 696, has clarified the appropriate analysis for such claims to a degree that, though not strictly overruling Cutshall and Bredesen, significantly undermines those cases' applicability to a challenge raised today; and third, the constitutionality of the ex post facto application of the Act

hinges on questions of fact on which Plaintiffs are entitled to present evidence reflecting currently available evidence and current conditions.

In Snyder, the Sixth Circuit looked beyond the provision-by-provision analysis embraced by Cutshall and Bredesen to consider the cumulative effect of Michigan's "byzantine code governing in minute detail the lives of the state's sex offenders." Id. at 697. Based on that comprehensive analysis, the Court concluded that Michigan's scheme "resembles, in some respects at least, the ancient punishment of banishment." Id. at 701. Applying Snyder in this case will require the Court to look at the cumulative effect of all of the Act's interlocking requirements and examine those requirements in the context of any historical antecedents—both of which will require a factual record. The Court, moreover, cannot merely assume that assembling a factual record is unnecessary because prior challenges to Tennessee's regime have been unsuccessful. As Snyder demonstrates, the available evidence regarding, for example, the efficacy and necessity of registration and monitoring regimes has not been frozen in amber since such regimes were adopted. See id. at 704–05 (discussing evidence of relationship between sexual offenses, registration, and recidivism). Snyder unambiguously holds that these fact-dependent issues are relevant to the determination of whether a state's scheme should be considered civil or punitive in purpose and effect. Id.

Defendants suggest that Snyder was decided "erroneously" (Doc. No. 27 at 7) and "should have no persuasive value in this case" (Doc. No. 11 at 13). Snyder, however, is the law of this Circuit and is binding on the Court. At this stage in the proceedings, the Court simply cannot know the full extent of the Act's effects and therefore cannot reach a conclusion on whether those effects are punitive under the rubrics set forth in Snyder. The Court accordingly cannot conclude that the Act is non-punitive as a matter of law. Plaintiffs are entitled to the opportunity to demonstrate that

the Act's effects are punitive, just as Defendants will have the opportunity to demonstrate that they are not. Counts 1 and 8 will not be dismissed without affording the parties the chance to make those showings.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions will be **GRANTED in part** and **DENIED in part.** The Court will **DISMISS** Counts 2, 3, 6, and 7 from both Plaintiffs' cases. Counts 8 and 9 will be **DISMISSED** only insofar as they challenge Tennessee's restrictions on where Plaintiffs may obtain treatment, and Defendants' requests to dismiss those claims and Count 1 will otherwise be **DENIED**.

The Court will issue an appropriate Order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE