IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE #1, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:16-cv-02862 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| WILLIAM B. LEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| JOHN DOE #2, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:17-cv-00264 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| WILLIAM B. LEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Pending before the Court in these consolidated actions are the following motions: (1) Defendants' Motion for Summary Judgment Against John Doe #1 (Doc. No. 73); and (2) Defendants' Motion for Summary Judgment Against John Doe #2 (Doc. No. 79) (collectively, "Defendants' Motions"). Pending also is Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 66, "Partial Summary Judgment Motion"). Responses and replies have been filed as to each motion, and the motions are ripe for review. For the reasons discussed below, the Court will rule as follows.

Defendants' Motion for Summary Judgment Against John Doe #1 (Doc. No. 73) will be granted in part and denied in part.

Defendants' Motion for Summary Judgment Against John Doe #2 (Doc. No. 79) will be granted in part and denied in part.

Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 66) will be granted in part and denied in part.

## BACKGROUND[1]

The parties do not dispute the material facts in this case. Plaintiffs John Doe and John Doe ("Doe #1" and "Doe #2") (collectively "Plaintiffs") each brought a separate action against the Governor of the State of Tennessee and the Director of the Tennessee Bureau of Investigation ("TBI") (collectively "Defendants"), each in their official capacity only.[2] In their respective complaints, Plaintiffs alleged, *inter alia*, that the retroactive application[3] of the Tennessee Sexual Offender and Violent Sexual Offender Registration Verification and Tracking Act of 2004 (hereinafter "SORA"), Tenn. Code Ann. §§ 40-39-201 – 40-39-218 (2018), (1) is an

---

[1] Unless otherwise noted, the facts in this section are taken from factual allegations in the Complaints that are not disputed and from the Plaintiffs' Responses to Statements of Undisputed Facts (where the facts are undisputed). For Doe #1, *see* Doc. No. 1, Doc. No. 92, Doc. No. 94. For Doe #2, *see* Doc. No. 1, Doc. No. 95. Additionally, the Court relies on facts as laid out in Plaintiffs' briefing. Though Plaintiffs jointly submitted a short five-page Statement of Undisputed Facts, Plaintiffs then relied on other facts supported by the record in their briefing (mainly the Memorandum in Support of Summary Judgment and the Response to Defendants' Motions for Summary Judgment). Defendants have not contested any of these facts, and, from the record, they do not appear to be in dispute. Therefore, when relevant, the Court has included these facts in both this section and its discussion.

[2] At the time of the filing, the individuals serving in these positions were William E. Haslam and Mark Gwyn, respectively. Under Fed. R. Civ. P. 25(d), each has automatically been replaced as a defendant by his successor in office.

[3] As the Court will discuss below when analyzing the various claims brought by Plaintiffs, it is often unclear whether these claims constitute facial or as-applied challenges.

2

unconstitutional violation of the Ex Post Facto Clause of the United States Constitution,[4] (2) violates the right to free speech guaranteed by the First Amendment, and (3) imposes oppressive restrictions in violation of the rights to parent, work, and travel under the Due Process Clause of Fourteenth Amendment.[5] The two cases have been consolidated for the purposes of case management, discovery, and pretrial motions.

A. Background facts regarding Doe #1

In 1994, Doe #1 was convicted of two counts of attempted aggravated sexual battery committed in 1990. (Doc. No. 1 at ¶ 17; Doc. No. 67 at 3). He pleaded either guilty or no contest[6] to both counts and received five years' probation. (Doc. No. 94 at ¶ 2).

Doe #1 is a retired airline pilot who currently runs a real estate development and rental company that owns various properties. (Doc. No. 94 at ¶¶ 1, 2). His business includes various properties located throughout Davidson County, adjacent counties, and a resort property in

[4] The Ex Post Facto Clause applicable in this case (the one applicable to the various states rather than the similar clause applicable to the federal government) provides: "No state shall . . . pass any . . . ex post facto law." U.S. Const. art. I, § 10. The term "ex post facto" often, and herein, is used as an adjective to mean, essentially "of or pertaining to the Ex Post Facto Clause." The Latin phrase "ex post facto" means "from a thing done afterward." In the constitutional context of the Ex Post Facto Clause, as the below discussion will illuminate, the term refers to *punishment* from a *law* passed *after* the conduct for which the punishment is inflicted.

[5] Doe #1 filed his Complaint (Doc. No. 1) on November 8, 2016 seeking declaratory and injunctive relief. Doe #2 filed his Complaint on February 8, 2017 bringing the same claims and using the same claim numbering as Doe #1's Complaint. (Case No. 3:17-cv-00264, Doc. No. 1 at ¶¶ 125– 54). Herein the Court will cite primarily to the documents filed in Doe #1's case, as it is the lead case. If citing to a document in Doe #2's case, the Court will provide clarification in the citation by way of case number.

[6] Defendants state that Doe #1 pled guilty, but Plaintiffs dispute this fact, stating that Doe #1 pled no contest. Though there is a dispute in this regard, it is not a material dispute of fact; SORA and its requirements apply to Doe #1 regardless of which type of plea he submitted. In a previous order in this case, the Court referred to the plea and subsequent sentencing as a conviction for purposes of SORA and this matter generally. (Doc. No. 37 at 1). The parties do not seem to dispute this characterization.

3

Honduras. (*Id.* at ¶¶ 2, 4). In 2012, after Metro police officers told him he could not reside at his first residence, Doe #1 moved to another property that he owns. (*Id.* at ¶ 9). Although the matter with Metro was resolved, Doe #1 has not moved back to his first residence, and instead actively keeps an office at that location. (*Id.* at ¶¶ 10, 11).

Doe #1 has ten children. (*Id.* at ¶ 12). One of his children is a minor, and Doe #1 shares parenting responsibilities for that child with his ex-wife. (*Id.* at ¶¶ 13, 14). Doe #1 also has a number of grandchildren. (*Id.* at ¶ 26).

B.  Background facts regarding Doe #2

Doe # 2 was indicted on three counts of sexual battery committed in 1992 or 1993 against his ex-wife's niece who was twelve years of age or younger at the time. (Doc. No. 92 at ¶ 2; Doc. No. 95 at ¶ 1). He pled either guilty or *nolo contendere* (he does not remember which)[7] to all counts of sexual battery in 2000. (Doc. No. 92 at ¶ 2; Case 3:17-cv-00264, Doc. No. 1 at ¶ 17). Doe #2 was sentenced to six years' probation and was required to register as a sex offender under Tennessee's 1994 Sexual Offender Registration and Monitoring Act, 1994 Tenn. Pub. Laws, ch. 976. (Doc. No. 95 at ¶ 2).

Currently, Doe #2 operates an accounting services company and owns a residence in Nashville. (*Id.* at ¶¶ 4, 5). As part of his job, Doe #2 attends networking meetings and goes to client meetings at his clients' offices. (*Id.* at ¶ 6). Doe #2 has one minor biological daughter. (*Id.* at ¶ 7). Currently, Doe #2's daughter lives with Doe #2's wife in Bowling Green, Kentucky, and attends school there. (*Id.* at ¶ 11). Doe #2 additionally has four adult stepchildren (who live in Bowling Green and Washington State) and three minor step-grandchildren. (*Id.* at ¶¶ 13, 14).

---

[7] As with Doe # 1, with Doe # 2 it is immaterial for present purposes which of these two kinds of pleas he entered.

C.  Tennessee's Adoption and Amendment of Sexual Offender Registration Statutes

In the Court's Order denying in part and granting in part Defendants' motions to dismiss ("November 9 Order"),[8] Chief Judge Crenshaw set forth a helpful recounting of Tennessee's adoption and amendment of its sexual offender registration statutes:

> On May 10, 1994, Governor Ned Ray McWherter signed into law Tennessee's Sexual Offender Registration and Monitoring Act ("SORMA"). 1994 Tenn. Pub. Laws, ch. 976. SORMA required TBI to "establish, maintain, and update a centralized record system of sexual offender registration and verification information." *Id.* § 7(a). "Sexual offender" was defined as an individual who had been convicted of one of a number of enumerated offenses under Tennessee criminal law—or who was convicted of committing the equivalent behavior in another state—unless the offender had been wholly released without supervision from incarceration, probation, or parole prior to January 1, 1995. *Id.* § 3(2)–(3). Accordingly, SORMA applied to some, but not all, qualifying offenders whose criminal acts occurred before the law's enactment.

> SORMA required any individual convicted of a sexual offense to register within ten days of release without supervision from probation, parole, or incarceration. *Id.* § 4. TBI was then instructed to send the registrant a verification and monitoring form every ninety days, which the registrant was required to complete and return within ten days of receipt. *Id.* § 5. In addition to these periodic updates, a registrant had an ongoing duty to complete a new form within ten days of any change of residence or entry into a municipality or county for temporary residence or domicile. *Id.* § 4. SORMA imposed no in-person registration or reporting duty, relying instead on the prescribed paper forms. *Id.* The information in the SORMA registry was expressly designated as confidential, with the exception that TBI or a local law enforcement agency could "release relevant information deemed necessary to protect the public concerning a specific sexual offender." *Id.* § 7(c). An offender registered under SORMA was permitted to petition a court for relief from its requirements ten years after his or her release from supervision. *Id.* § 8(a). The court, upon consideration of several factors including the age of the offender's victims and the behavior of the offender since his offense, was required to grant the petition if it found the registrant had complied with the Act, was rehabilitated, and did not pose a threat to public safety. *Id.* § 8(c). If the petition was granted, the TBI was required to expunge the registrant's data from its registry. *Id.*

---

[8] Two Defendants brought Motions to Dismiss against both Doe #1 and Doe #2, respectively. (Doc. No. 37 at 1 (citing Doc. Nos. 10 and 26)). At that stage, several counts of Plaintiffs' claims were dismissed; namely, Counts II, III, VI, VII, as well as Counts VIII and IX only to a very limited extent, were dismissed. (*Id.*). The case was later reassigned from Judge Crenshaw to the undersigned for all further proceedings. (Doc. No. 62).

5

In the ensuing decade, the General Assembly repeatedly amended SORMA either to expand its scope, increase the reporting requirements placed on registered offenders, or reduce the level of confidentiality of registry information. *See* 1996 Tenn. Pub. Acts, ch. 834, § 1 (extending SORMA to individuals charged with sex offenses but placed on pre-trial and judicial diversion); 1997 Tenn. Pub. Acts, ch. 455, § 3 (extending SORMA to individuals who had completed diversion and had their records expunged); 1997 Tenn. Pub. Acts, ch. 461, § 2 (making public registry information for offenders whose offenses were committed after July 1, 1997); 1997 Tenn. Pub. Acts, ch. 466, § 1 (extending SORMA to individuals convicted of certain non-sexual offenses against minors and permitting TBI to require that registrants provide current photographs); 2000 Tenn. Pub. Acts, ch. 882, § 1 (imposing mandatory 180-day sentence for falsification of registration forms); 2000 Tenn. Pub. Acts, ch. 997, § 1–2 (imposing mandatory lifetime registration for offenders with multiple convictions for sexual offenses or a single conviction of a "violent sexual offense," defined as actual or attempted aggravated rape, rape, aggravated sexual battery, or rape of a child); 2000 Tenn. Pub. Acts, ch. 997, § 3 (requiring registered offender to report within ten days of coming to a municipality or county in which they work or are students); 2002 Tenn. Pub. Acts, ch. 469, §§ 3, 5, and 11 (requiring registered offenders to report within ten days of being employed or becoming a student or volunteer at an institution of higher learning in the county or municipality in which they reside, and providing that the name and address of that institution will be made public for registered offenders who committed offenses after October 27, 2002).

SORMA did not expressly restrict where a registrant could live, work, or travel until 2003. (Doc. No. 1 at ¶ 55; Case No. 3:17-cv-00264, Doc. No. 1 at ¶ 39.) In 2003, however, the General Assembly enacted legislation prohibiting a SORMA registered offender from: establishing a residence or accepting employment with 1,000 feet of a school, a child care facility, or the home of their victim or the victim's immediate family member; coming within 100 feet of the victim; establishing a residence or other living accommodation with a minor who was not the registered offender's own child; and establishing a residence with the registered offender's own minor child, if any child of the offender had been the offender's victim or if the offender's parental rights had been or were being terminated. 2003 Tenn. Pub. Acts, ch. 95, § 1. A violation of any of the 2003 prohibitions was a Class A misdemeanor. *Id.*

In 2004, the Tennessee General Assembly repealed SORMA and replaced it with the Act, which continues, in amended form, today. 2004 Tenn. Pub. Laws, ch. 921. The Act continued the State's registration system, albeit with some changes. Carrying on a distinction first introduced to SORMA in 2000, the Act classifies registrants as either "sexual offenders" or "violent sexual offenders," depending on the offense of which that registrant was convicted. Individuals classified as sexual offenders include those convicted of sexual battery, statutory rape, aggravated prostitution, sexual exploitation of a minor, incest, indecent

6

exposure (upon the third such conviction), and false imprisonment of a minor who was not the offender's own child—an offense that, in and of itself, contains no expressly sexual element, *see* Tenn. Code Ann. § 39-13-302 ("A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."). *Id.* § 1(16). Also included as sexual offenders are any offenders convicted of attempt, solicitation, conspiracy, criminal responsibility, facilitation, or being an accessory after the fact with regard to any of the qualifying offenses. *Id.* Individuals classified as violent sexual offenders include those convicted of rape, aggravated rape, rape of a child, aggravated sexual battery, aggravated or especially aggravated sexual exploitation of a minor, aggravated or especially aggravated kidnapping of a minor other than the offender's own child, sexual battery by an authority figure, solicitation of a minor, and attempt, solicitation, or conspiracy with regard to any of the aforementioned qualifying offenses. *Id.* § 1(24).

Under the Act, sexual offenders must verify their registration information on an annual basis, and violent sexual offenders must do so quarterly. Tenn. Code Ann. § 40-39-204(b)–(c). In contrast to SORMA's system of TBI-propagated forms, the Act requires offenders to register and report in person to a designated law enforcement agency. Tenn. Code Ann. §§ 40-39-203(a), 40-39-204(b). Reports based on certain triggering events, such as a change of residence or employment, must be made within forty-eight hours. Tenn. Code Ann. § 40-39-203(a)(3)–(6). The Act increased the amount of information required to be reported, Tenn. Code Ann. § 40-39-203(h), and offenders are required to pay administrative fees related to their ongoing inclusion in the registry, Tenn. Code Ann. § 40-39-204(b)(1) and (c). Some offenders remain eligible for removal from the registry after ten years, but the authority to make an initial removal decision has been vested in the TBI, with a right to appeal to a chancery court. Tenn. Code Ann. § 40-39-207(b), (g). A violation of the Act's requirements is now a felony, as opposed to a misdemeanor under SORMA. Tenn. Code Ann. § 40-39-208(b).

Like SORMA, the Act has been repeatedly revised to increase its restrictions and requirements and to make more information about registered offenders publicly available. *See* 2005 Tenn. Pub. Acts, ch. 316, § 1 (adding to events and information that must be reported and increasing administrative fees); 2006 Tenn. Pub. Acts, ch. 890, § 20 (forbidding registrants whose victims were minors from living, obtaining sexual offender treatment, or working within 1,000 feet of a school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public); 2007 Tenn. Pub. Acts, ch. 126, § 1 (adding to events triggering a 48-hour reporting obligation); 2007 Tenn. Pub. Acts, ch. 531, § 1 (making public all registrants' information, regardless of date of offense); 2008 Tenn. Pub. Acts, ch. 979, § 1 (adding information required to be reported and making information, including registrant e-mail addresses, available to qualifying businesses); 2008 Tenn. Pub. Acts, ch. 1164, § 13 (restricting employment permitted to registrants whose victims were minors and forbidding said registrants from wearing certain costumes—such as clowns or

fictional characters—in the presence of minors); 2009 Tenn. Pub. Acts, ch. 597, § 1 (forbidding all registrants, regardless of age of victim, from the premises of school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public if they have reason to believe children are present, or from standing or sitting idly within 1,000 feet of such locations unless the registrant is responsible for a child or a "specific or legitimate reason" for their presence); 2010 Tenn. Pub. Acts, ch. 1138, §§ 7, 13 (increasing information required to be reported and requiring registrants to maintain and carry photo identification); 2010 Tenn. Pub. Acts, ch. 1145, § 1 (forbidding more than two registrants from living in the same residence); 2011 Tenn. Pub. Acts, ch. 266, § 1 (imposing reporting restrictions related to international travel); 2011 Tenn. Pub. Acts, ch. 287, § 1 (permitting public library directors to ban registrants from library premises); 2014 Tenn. Pub. Acts, ch. 992, § 1 (prohibiting registrants, regardless of age of victim, from living or working within 1,000 feet of a school, day care center, public park, playground, recreation center, or public athletic field available for use by the general public); 2014 Tenn. Pub. Acts, ch. 751, § 1 (authorizing local governments to establish community notification systems designed to notify residents, schools, and child care facilities when a registrant lives within a certain distance); 2014 Tenn. Pub. Acts, ch. 770, §§ 1, 2 (imposing lifetime registration requirement on all offenders whose victims were twelve or younger); 2015 Tenn. Pub. Acts, ch. 516, § 1 (increasing information required to be reported and prohibiting registrants being alone with a minor in a "private area").

(Doc. No. 37 at 2-7).

D.  The Effect of the Act's Adoption and Amendment on Plaintiffs

When Doe #1 pled guilty or *nolo contendere*, there was no sex offender registry ("SOR"). (Doc. No. 1 at ¶ 22). When Doe #2 pled guilty (or perhaps *nolo contendere*), the law in effect at the time (SORMA) required him to register, but it did not restrict his liberty. (Case 3:17-cv-00264, Doc. No. 1 at ¶ 21). As discussed above, SORMA (Tennessee's first law regarding SOR) was signed into law in 1994. SORMA kept private individuals' listings on the registry (including both Plaintiffs' listings) and contained an avenue to remove an individual from the registry after the passage of a period of time. By contrast, the current Act (SORA)—which undisputedly applies to both Plaintiffs—undisputedly requires Plaintiffs to comply with its terms for life. (Doc. No. 92 at ¶ 5).

a. <u>Effect on Doe #1</u>

In 2004, when the Legislature replaced SORMA with the currently effective SORA, Doe #1 became classified publicly (through an online database) as a "violent sexual offender." (Doc. No. 1 at ¶ 24); *see also* 2004 Pub. Acts ch. 921.

In 2011, Doe #1 was living in one-half of a duplex he owned, while his son's family (including minor grandchildren) lived in the other half of the duplex. (*Id.* at ¶ 28). Doe #1 was forced to move out of his home with forty-five minutes notice because officers from the Metro Nashville Police Department ("MNPD") and the District Attorney General for Davidson County (the "DA") told him that the arrangement was not acceptable under SORA. (*Id.*). Doe #1 was eventually successful in getting a declaratory judgment stating that he had a right to live in the duplex while his minor children (his grandchildren) lived on the other side of the duplex. (Doc. No. 1-1).

In 2016, Doe #1 was arrested and prosecuted for failing to report and pay the annual administrative fee required by SORA. (Doc. No. 1at ¶ 34). The office for reporting is open four days a week, although it is regularly closed without warning. (*Id.* at ¶ 35). Doe #1 must report each year in March, June, September, and December, and in March he must pay the annual fee required under SORA. (*Id.*). Doe #1 attempted to pay his annual fee for 2016 (due in March 2016) in December 2015 when he reported under SORA, but he was told that he could not pay it early. (*Id.* at ¶ 36). He then attempted to pay it on Thursday, March 31, 2016, and Friday, April 1, 2016, during the hours the office was supposed to be open, but both times the office was closed. (*Id.* at ¶¶ 37, 38).

Doe #1 also claims that he has had difficulty parenting his children due to SORA. Doe #1 regularly attended his children's sporting events and dropped off and picked up his children from

9

school prior to SORA's enactment. (Doc. No. 93 at 4). Now, Doe #1 must request permission to attend parent-teacher conferences and to pick up/drop off his (one remaining minor) child. (Doc. No. 94 at ¶ 16). Doe #1 refrains from picking up or dropping off at school because he fears that notifying the school staff would have negative consequences for his child.[9] (Doc. No. 93 at 4-5). Doe #1 was denied permission to attend a son's baseball game. (*Id.* at 5). Doe #1 was also not allowed to attend his youngest son's elementary school graduation. (Doc. No. 94 at ¶ 17). Doe #1 was advised by counsel not to request permission to attend another son's high school graduation. (*Id.* at ¶ 18). Doe #1 has generally not sought permission to attend his children's sporting events. (*Id.* at ¶ 19). Doe #1's minor son suffered a stroke and needs to swim twice a week, a need which his mother does not have enough time to help with. (*Id.* at ¶ 20). Doe #1 cannot swim with his son at public swimming pools, and he is uncertain whether he could go to a private swimming club. (Doc. No. 93 at 5). Doe #1 bought a remote-control airplane for his son, but he is unable to go to the park with him to fly it. (*Id.*). Doe #1 has a number of grandchildren that he sees variably, and although he has indicated he believes that he would see them more if he was not a registered sex offender, Doe #1 has not pointed to any reason for his belief other than his feeling about the matter. (*Id.* at ¶ 26).

---

[9] Doe #1 testified that:

> Everyone one of those ladies out in the front of the counter, just trying to get through to the principal is a bit of a problem. And you've got to tell whoever you're talking to what it's about. So it would be just a huge red flag to say, "I'm a sex offender and I want to bring my child to school." Not that they wouldn't necessarily allow it anyway, I don't know. But either way, I wouldn't want to do that.

(Doc. No. 93 at 5). The Court perceives that Doe #1 is somewhat inconsistent, in that at times he suggests one or more of his children's schools knew of his status (and deny him permission as a result) and at other times he asserts the importance of keeping such schools from ever knowing his status.

Doe #1 claims that SORA has negatively impacted his work. Doe #1 owns a business in Honduras that he does not manage in person because of difficulties traveling due to his registry status. (Doc. No. 93 at 3). Doe #1 has requested help interpreting SORA from an MNPD detective to determine whether he is eligible for exemption from the reporting requirement, but he has not received assistance in interpreting the statute or determining whether he falls within the frequent-travel-for-work exception. (*Id.* at 7). Doe #1 has a contract to deliver topsoil to a school system, but he does not make the deliveries himself for fear of violating SORA's geographic restrictions. (*Id.* at 3). Doe #1 has "opponents in business disputes" that "often mention" his registry status. (*Id.*).

Doe #1 refrains from the Internet or computers because he is worried about violating SORA. (Doc. No. 1 at ¶¶ 27, 28, 30, 31, 32, 33). Doe #1 is also concerned that the government will monitor his Internet use. (Doc. No. 93 at 6).

Doe #1 is concerned "every minute of every day" that he might be within 1,000 feet of a prohibited area. (*Id.* at 7). Doe #1 sometimes takes walks for exercise, and his route takes him near a school. (*Id.*). Doe #1 is concerned that if he is stopped in one of these areas, an officer might not accept his walk as a "legitimate" reason to be there. (*Id.*). An MNPD detective has stated in a deposition[10] that patrol officers would likely arrest a registrant found within 1,000 feet of a prohibited area who refused to respond to an officer's questions, which has heightened Doe #1's fear. (*Id.* at 8).

   b. <u>Effect on Doe #2</u>

---

[10] Officer Maria Sexton gave a deposition in this case, and she also previously gave a deposition five years ago in connection with the investigation regarding Doe #1's housing dispute. Her comments during this earlier deposition apparently prompted Doe #1's concerns. (Doc. No. 98-1 at 51). Officer Sexton was also asked, in her deposition in this case, about her comment in her earlier deposition. (Doc. No. 97-1 at 10-14).

Doe #2 was arrested because he went to his child's school events without notifying the school of his registrant status. (Doc. No. 93 at 5). He was arrested while his child was in school and was not released before school let out for the day, and so the Department of Children's Services took temporary custody of his child. (*Id.*). Doe #2 attended parent-teacher conferences at his daughter's school when she lived in Nashville, but his daughter now attends school in Kentucky. (Doc. No. 95 at ¶¶ 9, 11). Doe #2 additionally states that he cannot go to the park with his daughter or let his daughter have friends over to visit, and that he lost his family YMCA membership. (Doc. No. 93 at 5).

Doe #2 does use the Internet, but he is concerned that he must report all of his account information to the government and that the government might use this information. (Doc. No. 93 at 6). Doe #2 uses the Internet for work, research, and reading the news. (Doc. No. 95 at ¶ 17). He has two personal email accounts and banks online. (*Id.* at ¶¶ 18, 19). Doe #2 used Facebook to participate in professional groups, but Facebook cancelled his account due to his registry status. (Doc. No. 93 at 3).

Doe #2 states that he lost his prior job after an ex-employee revealed his registry status, and his ex-wife revealed his status to another employer in an attempt to have him fired. (*Id.*). Now self-employed, Doe #2 lost a client when that client learned of his registry status, costing him about 25% of his revenue, and the client also told Doe #2's referral sources about his status, and he subsequently lost the referral source as well. (*Id.* at 3-4). Because of losing business, which he attributes to his status on the SOR, Doe #2 is facing bankruptcy and the loss of his home. (*Id.* at 4).

When SORA's geographic restrictions were enacted, Doe #2's probation officer demanded that he move out of his home because it was near a prohibited area, and Doe #2 had to file a lawsuit

to stay in his home. (*Id.* at 4). Due to his financial difficulties, Doe #2 needs to move out of his house. (*Id.*). A friend offered Doe #2 a place to stay, but Doe #2 was unable to accept the offer because the house was too close to a prohibited area. (*Id.*). Doe #2 had to consult with an attorney to determine the distance of the home from the prohibited area. (*Id.*). An MNPD detective testified at her deposition[11] that she will not "pre-approve" an address as being far enough away from an exclusionary zone. (*Id.* at 8). MNPD and TBI do not provide maps to show prohibited areas in the County, and detectives use a range finder to determine whether a home is in a prohibited area. (*Id.*).

E.  Procedural History

On November 9, 2017, this Court granted in part and denied in part Defendants' motions to dismiss, dismissing Counts II, III, VI, and VII of the Complaints. (Doc. No. 38).[12] The Court also dismissed in part Counts VIII and IX, which raise due process challenges to SORA's Exclusionary Zones; specifically, those counts were dismissed to the extent that they challenge Tennessee's restrictions on where Plaintiffs may obtain treatment.[13] (*Id.*). The Court denied

---

[11] Officer Sexton made this statement in her deposition taken in relation to this case, not in her earlier deposition related to Doe #1's prior housing dispute. (Doc. No. 97-1 at 57).

[12] Count II pleads that SORA violates Doe #1's fundamental right to travel under the Due Process Clause, U.S. Const. Amend. 14, § 1 (Doc. No. 1 at ¶¶ 144–47); Count III pleads that SORA violates Doe #1's fundamental right to "engage in the common occupations of life" under the Due Process Clause (*Id.* at ¶¶ 148–52); Count VI pleads that the SORA's retroactive application deprives Doe #1 of due process (*Id.* at ¶¶ 160–62); and Count VII pleads that the imposition of SORA amounts, effectively, to a repudiation of his original plea bargain in violation of due process (*Id.* at ¶¶ 163–5).

[13] Count VIII pleads that SORA, and in particular the Exclusion Zone regime, violates due process by imposing criminal liability on wholly passive conduct without appropriately apprising of the duty to comply (*Id.* at ¶¶ 166–67); Count IX pleads that SORA violates due process by imposing restrictions that are unconstitutionally vague and/or render compliance impossible (*Id.* at ¶¶ 168–73).

13

Defendants' motions to dismiss with respect to Count I, which alleges that SORA's retroactive application to Plaintiffs violates the Ex Post Facto Clause of the United States Constitution.

In light of the Court's November 9 Order, the following counts remain pending against Defendants based on their enforcement of SORA: (1) violation of the Ex Post Facto Clause (Count I); (2) violation of the right under the Due Process Clause to educate and bring up one's children (Count IV); (3) violation of the right to freedom of speech (Count V); (4) violation of the Due Process Clause via the potential for imposition of criminal liability upon a registrant for violation of certain SORA requirements irrespective of the registrant's actual knowledge of such requirements (Count VIII); and (5) violation of the Due Process Clause via SORA's prescription of vague requirements or prohibitions, with which compliance is impossible (Count IX). Plaintiffs seek declaratory and injunctive relief.

On February 22, 2019, Plaintiffs moved for partial summary judgment on Count I of their respective complaints (Doc. No. 66), and Defendants moved for summary judgment separately as to Doe #1 and Doe #2 on Counts I, IV, V, VIII, and IX (all the Counts that remain pending after the November 9 Order). (Doc. Nos. 73, 79). The parties have filed corresponding responses and replies as appropriate.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248.

On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the non-moving

party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at **5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## DISCUSSION

### I.  Count I – Whether SORA Violates the Constitutional Prohibition Against Ex Post Facto Laws

The parties have filed cross-motions for summary judgment as to Count I of Plaintiffs' Complaints, which allege that the retroactive application of SORA violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1. In their Partial Summary Judgment Motion, Plaintiffs request that the Court (1) declare that SORA is punitive in effect and therefore its retroactive application violates the Ex Post Facto Clause, and (2) permanently enjoin its enforcement against Plaintiffs. (Doc. No. 66). Plaintiffs argue that there is no genuine dispute of material fact and that because Plaintiffs' offenses occurred before SORA's enactment and SORA has the same or similar elements as MSORA (which was found unconstitutional in *Snyder I*), the Court should grant summary judgment in their favor. (Doc. No. 67 at 7). In their Motions for Summary Judgment, Defendants argue that there is no genuine dispute of material fact and that

16

they are entitled to judgment as a matter of law because there are no violations of the Ex Post Facto Clause inasmuch as (according to Defendants) the law is not punitive. (Doc. No. 74 at 6-10).

### a. Relevant Precedent and Authority

Statutes similar to SORA have previously been evaluated by both the Supreme Court and courts in the Sixth Circuit. In fact, two district courts in the Sixth Circuit have specifically addressed the constitutionality of SORA in particular under the Ex Post Facto Clause. In their respective briefing, Plaintiffs and Defendants each rely heavily on certain cases repeatedly. Therefore, the Court will provide a brief background of the relevant law in this regard before turning to the merits of the motions.

In *Smith v. Doe*, 538 U.S. 84 (2003), the Supreme Court upheld the retroactive application of Alaska's sex-offender registration law. The law required sex offenders residing in Alaska to submit annual or quarterly registration and to update the state when they did things such as move, grow a beard, change their hair color, or get a new car. 538 U.S. at 90-91. Alaska maintained a central registry of sex offenders and their information. While some information was kept confidential, the state published on the Internet the offender's name, aliases, address, photograph, physical description, license and identification numbers of motor vehicles, place of employment, date of birth, crime, date and place of conviction, length and conditions of sentence, and a statement as to whether the offender was in compliance with the act's requirements or could not be located. *Id.* Applying the intents-effect test outlined in more detail below, the Supreme Court concluded that the Alaska law was civil, not criminal, and therefore did not violate the Ex Post Facto Clause. *Id.* at 96.

The Sixth Circuit likewise has previously upheld Tennessee's sex offender registry laws against challenges similar to those Plaintiffs bring here in two cases. In *Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999), the Sixth Circuit upheld as constitutional the retroactive application of

an earlier Tennessee sex offender registration law (SORMA), which has since been replaced with SORA as discussed above. As further discussed above, SORMA required sex offenders to register with law enforcement agencies and allowed law enforcement officials to release registry information when necessary to protect the public, but the information was not publicly available as it is under SORA. The Sixth Circuit examined the effects of the law and held that that SORMA was not punitive. *Id.* at 483. In so finding, the Sixth Circuit noted that "[the registrant] need only notify the TBI where he lives, where he works, and other basic data. He is free to live where he chooses, come and go as he pleases, and seek any employment he wishes." *Id.* at 474.

In *Doe v. Bredesen*, 507 F.3d 998, 1003-07 (6th Cir. 2007), the Sixth Circuit also rejected a constitutional challenge to SORA (which has since been amended many times, as discussed above) and to the 2004 Tennessee Serious and Violent Sex Offender Monitoring Pilot Project Act ("Pilot Project Act"), which is not at issue in this case. In *Bredesen*, the plaintiff challenged on ex post fact grounds both SORA (in its then-current form) and the Pilot Project Act, especially a provision of the Pilot Project Act authorizing the TBI to require certain offenders to wear a global positioning system ("GPS") monitor at all times. 507 F.3d at 1000. The court found that the legislature intended to implement a civil regulatory scheme (instead of a punitive measure) with both SORA and the Pilot Project Act, and that the punitive effect did not outweigh this intent so as to make the law punitive. *Id.* at 1005. The court also found that protecting the public from sex offenders' recidivism was a rational connection to a nonpunitive purpose and that SORA was not excessive in achieving that purpose. *Id.* at 1006.

As this Court has already recognized in a previous opinion, however, consideration of *Cutshall* and *Bredesen* does not conclude the Court's inquiry when analyzing Ex Post Facto Clause challenges to SORA, for three reasons:

[F]irst, Tennessee's scheme has been amended in meaningful respects since those cases were decided, . . . ; second, the Sixth Circuit's decision in last year's *Doe v. Snyder*, 834 F.3d 696, has clarified the appropriate analysis for such claims to a degree that, though not strictly overruling *Cutshall* and *Bredesen*, significantly undermines those cases' applicability to a challenge raised today; and third, the constitutionality of the ex post facto application of the Act hinges on questions of fact on which Plaintiffs are entitled to present evidence reflecting currently available evidence and current conditions.

(Doc. No. 37 at 40-41); *see also Reid v. Lee*, No. 3:20-CV-00050, 2020 WL 4501457, at *16-17 (M.D. Tenn. Aug. 5, 2020) (discussing with approval this Court's previous holding, collecting cases holding similarly, and applying *Snyder I*); *Jordan v. William*, No. 3:19-CV-00907, 2020 WL 4676477, at *18 (M.D. Tenn. Aug. 12, 2020) (same).

Indeed, the Sixth Circuit's decision in *Snyder I* has reshaped how district courts in this Circuit analyze challenges to sex offender registration laws under the Ex Post Facto Clause. In their Partial Summary Judgment Motion, Plaintiffs rely heavily on the ruling in *Snyder I*, arguing essentially that SORA is substantially identical to the Michigan law at issue in *Snyder I* and is in violation of the Ex Post Facto Clause. In *Snyder I*, the Sixth Circuit held that Michigan's Sex Offenders Registration Act ("MSORA") imposed punishment and that therefore the retroactive application of MSORA's 2006 and 2011 amendments was unconstitutional as violative of the Ex Post Facto Clause. *Does #1-5 v. Snyder*, 834 F.3d 696, 699 (6th Cir. 2016) ("*Snyder I*"). The court in *Snyder I* took issue with three parts of the statute, which cumulatively made the statute unconstitutional under the Ex Post Facto Clause: 1) the prescription of restricted zones where plaintiffs could not loiter, live, or work, 2) the public classifications to which plaintiffs were subject, and 3) the reporting obligations under MSORA. *Id.* at 705. The court found that the legislature did not intend the law to be punitive; nevertheless, considering several "guideposts," the court determined that the actual effects of the statute were punitive. *Id.* at 701.

Notably, however, the court was not entirely clear as to whether it was adjudicating a facial or as-applied challenge. And subsequent to *Snyder I*, there has been confusion in the lower courts regarding whether *Snyder I* addressed a facial or as-applied challenge. As the instant case presents similar confusion regarding the nature of *Snyder I*'s challenge (and, indeed, the scope of the challenges Plaintiffs themselves bring), the Court pauses to review case law which hints at what type of challenge *Snyder I* ruled on.

A few days after the Sixth Circuit issued its decision in *Snyder I*, a group of Michigan residents filed a class action complaint challenging the constitutionality of MSORA on largely the same grounds raised by the individual plaintiffs in *Snyder I*. *See Doe v. Snyder*, 449 F. Supp. 3d 719, 725 (E.D. Mich. 2020) ("*Snyder II*"). The court in *Snyder II* entered a stipulated order certifying the class under Fed. R. Civ. P. 23(b). *Id.* In July 2018, the plaintiffs moved for partial summary judgment on behalf of the ex post facto subclasses.[14] *Id.* The plaintiffs argued that despite the Sixth Circuit's decision in *Snyder I*, the Michigan legislature had neither amended MSORA to bring it into compliance with *Snyder I* nor had the state stopped enforcing its provisions. While the plaintiffs' motion was pending, the court granted the parties' multiple requests to extend the

---

[14] The case constituted a certified class which contained a primary class and two subclasses. The primary class contained all offenders who currently were or who would be subject to MSORA in the future. The primary class sought relief on vagueness, strict liability, and first amendment grounds. The two subclasses were both based on ex post facto claims, and were defined as follows:

(1) The "pre-2006 ex post facto subclass" [was] defined as members of the primary class who committed their offense or offenses requiring registration before January 1, 2006, and who have committed no registrable offense since.

(2) The "2006-2011 ex post facto subclass" [was] defined as members of the primary class who committed their offense or offenses requiring registration on or after January 1, 2006, but before April 12, 2011, and who have committed no registrable offense since.

*Snyder II*, 449 F. Supp. 3d at 725-26.

briefing schedule in order to allow them to engage in legislative negotiations. (ECF Nos. 41, 44, 45, 47, 51, 54). In May 2019, the court entered a stipulated order granting declaratory relief in favor of the plaintiffs, holding that the 2006 and 2011 amendments were unconstitutional as applied to the ex post facto subclasses. (ECF No. 55). Because of the parties' stipulation, neither the Sixth Circuit nor any Michigan court has made a judicial determination as to whether *Snyder I* was an as-applied challenge or a facial challenge to MSORA. Notably, in a later case, the Sixth Circuit seemed to imply that the holding in *Snyder I* applied to the statute on its face, but it was not required to answer that question, in light of another stipulated order. The court commented:

> The stipulated order—regarding plaintiff, the Michigan defendants, and Michigan's Sex Offender Registration Act (SORA)—was based on our decision in [*Snyder I*]. In that case, we determined that SORA was an unconstitutional ex post facto law because it was retroactive, and its stringent restrictions (such as severe limits on where sex offenders were allowed to live and work) constituted punishment. Given our decision in[*Snyder I*], and plaintiff and the Michigan defendants' "wish to avoid further litigation and expense," they "consent[ed] to entry of th[e] [stipulated] order."

*Willman v. Attorney Gen. of United States*, 972 F.3d 819, 822 n. 1 (6th Cir. 2020) (internal citation omitted).[15]

The Tennessee Act in its current form was tested for the first time on ex post fact grounds in *Doe v. Rausch*, 382 F. Supp. 3d 783 (E.D. Tenn. 2019) ("*Rausch I*") and for the second time in *Doe v. Rausch*, 461 F. Supp. 3d 747 (E.D. Tenn. 2020) ("*Rausch II*").[16]

---

[15] Though the Sixth Circuit and lower courts in Michigan have not specifically held whether *Snyder I* was an as-applied or facial challenge, at least one district court in Tennessee has described *Snyder I* as being "as applied to a select group of plaintiffs." *Doe v. Rausch*, 461 F. Supp. 3d 747, 759 (E.D. Tenn. 2020).

[16] Though the Court finds these cases instructive, the parties do not rely on them; indeed, they could not have done so, inasmuch as the opinions were published after the filing of briefing on the various dispositive motions in this case.

In *Rausch I*, the court considered the constitutionality of the retroactive application of SORA's 2014 amendment—requiring plaintiff to comply with *all* of SORA's provisions for life—under the Ex Post Facto Clause. 382 F. Supp. 3d at 789. Over the defendant's arguments to the contrary, the court found *Snyder I* to be "binding precedent from the Sixth Circuit." *Id.* at 795. The court granted plaintiff's motion for summary judgment in part, holding that the effect of lifetime compliance was punitive as related to the plaintiff; in so doing, the Court emphasized that it ruled only on an as-applied basis. *Id.* at 799-800.

In a similar opinion in *Rausch II*, the court again considered the constitutionality of the retroactive application of SORA's 2014 amendment. 461 F. Supp. 3d at 753-54. Deeming *Snyder I* as binding precedent prescribing the analysis the district court must apply (and describing *Snyder I* as an as-applied challenge), the court granted the plaintiff's motion for summary judgment, holding that the effect of lifetime compliance with SORA was punitive as it related to the plaintiff. *Id.* at 759-61, 779 ("*Snyder [I]* is binding precedent upon this Court."). In enjoining SORA, the court noted that because plaintiff's claim was "as-applied," the court's finding was limited to the plaintiff and SORA may continue to be enforced in circumstances where it is constitutional. *Id.* at 761-62.

Defendants rely heavily on the out-of-circuit case of *Shaw v. Patton*, 823 F.3d 556, 568-69 (10th Cir. 2016), in support of their Motion for Summary Judgment. The court there rejected an ex post facto challenge to Oklahoma's Sex Offender Registration Act. In particular, Defendants point to the court's finding in *Shaw* that the Oklahoma act's prohibition on offenders residing in certain areas was not punitive, because it did not "expel the offender from a socio-political community or prohibit an offender's presence in its entirety." (Doc. No. 74 at 9).

### b. The Scope of Plaintiffs' Ex Post Facto Challenge

In order to rule on the parties' motions, the Court must define the nature of Plaintiffs' ex post facto challenge. A statute may be unconstitutional either "on its face" or "as applied" to a particular set of circumstances. *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir. 1997). The scope of a challenge varies depending on which kind of challenge it is. "In an as-applied challenge, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional." *Id.* (quoting *Ada v. Guam Soc'y of Obstetricians and Gynecologists*, 506 U.S. 1011, 1012 (1992) (Scalia, J., dissenting), *denying cert. to* 962 F.2d 1366 (9th Cir. 1992)). When a plaintiff succeeds in an as-applied challenge, the law may not be applied to the plaintiff, but may continue to be enforced "in circumstances where it is constitutional." *Rausch II*, 461 F. Supp. 3d at 769.

By contrast, a plaintiff that challenges a law "on its face" attempts "to invalidate the law in each of its applications, to take the law off the books completely." *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 691 (6th Cir. 2015) (quoting *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013)). "'The fact that [an Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid [.]'" *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 193 (6th Cir.1997) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)). To succeed on a typical facial challenge, "a plaintiff must establish 'that no set of circumstances exists under which [the statute] would be valid.'" *Speet*, 726 F.3d at 872 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). This is an "exceptional remedy." *Id.* (quoting *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010)).

In their Complaints, Plaintiffs do not specify whether (at least in their view) their ex post facto challenge is facial or as-applied to Plaintiffs.[17] Plaintiffs allege merely that the "retroactive application of SORA violates the *Ex Post Facto* Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses committed prior to its enactment." (Doc. No. 1 ¶ 143). But Plaintiffs plead facts under a heading that seems to contemplate an as-applied challenge: "Factual Allegations: Impact of the Act *on the Plaintiffs*." (*Id.* at 26) (emphasis added). Plaintiffs also request *inter alia* a permanent injunction restraining Defendants from retroactively enforcing the Act *against Does #1 and #2*. (Doc. No. 1 at 54) (using language in the "Request for Relief" section such as "from retroactively enforcing the Act against Doe," "restraining the defendants from enforcing against Doe," and "restraining defendants from retroactively extending Doe's registration period"). Finally, in their memorandum in support of their Partial Summary Judgment Motion, Plaintiffs request the Court "declar[e] that SORA is punitive in effect and that its retroactive application to Plaintiffs violates the *Ex Post Facto* Clause of the U.S. Constitution and (2) permanently enjoin[] its enforcement against Plaintiffs." (Doc. No. 67 at 1-2). Accordingly, Defendants reasonably interpret Plaintiffs' ex post facto claim to be an as-applied challenge. (Doc. No. 91 at 2 ("Here, Plaintiffs assert that the law has an unconstitutional punitive effect *as applied* to them.")); Doc. No. 74 (same).

However, Plaintiffs assert (for the first time in their opposition to Defendants' Motions) that their challenge is not strictly as-applied but rather "attack[s] every retroactive application of [the Act]." (Doc. No. 93 at 11). In support of this, Plaintiffs cite the Sixth Circuit's decision in *Green Party of Tennessee v. Hargett*, 791 F.3d 684 (6th Cir. 2015), acknowledging that "a claim

---

[17] The Court notes that, as will be discussed, the Plaintiffs explicitly allege a facial attack only in Count V, in which they bring claims for violation of their First Amendment rights. (Doc. No. 1 at ¶ 159).

24

can have characteristics of as-applied and facial challenges: it can challenge more than just the plaintiff's particular case without seeking to strike the law in all its applications." *Id.* at 692 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010)). Additionally, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases." Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1339 (2000) (quoted by *Citizens United*). In *Green Party*, the Sixth Circuit elaborated that "[i]n constitutional challenges reaching beyond the plaintiff's circumstances [a kind of challenge the undersigned prefers to call a "qualified facial challenge], the plaintiff must satisfy the 'standards for a facial challenge to the extent of that reach.'" 791 F.3d at 692.

Accordingly, the Court will construe Plaintiffs' ex post facto claim as asserting not only an as-applied challenge, but also a facial challenge to the extent that it seems to challenge all retroactive applications of SORA. Therefore, the Court will consider Plaintiff's facial challenge to be a qualified facial challenge. Because the parties have largely conflated their arguments that may pertain to a facial challenge versus an as-applied challenge, the Court will discuss simultaneously the implications and merits of both kinds of challenges under the Ex Post Facto Clause.

### c. Whether the Retroactive Application of SORA is Unconstitutional under the Ex Post Facto Clause

In their Partial Summary Judgment Motion, Plaintiffs focus on the combined effect of SORA's (1) restrictions on where offenders can live, work, or "stand idly"; (2) classification of

offenders as "dangerous/violent" without individualized assessment; and (3) time-consuming and cumbersome in-person reporting obligations. According to Plaintiffs, the effect is punitive and therefore SORA's application to offenders who were convicted before SORA's existence violates the Ex Post Facto Clause.[18] (Doc. No. 67 at 25). As discussed, Plaintiffs request declaratory relief and a permanent injunction restraining Defendants from retroactively enforcing SORA against Plaintiffs. (*Id.* at 54). As will be discussed, though Plaintiffs seem to envision only the Court holding the entire Act to be unconstitutional, the Court is under no such "all or nothing" restraint. *See Rausch II*, 461 F. Supp. 3d at 768. However, the Court also keeps in mind that "even if each individual restriction passes muster in isolation, [Plaintiffs'] motion for summary judgment has attacked the retroactive lifetime imposition of all of [SORA's] requirements, which have grown since [SORA's] enactment. Consequently, the Court must consider the combined, cumulative lifetime impact of all of [SORA's] requirements on Plaintiff." *Id.*[19]

---

[18] Though Plaintiffs have clarified their arguments in their Partial Summary Judgment Motion, the Court notes that the Complaints were less than clear on whether SORA was being challenged in its entirety and, if not, on what provisions SORA was being challenged. In the relief section, the Complaint merely stated "The retroactive application of the Act violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses committed prior to its enactment." (Doc. No. 1).

The three aspects of SORA challenged by Plaintiffs mirror the three aspects of the Michigan act held unconstitutional in *Snyder I*. It appears that, similar to *Snyder I*, Plaintiffs attack SORA as unconstitutional in its entirety based on these three aspects of SORA.

[19] The Court discusses the requirement of lifetime compliance throughout this opinion. Plaintiffs' Complaint and briefing primarily focuses on the effects of the *content* (rather than the *duration*) of the requirements (such as the burdensome nature of the exclusionary zones or the effect of the labelling requirements in the statute) and does not devote much argument to the fact that compliance is required for life. However, Plaintiffs do discuss the lifetime compliance in several places in both their Complaints and briefing, and the Court finds the two topics (the content of the requirements as well as their timespan) to be relevant to the nature and effects of SORA on Plaintiffs. The Court will therefore discuss both topics.

26

Plaintiffs' Partial Summary Judgment Motion is premised entirely upon the Sixth Circuit's decision in *Snyder I*. Plaintiffs argue that because SORA has the same elements that made MSORA punitive in effect, as held in *Snyder I*, the retroactive application of SORA is also unconstitutional under the Ex Post Facto Clause, as was the retroactive application of the MSORA. (Doc. No. 67 at 13-16). But Defendants argue that the holding of *Snyder I* is not controlling here, because the Sixth Circuit found MSORA unconstitutional *as it applied to those plaintiffs* without opining on the facial constitutionality of the statute. (Doc. No. 74 at 10; Doc. No. 91 at 1). Plaintiffs reply that *Snyder I* involved no as-applied challenge because "the Sixth Circuit examined how the Michigan registry law affected registrants generally, not specifically" and when the Sixth Circuit did reference "an individual plaintiff's circumstances, it [did] so for examples to illustrate the statute's general effect." (Doc. No. 93 at 11). As discussed above, *Snyder I* and the cases that followed did not clarify whether *Snyder I* addressed an as-applied challenge or a facial challenge. Though speaking broadly in some places of the unconstitutionality of the statute, the Sixth Circuit concluded its opinion in *Snyder I* by implying an as-applied holding, stating "[t]he retroactive application of [the relevant MSORA amendments] to Plaintiffs is unconstitutional, and it must therefore cease." 834 F.3d at 706.

Though neither the Sixth Circuit nor any Michigan district court applying *Snyder I* has explicitly defined the nature of the constitutional challenge brought there, other district courts (including this one in the November 9 order) have found *Snyder I* to be binding precedent over opposition (as Defendants argue in this case) from parties. *E.g.*, (Doc. No. 37 at 40-41); *Reid*, 2020 WL 4501457, at *16-17; *Jordan*, 2020 WL 4676477, at *18. Regardless, whether *Snyder I* involved an as-applied or facial challenge is not dispositive here. Even if the Sixth Circuit had held that MSORA was facially unconstitutional as applied retroactively, that finding would not

27

automatically apply to SORA. First, the Court notes that, though extremely similar, MSORA and SORA are not identical. Second, it is well established that "it is the effect, not the form, of the law that determines whether it is ex post facto." *Weaver v. Graham*, 450 U.S. 24, 31 (1981). Though *Snyder I* may be helpful to Plaintiffs, Plaintiffs cannot demonstrate that SORA is punitive by relying exclusively on symmetries between the text of MSORA and the text of SORA.[20] Rather, as this Court has already stated, "[a]pplying *Snyder* [*I*] in this case will require the Court to look at the cumulative effect of all of the Act's interlocking requirements and examine those requirements in the context of any historical antecedents—both of which will require a factual record." (Doc. No. 37 at 41); *see also Snyder I*, 834 F.3d at 701 ("We must therefore consider whether [MSORA's] actual effects are punitive.").

The Constitution provides that "[n]o State shall . . . pass any . . . ex post facto Law." U.S. Const. art. I § 10, cl. 1. The Supreme Court has indicated that the Ex Post Facto Clause is "a term of art with an established meaning at the time of framing" and that the Clause is aimed at criminal laws, not civil laws. *California Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quotation omitted). "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver*, 450 U.S. at 28–29.

Two critical elements must be present for a law to fall within the ex post facto prohibition: (1) "it must apply to events occurring before its enactment"; and (2) "it must disadvantage the offender affected by it . . . by altering the definition of criminal conduct or increasing the

---

[20] In their memorandum in support of their Motion for Partial Summary Judgment, Plaintiffs included several pages of charts noting the similarities and differences between MSORA and SORA. (Doc. No. 67 at 13). These similarities include, among other things, the way individuals are classified and certain reporting requirements. Though these similarities are not irrelevant, such similarities alone do not merit granting Plaintiffs' Motion for Partial Summary Judgment.

28

punishment for the crime[.]" *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (internal citation and quotation marks omitted); *see also Hill v. Snyder*, 900 F.3d 260, 266 (6th Cir. 2018). The Constitution "does not bar *all* retroactive lawmaking, but only retroactive punishment." *Snyder I*, 834 F.3d at 699. Here, the parties do not dispute that SORA is being enforced retroactively as to Plaintiffs. Rather, they dispute whether SORA is punitive.

In order to determine whether a law is punitive, the Court employs a two-part test—known as the "intent-effect test"—which asks: "(1) Did the legislature intend to impose punishment? And (2), if not, is the statutory scheme so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Snyder I*, 834 F.3d at 700 (citing *Smith v. Doe*, 538 U.S. 84, 92 (2003) (internal quotation marks omitted)). Plaintiffs do not suggest that the Tennessee Legislature intended to impose punishment by implementing SORA,[21] and SORA contains specific language stating that punishment was not the Tennessee Legislature's intent. Tenn. Code Ann. § 40-39-201(1), (6) ("This policy of authorizing the release of necessary and relevant information about offenders to members of the general public is a means of assuring public protection and shall not be construed as punitive."). Rather, Plaintiffs focus their argument on attempting to show that the statutory scheme's effect is punitive. Consequently, the Court is "mindful that, as *Smith* makes clear, states are free to pass retroactive sex-offender registry laws and that those challenging an ostensibly non-punitive civil law must show by the 'clearest proof' that the statute in fact inflicts punishment." *Snyder I*, 834 F.3d at 705.

---

[21] Plaintiffs note that the court in *Snyder I* found that the legislature did not intend to impose punishment, but they make no argument about the intentions of the Tennessee legislature. (Doc. No. 67 at 8).

In order to determine whether the effects of a law are punitive, the Supreme Court has instructed lower courts to "refer to" seven factors originally noted in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–169 (1963). *Smith*, 538 U.S. at 97. And of these seven, the Court has identified five as the most relevant. *Id.* The Sixth Circuit has since reformulated these five factors into five respective questions for courts to consider:

> (1) Does the law inflict what has been regarded in our history and traditions as punishment?
>
> (2) Does it impose an affirmative disability or restraint?
>
> (3) Does it promote the traditional aims of punishment?
>
> (4) Does it have a rational connection to a non-punitive purpose?
>
> (5) Is it excessive with respect to this purpose?

*Snyder I*, 834 F.3d at 701 (citing *Smith*, 538 U.S. at 97). These factors are "neither exhaustive nor dispositive[,]" but rather serve as "useful guideposts" for a court. *See Smith*, 538 U.S. at 97 (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)). The Court will weigh each factor in turn. The undersigned here will reiterate what he has said previously about multi-factor tests generally:

> "The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *16 (M.D. Tenn. Aug. 28, 2020) (quoting Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor") and Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations")). This reality tends not to bode well for the prospects of a multi-factor test to resolve a question as a matter of law at the summary judgment stage.

*Acosta v. Peregrino*, No. 3:17-CV-01381, 2020 WL 5995049, at *6 (M.D. Tenn. Oct. 9, 2020).

Notably, to the extent that multi-factor tests generally are not easily susceptible to resolution as a matter of law at the summary judgment stage, that generality may not hold here, inasmuch as neither party has pointed the Court to any dispute of material fact affecting the evaluation of the factors individually or collectively.

### a. Does SORA inflict what has been regarded in our history and traditions as punishment?

The first factor directs the Court to consider whether the effects of SORA resemble traditional forms of punishment. As an initial matter, consistent with the Sixth Circuit's findings in *Snyder I*, the Court finds that SORA's restrictions fall within the general, and widely accepted, definition of punishment offered by legal philosopher H.L.A. Hart. 834 F.3d at 701. Here, SORA's obligations: "(1) involve[] pain or other consequences typically considered unpleasant; (2) follow[] from an offense against legal rules; (3) appl[y] to the actual (or supposed) offender; (4) [are] intentionally administered by people other than the offender; and (5) [are] imposed and administered by an authority constituted by a legal system against which the offense was committed." *Id.* at 701 (quoting H.L.A. Hart, Punishment and Responsibility 4-5 (1968)); *see also Rausch II*, 461 F. Supp. 3d at 763.

Plaintiffs additionally argue that SORA resembles the traditional punishments of banishment, shaming, and probation/parole, which are commonly addressed subfactors under the first question identified as relevant in *Snyder I*. (Doc. No. 67 at 17-22); 834 F.3d at 701-04.

### 1. Banishment

In *Smith*, the Supreme Court recognized banishment as a traditional form of punishment. 538 U.S. at 98. In our country's history, banishment was reserved for the most serious offenders

who were prohibited from residing in their original communities and, due to stigma, were effectively prevented from joining new communities. *Id.* In analyzing the banishment factor, *Snyder I* did not require the plaintiffs to meet the definition of traditional banishment, which involved *total* exclusion and ostracization from a jurisdiction, and instead focused on the "very burdensome" nature of the statute's regime of exclusionary zones which prohibited offenders from entering *certain* areas within the jurisdiction:

> More specifically, SORA resembles, in some respects at least, the ancient punishment of banishment. True, it does not prohibit the registrant from setting foot in the school zones, and it certainly doesn't make a registrant "dead in law [and] entirely cut off from society," which is how Blackstone described the banished. 1 William Blackstone, *Commentaries* *132. But its geographical restrictions are nevertheless very burdensome, especially in densely populated areas. Consider, for example, this map of Grand Rapids, Michigan, prepared by one of Plaintiff's expert witnesses: [The Sixth Circuit included here a map showing exclusionary zones.]
> Sex Offenders are forced to tailor much of their lives around these school zones, and, as the record demonstrates, they often have great difficulty in finding a place where they may legally live or work. Some jobs that require traveling from jobsite to jobsite are rendered basically unavailable since work will surely take place within a school zone at some point.

834 F.3d at 701-02. Similarly, in *Rausch II*, the court considered evidence of how the plaintiff had changed his lifestyle (such as no longer being able to go to the library, have picnics in the park, and accept employment opportunities) and a map of the relevant county, concluding that "by perpetually limiting Plaintiff's vocation, habitation, and recreation so extensively, the restrictions of [SORA] also resemble the traditional punishment of banishment." 461 F. Supp. 3d at 764; *see also Rausch I*, 382 F. Supp. 3d at 796 (finding banishment when the plaintiff lost a job because he could not make deliveries to schools and could not attend family gatherings in a public park).

Plaintiffs assert the existence of resemblance between banishment and SORA's geographic restrictions limiting where registrants may establish a residence, accept employment, or "stand idly" in certain locations. (Doc. No. 67 at 17). Drawing a comparison to the Sixth Circuit's finding

32

in *Snyder I*, Plaintiffs contend that SORA imposes even broader restrictions than MSORA, which the Sixth Circuit found resembled banishment. 834 F.3d at 701. MSORA prevents registrants from establishing a residence, accepting employment, or "loitering" within 1,000 feet of schools. Mich. Pub. Acts 121, 127 (2005). SORA creates the same 1,000-foot buffer around schools, but also prevents registrants from establishing a residence or accepting employment within 1,000 feet of licensed day care centers, other childcare facilities, public parks, playgrounds, recreation centers, and public athletic fields "available for use by the general public." (Doc. No. 67 at 17 (citing Tenn. Code Ann. § 40-39-211(a)(1) & (d)(1)(B))). SORA also prevents registrants from standing, sitting idly, or remaining within 1,000 feet of those places if children are present unless the registrant has responsibility for a child or has "other specific or legitimate reason[s.]" Tenn. Code Ann. § 40-39-211(d)(B).

In support of their argument, Plaintiffs rely on three maps (Doc. No. 67 at 18-19, Doc. No. 67-1, Doc. No. 67-2, Doc. No. 67-3):[22]

---

[22] Though Plaintiffs reproduced these maps in their Partial Motion for Summary Judgment, they were also attached as exhibits thereto. The Court will cite herein to the docket number of each individual map, though this is not the only place the maps appear in the record.





34



The first two maps show the areas that fall within the statutory "exclusionary zones" in Davidson County. (Doc. Nos. 67-1, 67-2). The first map shows the entirety of Davidson County, and the second map focuses on Davidson County's urban core. (Doc. No. 67 at 18). The areas marked (in yellow) on the maps represent the following excluded locations and their 1,000 foot buffers: public schools, private schools, licensed day cares, Head Start buildings, and public parks. (Doc. No. 70-9 at 2; Doc. No. 70-3 at 43-45). The maps do not include other exclusionary zones of which there is no available comprehensive list, including areas containing "other child care facility," playgrounds owned by private entities, recreation centers, and public athletic fields. (Doc. No. 70-9 at 2). The maps resemble, in an important sense, the map of Grand Rapids, Michigan, with School Safety Zones highlighted, that the Sixth Circuit considered in *Snyder I*; in particular, based on these maps, it appears that the portion (in terms of percentage) of the mapped area unavailable to Plaintiffs is roughly equivalent to the portion that was unavailable to the plaintiffs in *Snyder I*. (Doc. Nos. 67-1, 67-2).

Plaintiffs' third map shows (in yellow) the areas in the western part of Davidson County that, according to Plaintiffs, are unavailable for development because they are sloped at a grade of 25 percent or greater. (Doc. No. 67-3). Plaintiffs present this map to show that "[t]he impact of SORA's geographical restrictions is greater" than one might think when viewing the first map in isolation. (Doc. No. 67 at 19). The first map shows a great deal of unrestricted space in the northwestern part of Davidson County, but the third map shows that this northwest area of Davidson County is largely unavailable to all residents anyway due to its terrain. Therefore, the areas that are available to Plaintiffs are even more limited than the first map, viewed in isolation, indicates.

Defendants dispute that SORA's geographical restrictions resemble banishment. (Doc. No. 91 at 3-4). In their Response to Plaintiffs' Partial Summary Judgment Motion, Defendants argue that, unlike the plaintiffs in *Snyder I*, Plaintiffs here have failed to allege that SORA's restrictions have created difficulty for them in finding a place to live or work in Davidson County. (*Id.*). According to Defendants, the three maps carry no weight because neither Plaintiffs nor their expert draw any conclusions based on the map or data. (*Id.*). In addition, Defendants assert that any conclusions and/or opinions in Plaintiffs' expert's report regarding the effect or impact of his data on sex offenders are inadmissible because he is not qualified to draw such conclusions. (*Id.*).

From viewing the three maps, the Court can clearly see that a large portion of Davidson County is unavailable to Plaintiffs and other registered sex offenders. Additionally, Plaintiffs have put into the record facts that show that they are, in fact, facing real consequences in their lives from such banishment.[23] Doe #1's minor son suffered a stroke and needs to swim twice a week,

---

[23] There is some evidence in the record that is potentially relevant to banishment that the Court declines to consider. In his Complaint, Doe #1 states that he has been living in a home that is "grandfathered" in to an exclusionary zone, *i.e.*, it remains permissible for his habitation based

36

which his mother does not have enough time to do. (*Id.* at ¶ 20). Doe #1 cannot swim with his son at public swimming pools, and he is uncertain if he could go to a private swimming club. (Doc. No. 93 at 5). Doe #1 bought a remote-control airplane for his son, but he is unable to go to the park with him to fly it. (*Id.*). Doe #1 has a contract to deliver topsoil to a school system, but he does not make the deliveries himself for fear of violating SORA's geographic restrictions. (*Id.* at 3).

Doe #2 states that he cannot go to the park with his daughter. (Doc. No. 93 at 5). Due to financial difficulties, Doe #2 needs to move out of his current home. (*Id.*). A friend offered Doe #2 a place to stay, but Doe #2 was unable to accept the offer because the house was too close to a prohibited area. (*Id.*). Doe #2 had to consult with an attorney to determine the distance of the home from the prohibited area. (*Id.*).

Therefore, the Court finds that Plaintiffs have shown that they are effectively banished from much of Davidson County, as they have shown that their living and recreational activities have been limited by SORA's exclusionary zones. This finding supports Plaintiffs' as-applied challenge.

However, the Court does not believe that Plaintiffs have shown that this factor should cut in favor of granting relief on their qualified facial challenge. Indeed, although Plaintiffs ask the Court to find "every retroactive application of SORA," (Doc. No. 93 at 11), unconstitutional under

---

solely on his pre-existing and continuing habitation there. He fears that if he were to move out of the house for an extended time (to renovate it), law enforcement would forbid him to move back because he would have lost the grandfathering exception by virtue of discontinuing his residence there. (Doc. No. 1 at ¶ 88). Despite speculating about this outcome his Complaint, Doe #1 has pointed the Court to nothing in the record substantiating that this in fact would be the outcome of temporarily vacating his residence in this manner.

Additionally, the Court does not consider evidence in the record that Plaintiffs cannot take their children to school or attend school functions. Plaintiffs' have advanced no argument that this is a form of banishment.

the Ex Post Facto Clause—a finding that would be applicable statewide, to all counties—they provide the Court with maps only of Davidson County.

## 2. Shaming

Pursuant to two of the definitions prescribed by SORA, a registrant can be classified as a "violent sexual offender" (as was Doe #1) or an "offender against children" (as was Doe #2). *See* Tenn. Code Ann. § 40-39-202(30); *id.* § 40-39-202(10).[24] A "violent sexual offender" means anyone "who has been convicted in [Tennessee] of committing a violent sexual offense or has another qualifying conviction." Tenn. Code Ann. § 40-39-202(30).[25] "Offender against children" means any offender (*i.e.*, any sexual offender, violent sexual offender, or violent juvenile sexual offender)[26] if the victim in one or more of the offender's crimes was a child of twelve years of age

---

[24] A registrant conceivably could fall under both definitions (classifications), but that is not the case for either Doe #1 or Doe #2.

[25] A "violent sexual offense" is defined to include the commission of any act that constitutes the criminal offense of aggravated rape, rape, aggravated sexual battery, rape of a child, attempt to commit rape, aggravated sexual exploitation of a minor, especially aggravated sexual exploitation of a minor, aggravated kidnapping where the victim is a minor (except when committed by a parent of the minor), especially aggravated kidnapping where the victim is a minor (except when committed by a parent of the minor), sexual battery by an authority figure, solicitation of a minor (when the offense is classified as a Class B or Class C felony), spousal rape, aggravated spousal rape, criminal exposure to HIV, statutory rape by an authority figure, incest, aggravated rape of a child, aggravated prostitution, trafficking for a commercial sex act, promotion of prostitution (if there was a prior conviction for the same), continuous sexual abuse of a child, and criminal attempt, solicitation, conspiracy, criminal responsibility, facilitating the commission, or being an accessory after the fact to commission any of the offenses enumerated in the subsection defining "violent sexual offense." Tenn. Code Ann. § 40-39-202(31)(A)-(AA).

[26] "Offender" is the term SORA uses for someone required by SORA to register. *See* Tenn. Code Ann. § 40-39-203(a)(1). (Herein, the Court variously uses the terms "offender" or "registrant" for a non-juvenile who is required to register and/or has registered). Setting aside juvenile offenders (which the Court generally has throughout this opinion), who can be offenders only if they are "violent juvenile sexual offenders," an "offender" is either a "sexual offender" or a "violent sexual offender." *See* Tenn. Code Ann. § 40-39-202(9). A "sexual offender" is someone who has committed a crime on a list of relatively less serious crimes considered sexual in nature, and a "violent sexual offender" is someone who has committed a crime on a list of more serious crimes

or less. Tenn. Code Ann. § 40-39-202(10). Importantly, the classification of "violent sexual offender" clearly is based solely on the offense for which an offender was convicted—the statute the offender was found to have violated—rather than the particular conduct (including conduct not necessary to violate the statute) involved in the offender's violation of the statute. The same is *not* true of the classification of "offender against children"; that classification turns on the actual age of the victim(s) actually involved in the offender's particular conduct that violated the statute. Plaintiffs argue that SORA's classification of some registrants as "violent sexual offenders" or "offenders against children" without individualized assessment resembles traditional shaming. (Doc. No. 67 at 20; Doc No. 104 at 2). It is clear that if a registrant is classified as an "offender against children," then such classification of the registrant is publicly available information. *See* Tenn. Code Ann. § 40-39-206(d)(16). The Court does not see where SORA declares that a registrant's classification as a "violent sexual offender" is likewise publicly available information; however, Plaintiffs asserts that it is, and Defendants do not seem to dispute that, and so the Court will assume that it is.

---

of a sexual nature (though not *necessarily* "violent crimes," as discussed herein). In this sense, the classification of "sexual offender" is the least derogatory—the minimum, so to speak— classification for an offender. *See* Tenn. Code Ann. § 40-39-202(19), (20), (30), (31). An "offender against children" is a classification that includes offenders—whether "sexual offenders" or "violent sexual offenders"—who victimized someone less than 13 years of age. *See* Tenn. Code Ann. § 40-39-202(10). So in short, classification as an "offender against children" (i) is not itself what lands someone on the registry, (ii) can occur for persons who committed only an offense that (if the age of the victim(s) is not taken into account) is relatively less serious, (iii) runs in parallel to, and not to the exclusion of, classification as a "sexual offender" or "violent sexual offender," and (iv) is a classification that imparts a particular kind of ignominy (based on societal revulsion for those who hurt children) that goes beyond the ignominy imparted by the parallel classifications of "sexual offender" or "violent sexual offender."

To summarize, Plaintiffs are right to suggest that the classifications of "violent sexual offender" and "offender against children" impart ignominy additional to the "baseline" ignominy imparted by being required to register (due to the minimum status of "sexual offender").

39

Although neither side here, nor courts generally, focus on (or even discuss) the purpose(s) of these kinds of classifications, the Court believes that such purpose(s) are very relevant to whether a person's placement in such classes constitutes shaming; among other things, it is probative of whether the *intent* of such placement is to shame. This question appears relevant to the analysis of the "shaming" factor. In *Smith v. Doe*, the Supreme Court seemed to imply that the intent of the statute was also relevant, noting that "[i]n contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the *objective* of the regulatory scheme." 538 U.S. at 99 (emphasis in original); *see also Hatton v. Bonner*, 356 F.3d 955, 965 (9th Cir. 2004) ("We find no evidence that an objective of § 290 is to shame, ridicule, or stigmatize sex offenders.").

The label of "violent sexual offender," in lieu of the label of mere "sexual offender,"[27] is not gratuitous in the sense that it is applied to the offender solely to pronounce (and publicly announce) the offender as a particular (bad) kind of person. Rather, a registrant is so labeled at least in part because the person's particular obligations or restrictions under SORA depend in part on the registrant falling (or not falling) within that class. For example, if a registrant is classified as a "violent sexual offender," the registrant must report in person to a designated law enforcement agency quarterly, rather than merely annually as required for offenders generally. *See* Tenn. Code.

---

[27]As noted in a footnote above, the label of "violent sexual offender" is also used to identify (by category, based on the particular crime(s) committed) persons who need to register. But the label "sexual offender" is used for the same purpose, and it could also have encompassed everyone labeled as a "violent sexual offender"; the latter classification could have been omitted, with the list of crimes that currently render someone a "violent sexual offender" being added to the list of crimes currently rendering someone a "sexual offender." So the label "violent sexual offender" does not serve the purpose of identifying (by category) persons subject to any category-specific registration obligations; the registration obligation could have been pronounced by using the (less derogatory) label applied to other offenders having the same obligation to register.

40

Ann. § 40-39-204(b)(1), (c). So such classification does not appear intended to shame, but rather intended to identify (by category) registrants who (supposedly) merit additional scrutiny or restrictions.

The situation is somewhat different for the label "offender against children." As far as the Court can tell, such classification serves no purpose under SORA other than having the label announced publicly. *See* Tenn. Code Ann. § 40-39-206(d)(16) (stating, that whether a registrant is an "offender against children" is "information [that is] public").[28] Thus, apparently SORA's purpose in making this classification was to announce the fact that the registrant fit into this classification. That is not to say, however, that such classification is intended to shame. It is easily inferable to the Court that the announcement was not intended to gratuitously brand the registrant in public as a particular type of (bad) person, but rather to put on notice members of the public (especially parents of children living relatively near where the registrant lives) who may have a legitimate need to know of the nearby presence of someone who has done the kind of things to children that resulted in his or her classification as an offender against children. So such classification, though perhaps coming closer to shaming than does the classification of "violent sexual offender," nevertheless does not appear intended to shame.

So neither classification appears to have the intent to shame, and Plaintiff does not argue otherwise. Indeed, neither party makes any argument as to if SORA has an intent to shame, instead

---

[28] A registrant's classification as an "offender against children" (or, for that matter, as a "violent sexual offender") does serve another purpose under a different statute enacted in 2016, long after SORA originally went into effect. *See* Tenn. Code Ann. § 49-7-162 ("No person who is registered, or required to register, as a violent sexual offender or offender against children pursuant to [SORA], shall knowingly establish a primary or secondary residence or any other living accommodation in any public institution of higher education's on-campus student residence facilities, including dormitories and apartments.").

focusing on if the statute has the effect of imbuing Plaintiffs with additional ignominy as discussed in *Snyder I*.

When looking at whether a statute resembles traditional shaming, courts typically do indeed look to the effects of the statute. In *Snyder I*, the Court specifically looked for additional "ignominy"—beyond that imparted by their convictions—inflicted on the plaintiffs by their classification under MSORA's provisions as among the most dangerous offenders ("Tier III" offenders). *Snyder I*, 834 F.3d at 703. And in *Rausch I* and *Rausch II*, the respective courts likewise looked at the effect of SORA generally (though not the effect of a particular classification mandated by SORA) upon the plaintiffs. *Rausch II*, 461 F. Supp. at 763 (listing ways the plaintiff had been shamed by the public information in the statute, such as having individuals vandalize his yard, make false accusations against him for harboring a child, and questioning him during a traffic stop); *Rausch I*, 382 F. Supp. 3d at 796 ("Yes, Plaintiff's criminal conviction is a matter of public record, but [SORA] requires Defendant to publish that information, along with much personal information about each registrant – date of birth, home and work addresses, driver's license number, license plate number and description of all vehicles, etc. – on a publicly accessible website. See Tenn. Code Ann. 40-39-206(d). Plaintiff testified that his name and photograph are often included in local news publications about sex offenders and his status as a sex offender is printed on his identification. These provisions resemble the traditional punishment of shaming.").

The effect of the two relevant classifications under SORA are driven not only by the mere name of the classifications, but also by their substance. The Court believes it undeniable that the names of these classifications objectively have very negative—and shameful—connotations. Their substance (the definitions that prescribe who falls within the classification) closely mirrors the names of the classifications and thus likewise carries shameful connotations.

Plaintiffs argue that these classifications publicly brand offenders as "violent"[29] and/or an offender against multiple "children" without any individualized assessment of the offender's present dangerousness. (Doc. No. 67 at 20; Doc. No. 104 at 2). Again, Plaintiffs compare this requirement to MSORA, which categorized offenders into tiers corresponding to the state's estimation of present dangerousness and published those classifications without providing for any individualized assessment. (Doc. No. 67 at 20-21); *Snyder I*, 835 F.3d at 702-03. The Sixth Circuit held MSORA resembled the traditional punishment of shaming because "[u]nlike the law in *Smith*, which republished information that was already publically available, [MSORA] ascribes and publishes tier classifications corresponding to the state's estimation of present dangerousness without providing for any individualized assessment." *Snyder I*, 834 F.3d at 701-02.

Relevant to the as-applied challenge, Defendants do not dispute that (as the Court has found) the relevant classifications carry shameful connotations. Instead, Defendants argue that SORA does not resemble shaming because, unlike MSORA,[30] it does not provide a label for Plaintiffs other than one that already was publicly ascribable to Plaintiffs because they both pled guilty to "violent" sexual offenses. (Doc. No. 91 at 3-4). Essentially, Defendants argue that the label "violent sexual offender" makes public no additional information about Plaintiffs because

---

[29] It is not lost on the Court that people can and sometimes do disagree about what is and is not violen[ce][t]. Herein, the Court does not purport to pronounce specifically what does and does not fit within the scope of such term[s]. Rather, its focus is whether there is any reasonable interpretation of the word "violent" that would result in Doe #1 suffering additional ignominy from being classified as a violent sexual offender beyond the ignominy he otherwise faces given what it was that landed him on the registry and in the classification of "violent sexual offender."

[30] Defendants have a point about MSORA. The "tier" of dangerousness publicly ascribable to a registrant under MSORA unquestionably added an additional public designation of a very unflattering nature (at least to those not on the lowest of MSORA's three tiers), and is unlike anything found in SORA.

43

both pled guilty to sexual offenses involving violence to a minor child. (*Id.* at 4). However, as Plaintiffs note, in making their arguments Defendants mistakenly state that Doe #2 is classified as a violent sexual offender (as Doe #1 is). In fact, Doe #2 is classified as an "offender against children."

According to Plaintiffs, Defendants are mistaken because the labels "violent sexual offender" and "offender against children" do in fact create "additional ignominy" beyond that created by their convictions. (Doc. No. 104 at 2). Doe #1 was convicted of attempted aggravated sexual battery, an offense that does not always require proof of violent conduct (and, the Court would add, did not necessarily involve violent conduct in Doe #1's case, as far as the record reveals).[31] (*Id.*). Despite this, he is automatically labeled a "violent sexual offender" under SORA.

---

[31] The statute of conviction for Doe #1 was criminal attempt in violation of Tenn. Code Ann. § 39-12-101. (Doc. No. 70-1). The crime that was the object of his attempts (he was convicted of two counts of criminal attempt) does not necessarily involve violence; aggravated sexual battery arises in any one of four circumstances set out in separate paragraphs under subsection (a) of the statute proscribing aggravated sexual battery: 1) involving force or coercion, 2) bodily injury, 3) the defendant is aided and abetted by one or more other people and either force or coercion is used or the defendant knows or has reason to know of the victim's mental deficiency or incapacitation or physical helplessness, or 4) the victim is less than thirteen years of age. Tenn. Code Ann. § 39-13-504(a). It is fair to say that the fourth circumstance, though very disturbing, does not necessarily involve violence; the same possibility could fairly be said to exist for each of the three other circumstances. And even if it could be said that aggravated sexual battery necessarily requires "violent" conduct, *attempted* aggravated sexual battery does not require violent conduct. A review of the elements of criminal attempt in violation of Tenn. Code Ann. § 39-12-101 reveals that a person can be guilty of attempt to commit aggravated sexual battery without having taken any action that is violent; that is to say, even if someone necessarily is *intending* to commit aggravated sexual assault, and even if aggravated sexual assault necessarily involves violence, attempted aggravated sexual assault be committed without any violence having occurred.

Moreover, the Court sees nothing in the record to indicate that Doe #1's attempts actually involved violent conduct, or that his attempts amounted to efforts to commit aggravated sexual assault in a way that actually would have involved violence. The written judgment in the criminal court (Doc. No. 70-1) did not indicate a particular subsection under which Doe #1 was convicted, and the parties agree that Doe #1 was convicted in 1994 of committing attempted aggravated sexual battery, without further describing the events. (Doc. No. 92 at ¶ 1).

44

Plaintiffs also argue that Doe #2's classification as an "offender against children" (based on his conviction for sexual battery in violation of Tenn. Code Ann. § 39-13-505) creates "additional ignominy" because (1) the classification suggests (by using the word "children" as opposed to "a child") that Doe #2 has victimized more than one child (even though, the Court notes, there is nothing in the record to suggest that he did),[32] and (2) sexual battery does not require that the victim be a child.[33] (*Id.* at 3).

There is no question that Doe #1 and Doe #2 each have been classified in a manner that suggests he did something egregious (engage in "violent" conduct and victimize multiple minor victims, respectively) that he was not required to do in order to land in such classes. As for Doe #1, it is not clear from the record that he *in fact* engaged in "violent" behavior in committing the crime that landed him on the registry, and it is certainly not clear that his crime of conviction involved the violation of a statutory provision (subsection) that required "violent" behavior. In short, even if Doe #1 did in fact engage in offense conduct that involved "violent" behavior, that fact would not be clear to anyone based on what offense of conviction landed him in the classification of "violent sexual offender." True, if Doe #1 in fact had engaged in "violent" conduct in committing his offenses of conviction, a hypothetical member of the public could determine that by drilling down on publicly available information about Doe #1's criminal cases. But the record does not reflect that there is publicly available information suggesting that Doe #1 did in fact engage in "violent" behavior in committing his offenses. And even if it did, the Court would find that SORA, by causing Doe #1 to be labeled a "violent sexual offender," adds ignominy to

---

[32] The written judgment in the criminal court on each of Doe #2's three counts (Doc. No. 70-2) did not indicate more than one victim, and the parties agree that Doe #2 was convicted of three counts of sexual battery involving his ex-wife's niece without indicating any additional victims. (Doc. No. 95 at ¶ 1).

Doe #1 beyond the ignominy otherwise resulting from his convictions, considering the not-necessarily-violent nature of the offenses that landed him in this classification.

As for Doe #2, the offense of conviction that landed him on the registry (sexual battery, which makes him a "sexual offender" though not a "violent sexual offender") does not require an offense against (multiple) children or even a single child. And his classification as an "offender against children," though requiring that he actually have committed an offense against one child victim, does not require that he engaged in the even more shameful conduct of victimizing (multiple) children. And in this case, the record reflects pretty clearly that Doe #2 in fact had merely a single child victim. So his public labeling as an "offender against children" conveys ignominy additional to the ignominy associated with the minimum conduct suggested either by the fact that he is a registrant, the fact that he committed the particular crime that made him a registrant, or the fact that he had one (and only one) child victim.

The Court thus finds that, as applied to Plaintiffs, the respective statutory classifications resemble shaming because they create additional ignominy without an individualized assessment other than the conviction itself, similar to what Michigan's "tier" system did in *Snyder I*.

Relevant to the facial challenge, Plaintiffs also point the Court to other offenses (which are not relevant to any as-applied challenge, since Plaintiffs were not convicted of them) that do not contain an element of "violence" but result in the label "violent sexual offender" under SORA. These include aggravated sexual exploitation of a minor, solicitation of a minor, criminal exposure of another to HIV, and statutory rape by an authority figure. (*Id.* at 2). Depending on how one defines "violent"—including, for example, whether one considers statutory rape inherently violent even though it can be committed without certain common indicia of violence—Plaintiffs are correct that persons (beyond just Doe #1) can be classified as "violent sexual offenders" based on

crimes that do not require proof of violence. However, Plaintiffs do not seem to make an argument that shaming occurs when a registrant is called a "violent sexual offender" based on conviction of a crime that necessarily requires violent conduct. It is clear that of the statutes whose violation results in this classification, many contain subsections that are not violated unless there is "violent" conduct, even if other subsections can be violated without violent conduct. So if a registrant was expressly adjudicated—as reflected specifically in a written judgment, for example—to have violated such a subsection in particular,[34] the registrant's classification as a "violent sexual offender" does not add any ignominy beyond that already conveyed publicly by the mere identification (by subsection) of the registrant's crime of conviction.

As for the classification of "offender against children," the Court reiterates that such a classification is based not on the identity of the criminal statutory provision violated by the registrant, but rather on the particular conduct in which the registrant *actually* engaged. There can be no doubt that some offenders will end up on the registry for committing one or more crimes that victimized more than one child.[35] In some cases, the fact that a registrant's crime(s) involved more than one child will be quite public For such offenders, their classification as "offenders against children" would not add ignominy beyond that already imparted by their crimes(s) that led to that classification.

_____

[34] This did not happen in the case of Doe #1. Indeed, his statute of conviction does not have such subsections, and additionally the written judgments in his case did not reflect the subsection of the aggravated sexual assault statute (not all of which require violent conduct) that he attempted to violate.

[35] Such crimes could include those that, like Doe #2's crime of sexual battery, do not require a child victim at all. But some such crimes would require a child victim; for example, rape of a child in violation of Tenn. Code. Ann. §39-13-522 requires the victim to be less than 13 years of age.

Therefore, for each of these two classes under the SOR, circumstances exist under which a registrant's labeling would accurately reflect what the registrant did to end up with such a label, without inflicting additional ignominy on an offender beyond that already inflicted by publicly available information relating to the reasons for the classification. This cuts against Plaintiffs on their facial challenge. As noted previously, to succeed on a facial challenge "a plaintiff must establish 'that no set of circumstances exists under which [the statute] would be valid.'" *Speet*, 726 F.3d at 872 (quoting *United States v. Stevens*, 559 U.S. at 472).

In summary, the Court finds that SORA resembles the traditional punishment of shaming as applied to Plaintiffs, but not on its face.

### 3. Probation

Third, Plaintiffs argue that SORA's geographic restrictions and registration requirements, which are backed by the threat of imprisonment, resemble the punishment of probation.[36] (Doc. No. 67 at 21). According to Plaintiffs, SORA's provisions—including the geographic restrictions, annual or quarterly in-person reporting, in-person reporting within 48 hours of changing residence, establishing employment, or beginning school, and reporting within 48 hours of other changes—impose restrictions comparable and perhaps even more severe than the punishments of probation and parole. (*Id.* (citing Tenn. Code Ann. § 40-39-211(a)(d), § 40-39-204(b), (c), § 40-39-203(a)(1), § 40-39-203(a)(4) & (6), 40-39-203(a)(3), § 40-39-204(h)). Applying the Sixth Circuit's reasoning in *Snyder I*, Plaintiffs argue that "unlike registrant's [sic] under Alaska's law, registrants under

---

[36] In some cases, imposition of probation may be considered a manifestation of judicial leniency at sentencing. Nevertheless, probation unquestionably is a form of punishment, and indeed is not even at the very lowest end of the punishment spectrum. *See United States v. Knights*, 534 U.S. 112, 119 (2001).

48

SORA are not free to 'move where they wish and to live and work as other citizens, with no supervision.'" (Doc. No. 67 at 21 (citing *Snyder I*, 834 F.3d. at 703)).

In response, Defendants argue this Court's analysis of the parole factor is dictated by the Sixth Circuit's decision in *Bredesen*, which concluded that a version of "the Act's registration, reporting, and surveillance requirements do not resemble punishment."[37] (Doc. No 91 at 4). In *Bredesen*, the Sixth Circuit found that wearing a GPS monitoring system was part of a registration, reporting, and surveillance scheme that was not typically considered punishment. 507 F.3d at 1005. This Sixth Circuit decision built on the Supreme Court's finding in *Smith* that registration and notification requirements were "less harsh than the sanctions of occupational debarment, which we have held to be nonpunitive." 538 U.S. at 100. Defendants' argument misses the point. The Court has noted above that its analysis will go beyond mere consideration of *Cutshall* and *Bredesen* for various important reasons, the most applicable being that "the Sixth Circuit's decision in last year's [*Snyder I*] has clarified the appropriate analysis for such claims to a degree that, though not strictly overruling *Cutshall* and *Bredesen*, significantly undermines those cases' applicability to a challenge raised today." (Doc. No. 37 at 40-41).

Specifically, *Snyder I* found that MSORA "resembles the punishment of parole/probation." 834 F.3d at 703. *Snyder I* distinguished *Smith* by noting that in *Smith* the Supreme Court dealt with mere statutory reporting requirements that did not impair offenders' freedom to live and work with no supervision, and that the Supreme Court nevertheless treated seriously the contention that the requirements resembled parole/probation. *Id.* The court in *Snyder I* found that compared to the

_____

[37] In their Response to Plaintiff's Motion, Defendants do not break down their arguments clearly into the three forms of traditional punishment (banishment, shaming, and probation). Defendants use the general phrase "punishment" when making this argument, but the Court believes Defendants intended their reference here to *Bredesen* to apply more specifically to probation.

system in *Smith*, MSORA was more similar to a parolee system, where registrants had numerous restrictions on where they could live and work, along with in-person reporting requirements (as opposed to by mail). *Id.* The court reasoned that, in contrast to *Smith*:

> Registrants [under MSORA] are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail. Failure to comply can be punished by imprisonment, not unlike a revocation of parole. And while the level of individual supervision is less than is typical of parole or probation, the basic mechanism and effects have a great deal in common. In fact, many of the plaintiffs have averred that [MSORA's] requirements are more intrusive and more difficult to comply with than those they faced when on probation.

*Snyder I*, 834 F.3d at 703. Applying *Snyder I*, the court in *Rausch II* found that SORA, as-applied to the plaintiff, resembled probation because of the in-person reporting requirements and the level of supervision required by SORA. 461 F. Supp. 3d at 764; *Rausch I*, 382 F. Supp. 3d at 796-97 (finding resemblance to parole because of the travel restrictions and reporting requirements).

Similar to *Snyder I*, all registrants under the Tennessee system have numerous restrictions. SORA requires registrants to update changes to certain information with 48 hours. Tenn. Code. Ann. § 40-39-203(a)(1). Violent sexual offenders must report in person four times a year. Tenn. Code. Ann. § 40-39-204(b)(1). All sexual offenders must report in person once a year. *Id.* at (c). All sexual offenders must report at least 21 days before leaving the country, with a few exceptions. *Id.* at (h). Within three days of changing "internet communication name or identity information," an offender must report the change. Tenn. Code. Ann. § 40-39-203(a)(7). As discussed above, registrants also have numerous geographic restrictions on where they live, work, and spend time.

Because he finds SORA to be confusing, Doe #1 has foregone travel to Honduras in the last two years, although previously he spent a substantial amount of his time in Honduras. (*Id.* at ¶ 34). As a violent sexual offender, Doe #1 must report in person four times a year. As an offender against children, Doe #2 must report in person once a year. Both must report their changes to

50

Internet identifiers and changes to other information within a matter of days. Looking at the statute on its face, all registrants face some level of monitoring and in-person reporting requirements. These in-person reporting and supervision restrictions faced by Plaintiffs and offenders generally are similar to those found to resemble probation in *Snyder I* and *Rausch II*, and they appear to have a similar effect.

Therefore, both facially and as applied, the Court finds that SORA resembles probation.

### 4. Conclusion regarding resemblance to punishment

In sum, the Court finds that as applied to Plaintiffs, SORA resembles traditional forms of punishment because it resembles banishment, shaming, and parole. On its face, SORA resembles parole, but not banishment or shaming.

### b. Does SORA impose an affirmative disability or restraint?

In support of their Partial Summary Judgment Motion, Plaintiffs argue that "SORA's extensive geographic restrictions, in-person reporting requirements, and life-time registration requirement for violent sexual offenders are indistinguishable from those of [MSORA] and likewise impose 'direct restraints on personal conduct' that are neither 'minor' nor 'indirect.'" (Doc. No. 67 at 22) (footnotes omitted). Defendants do not address this factor in their response or in their briefs supporting Defendants' Motions.

In *Snyder I*, the court addressed MSORA's restrictions on where registrants could live, work, and loiter, as well as the requirement to appear in person to make updates. The court found that these were "direct restraints on personal conduct," and more severe than the restrictions in *Smith*, which did not require in-person updates. 834 F.3d at 703. The court rejected the defendant's argument that the restraints were only "minor and indirect" because they were not physical. *Id.* The court elaborated: "surely something is not 'minor and indirect' just because no one is actually

51

being lugged off in cold irons bound. Indeed, those irons are always in the background since failure to comply with these restrictions carries with it the threat of serious punishment, including imprisonment." *Id.* The court in *Rausch II* also found that SORA imposes an affirmative disability or restraint, explaining that

> Plaintiff is restricted on where he can live, work, travel, and engage in leisure activities with his wife. He must report in-person four times a year for as long as he is on the registry, which is a lifetime commitment. It is true that Plaintiff has been content with his current residence, has not experienced a dramatic change in income, and has been assisted in his compliance by law enforcement officers. However, making the most of a difficult situation does not change the fact that [SORA's] restrictions are "direct restraints on personal conduct," particularly "since failure to comply with these restrictions carries with it the threat of serious punishment, including imprisonment." *Snyder*, 834 F.3d at 703.

461 F. Supp. 3d at 765; *see also Rausch I*, 382 F. Supp. 3d at 797.

Similar to the plaintiff in *Rausch II*, Plaintiffs here face serious punishment, including imprisonment, if they fail to comply with lifetime, in-person reporting requirements and particular geographic restrictions. As noted above, these requirements and restrictions resemble probation, and probation is a restriction on liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) (noting that probation inherently entails restricting liberty to which the probationer otherwise would be entitled); *Blanton v. City of N. Las Vegas, Nev.*, 489 U.S. 538, 542 (1989) (noting that probation "may engender a significant infringement of personal freedom" (internal quotation marks and citation omitted)); United States Sentencing Commission, *Federal Sentencing: The Basics*, at 8 (discussing probation as a "form of deprivation of liberty"). The situation appears no different for other registrants. Therefore, the Court finds SORA to be a "direct restraint on personal conduct." *Rausch II*, 461 F. Supp. 3d at 765.

The Court finds this factor weighs in favor of Plaintiffs, both on their as-applied challenge and their facial challenge.

52

### c. Does SORA promote the traditional aims of punishment?

Plaintiffs argue that "SORA's geographic restrictions try to incapacitate registrants by denying them access to potential victims. SORA imposes retribution by forcing a person to register based solely on his past offense, publicly marking him—on the Internet, no less—as one 'who cannot be fully admitted into the community,' and by physically excluding him from much of the community by extensive geographic restrictions." (Doc. No. 67 at 23 (quoting *Snyder I*, 834 F.3d at 704)). Defendants do not address this factor in their response or in their motions for summary judgment.

In *Snyder I*, the court found that MSORA "advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence." 834 F.3d at 704. The court noted that:

> Its very goal is incapacitation insofar as it seeks to keep sex offenders away from opportunities to reoffend. It is retributive in that it looks back at the offense (and nothing else) in imposing its restrictions, and it marks registrants as ones who cannot be fully admitted into the community. Further, as discussed below, it does so in ways that relate only tenuously to legitimate, non-punitive purposes. Finally, its professed purpose is to deter recidivism (though, as discussed below, it does not in fact appear to do so), and it doubtless serves the purpose of general deterrence.

*Id.* However, the court in *Snyder I* gave this factor little weight, noting that the same goals can also be described as "civil and regulatory." *Id.*

The court in *Rausch II* found SORA to promote the traditional aims of punishment as applied to that plaintiff, and this Court finds that court's reasoning persuasive:

> Here, the permanence of the restrictions imposed on Plaintiff emulate retribution, as the perpetual restrictions are imposed on the basis of his former conviction, not his likelihood of re-offense. Likewise, the exclusion zones track the aims of specific deterrence and incapacitation by forever limiting Plaintiff's access to places and areas around places where children may be. Though [SORA's] restrictions promote deterrence, both the Supreme Court and the Sixth Circuit have emphasized that a deterrent purpose does not make a statute criminal . . . On balance, the Court finds

that permanence of [SORA's] restrictions, based solely on his prior offense rather than a present potential of re-offense, weigh in favor of traditional punitive aims.

461 F. Supp. 3d at 765–66; *see also Rausch I*, 382. F. Supp. 3d at 797.

The Court finds that this factor weighs in favor of Plaintiffs on their as-applied challenge. Additionally, since the statute would apply the same permanent restrictions, regardless of the potential of a re-offense to all registrants, the Court finds that this factor weighs in favor of Plaintiffs on their facial challenge. As noted, however, the significance of this factor is relatively minor.

### d. Does SORA have a rational connection to a non-punitive purpose?

"The Act's rational connection to a nonpunitive purpose is a '[m]ost significant' factor in our determination that the statute's effects are not punitive." *Smith v. Doe*, 538 U.S. at 102 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)). Thus, if the Court were to find a rational connection to a non-punitive purpose, that would cut heavily against Plaintiffs' position.

Plaintiffs argue that here, like in *Snyder I*, there

is no empirical evidence that Tennessee's SORA serves its supposed non-punitive purpose. This disconnect between SORA's means and ostensibly non-punitive ends is exacerbated by the absence of any individualized assessment of a registrant's dangerousness or proclivities. Like Michigan's sex offender registry law, the geographic restrictions of Tennessee's SORA are crude, blunt instruments that apply without regard to actual dangerousness.

(Doc. No. 67 at 23).

In *Snyder I*, the court found it concerning that the record provided "scant support" that MSORA was accomplishing its professed goals. 834 F.3d at 704. The court pointed to various evidence put into the record by plaintiffs showing that recidivism might not be lowered (and in fact might be increased) by the restrictions imposed by the statute. *Id.* The Sixth Circuit cautioned courts against using intuition to make a decision regarding the rational connection, noting that

54

"while it is intuitive to think that at least some sex offenders—*e.g.*, the stereotypical playground-watching pedophile—should be kept away from schools, the statute makes no provision for individualized assessments of proclivities or dangerousness, even though the danger to children posed by some—*e.g.*, Doe # 1, who never committed a sexual offense—is doubtless far less than that posed by a serial child molester." *Id.* at 705.

Defendants argue that in *Snyder I*, the plaintiffs developed an extensive record via experts who testified regarding doubts cast by empirical studies on if recidivism is high. (Doc. No. 91 at 4). Defendants additionally rely on *Bredesen*, noting that the Sixth Circuit has previously held that "the Tennessee legislature could rationally conclude that sex offenders present an unusually high risk of recidivism, and that stringent registration, reporting, and electronic surveillance requirements can reduce that risk and thereby protect the public without further 'punishing' the offenders." 507 F.3d at 1006. For reasons previously discussed, Defendants bare reliance on *Bredesen* (and presumably the rational connection credited therein), to the exclusion of presenting this Court with argument or evidence suggesting that SORA (in its present form) is rationally connected to a non-punitive purpose such as lowering recidivism, is misplaced. Even in *Bredesen*, the court noted that it was relying on undisputed statistics by the United States Department of Justice cited by SORA's preamble in evaluating if SORA (in its former form) and the Pilot Project Act had a rational connection to a non-punitive purpose. *Id.* Perhaps Defendants intend to rely on these kinds of statistics here, but Defendants do not say so.

Defendants also cite to a more recent Tenth Circuit case (which was issued several months before the decision in *Snyder I*), *Shaw v. Patton*, 823 F.3d 556 (10th Cir. 2016), in which the Tenth Circuit held that the Oklahoma legislature rationally could conclude that there was a connection between residency restrictions in the statute and the reduction of recidivism, which promoted

public safety. *Id.* at 573. The Tenth Circuit did not cite to any evidence that the recidivism was actually lowered by the residency restrictions. *Id.* Defendants seem to argue from their citation to this case that provisions in a sex offender registry law are rationally related to a non-punitive purpose when they are aimed at "reducing sex offenders' temptations and opportunities to reoffend." (Doc. No. 91 at 5). Assuming that Defendants invoked *Shaw* to imply that SORA's residency restrictions were rationally connected to SORA's non-punitive purpose of deterring recidivism, the Court would reject the implication based on the Sixth Circuit's reasoning in *Snyder I*, which cautioned against knee-jerk reactions and the automatic association of lowered recidivism rates with geographic restrictions. In *Snyder I*, as noted above, the court found that "[t]ellingly, nothing the parties have pointed to in the record suggests that the residential restrictions have any beneficial effect on recidivism rates. And while it is intuitive to think that at least some sex offenders—*e.g.*, the stereotypical playground-watching pedophile—should be kept away from schools, the statute makes no provision for individualized assessments of proclivities or dangerousness." *Snyder I*, 834 F.3d at 705. Here, the parties have similarly pointed to nothing in the record that shows that SORA has a beneficial effect on recidivism rates. Therefore, Defendants provide the Court with no rational connection to a non-punitive purpose.

Defendants do not cite the Court to the legislative findings in SORA, which lay out the purposes of the statute. Because Defendants did not even mention the legislative findings in arguing that SORA is rationally related to a non-punitive purpose, Defendants also made no attempt to connect SORA's listed purposes with non-punitive purposes as applied to Plaintiffs' claims. As this is a "most significant factor," the Court nevertheless will briefly examine these legislative findings, as the court did in *Rausch II* (which featured a similar lack of argument from

56

the defendants). *Smith v. Doe*, 538 U.S. at 102 (cleaned up); 461 F. Supp. 3d at 767. These legislative findings include:

- "Repeat sexual offenders, sexual offenders who use physical violence and sexual offenders who prey on children are violent sexual offenders who present an extreme threat to the public safety. Sexual offenders pose a high risk of engaging in further offenses after release from incarceration or commitment and protection of the public from these offenders is of paramount public interest";

- "It is a compelling and necessary public interest that the public have information concerning persons convicted of sexual offenses collected pursuant to this part, to allow members of the public to adequately protect themselves and their children from these persons";

- "In balancing the sexual offender's and violent sexual offender's due process and other rights against the interests of public security, the general assembly finds that releasing information about offenders under the circumstances specified in this part will further the primary governmental interest of protecting vulnerable populations from potential harm";

- "The registration of offenders, utilizing complete and accurate information, along with the public release of specified information concerning offenders, will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems that deal with these offenders";

- "To protect the safety and general welfare of the people of this state, it is necessary to provide for continued registration of offenders and for the public release of specified information regarding offenders. This policy of authorizing the release of necessary and relevant information about offenders to members of the general public is a means of assuring public protection and shall not be construed as punitive."

Tenn. Code Ann. § 40-39-201(b). "These stated goals include several non-punitive purposes, such as public scrutiny of the criminal and mental health systems that deal with sex offenders, reduction of recidivism, and providing for the protection of the public." *Rausch II*, 461 F. Supp. 3d at 767.

Like Plaintiffs here, the plaintiff in *Rausch II* thinly supported his argument that there was no rational connection to a non-punitive purpose by citing merely to the evidence of recidivism the plaintiffs put on in *Snyder I*, and the defendants (like Defendants here, who suffer from a dearth

of arguments) failed to point to a non-punitive rationale for SORA's restrictions as-applied to the

plaintiff. *Rausch II*, 461 F. Supp. 3d at 766. The court there ultimately found that:

> the record is devoid of support for the notion that perpetually imposing [SORA's]
> restrictions accomplishes these goals as applied to Plaintiff. "[W]hile it is intuitive
> to think that at least some sex offenders . . . should be kept away from schools, the
> statute makes no provision for individualized assessments of proclivities or
> dangerousness." *Snyder*, 834 F.3d at 705. Presumably, Defendant is arguing that
> the nature of Plaintiff's convictions should cause the Court to intuit the need for a
> lifetime obligation. The Court does not take lightly the egregiousness of Plaintiff's
> crimes over twenty years ago, but Defendant has not tethered any of [SORA's] non-
> punitive rationale to the case at hand. While the parties quibble about the
> appropriateness of considering statistical findings regarding recidivism referenced
> in *Snyder* that is not before this Court, Defendant cannot escape the absence of
> evidence in this record of non-punitive purposes. Specifically, there is no indication
> that the restrictions of [SORA] have kept Plaintiff from re-offending or that
> requiring a lifetime of compliance will do so. *See Hoffman v. Vill. of Pleasant
> Prairie*, 249 F. Supp. 3d 951, 959 (E.D. Wis. 2017) ("[a]n individualized
> assessment helps to ensure that a statute's particularly harsh disability or restraint
> is rationally related to a non-punitive purpose") (quoting *Shaw*, 823 F.3d at 575).
> Instead, the restrictions have greatly limited Plaintiff's ability to acquire better-
> paying jobs and engage in normal, healthy recreational activities. The Court notes
> that Defendant certainly could demonstrate that [SORA's] restrictions are
> rationally related to a non-punitive purpose, that has not been accomplished here.
> *See id.* at 960 ("[t]he lack of evidence eliminates the possibility that the
> [defendant's] action was rational").

461 F. Supp. 3d at 767; *see also Rausch I*, 382 F. Supp. 3d at 798–99 ("The difficulty, much like

in *Snyder*, is that the present record is bereft of any factual support that the restrictions of the Act

accomplish those goals. Defendant has presented no information or studies to show how the

residential, work, or travel restrictions of the Act have protected public safety or reduced

recidivism by registered offenders. Nor is there any information or attempt to link the restrictions

of the Act to the success of the criminal justice or mental health systems in dealing with those

offenders. Instead, these stated legislative purposes appear to be supported by popular stereotypes,

rather than any individualized assessment of dangerousness. Most importantly, as applied to

Plaintiff, there is no evidence or argument that the restrictions of the Act have kept him from re-

offending or that requiring him to comply with the Act for life will do so . . . While the Court does not conclude that the Defendant cannot demonstrate that the restrictions of the Act are rationally related to a non-punitive purpose, the Defendant has not done so in this case." (internal citations omitted)).

Here, neither side has put any original evidence into the record on this issue. The Plaintiffs rely primarily on *Snyder I*, and Defendants rely on *Bredesen* and *Shaw*. Given the absence of evidence to prove or disprove a rational connection, the evaluation of this factor turns on which party has the burden for each kind of challenge. From its research, the Court cannot see where the Sixth Circuit has explicitly stated whether the challenger bears the burden on an as-applied challenge. *Rausch II* suggests that the "as applied" challenger does not, and this is consistent with what other courts have said (albeit in other contexts): the state (officials) must justify the regulation as applied to the particular challenger. *See, e.g.*, *Free Speech Coal., Inc. v. Attorney Gen. U.S.*, 787 F.3d 142, 160 (3d Cir. 2015) ("Unlike an as-applied challenge, the burden falls upon Plaintiffs to demonstrate the Statutes' facial overbreadth [under the First Amendment]." (citing *Virginia v. Hicks,* 539 U.S. 113, 122 (2003)), *on reh'g vacated on other grounds, Free Speech Coal., Inc. v. Attorney Gen. United States*, 825 F.3d 149 (3d Cir. 2016); *Educ. Media Co. at Virginia Tech, Inc. v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013) ("In an as-applied challenge [made on First Amendment grounds, … the state must justify the challenged regulation with regard to its impact on the plaintiffs.") The Court does not see why the burden would not fall on Defendants here just as it would if the challenge here were based purely on the First Amendment. Because of this, the Court finds that this factor weighs in favor of Plaintiffs on their as-applied challenge for reasons mirroring those in *Rausch II.*

However, in the case of a facial challenge, the burden clearly falls on the challenger to show what needs to be shown, and not on the state (officials) to disprove the existence of what needs to be shown. Thus, the court cannot find that this factor weighs in favor of Plaintiffs to the extent that they have brought a facial challenge, as Plaintiffs have not shown the Court that "that no set of circumstances exists under which [the statute] would be valid." *Speet*, 726 F.3d at 872 (quoting *United States v. Stevens*, 559 U.S. at 472).

### e. Is SORA excessive with respect to this purpose?

Relying on *Snyder I*, Plaintiffs state that there is "no evidence of any positive counterbalance to the onerous burdens imposed by Tennessee's practically identical reporting requirements and geographic restrictions." (Doc. No. 67 at 24). Plaintiffs focus on "blanket restrictions" that they claim "limit, restrict, and burden all registrants indiscriminately." (*Id.*). Defendants do not address this factor (excessiveness) in their response or in their memorandums in support of their Motions.

In *Snyder I*, the court noted that the requirement for "frequent, in person appearances before law enforcement" appears to have no relation to public safety. 834 F.3d at 705. The Court, especially absent any contrary information, agrees; in particular, it is not willing to blindly assume that periodic mandatory visits to law-enforcement offices actually helps law enforcement keep a proverbial eye on the registrant in a way that actually deters the registrant from re-offending in between visits. In *Snyder I*, the court also noted that the "negative effects are plain on the law's face." *Id.* In *Rausch II*, the court similarly noted that "the record before the Court is devoid of positive consequences arising from the lifetime of restrictions placed on Plaintiff. Put simply, Defendants have not shown that the public is safer or that Plaintiff has been saved from recidivism

60

by a lifetime of restrictions, as opposed to just ten years." 461 F. Supp. 3d at 767; *see also Rausch I*, 382 F. Supp. 3d at 799. The same is true in the present case

Therefore, the Court finds that this factor weighs in favor of Plaintiffs on both their as-applied and facial challenges.

### f. Other factors

The five relevant factors (questions) raised by the Sixth Circuit in *Snyder I* are not necessarily exclusive. However, the Court does not perceive that any additional material factors were brought to its attention on the ex post facto issue.

### g. Conclusion

### 1. Facial Challenge

As noted above, to succeed on a typical facial challenge, "a plaintiff must establish 'that no set of circumstances exists under which [the statute] would be valid.'" *Speet*, 726 F.3d at 872 (quoting *Stevens*, 559 U.S. at 472).

As discussed above, Plaintiffs ask the Court to find that "every retroactive application" of SORA is unconstitutional under the Ex Post Facto Clause. (Doc. No. 93 at 11). In other words, they ask the Court to find that the statute is unconstitutional on its face. But the Court declines to do so because Plaintiffs have not made a sufficient showing, as required, that *all* retroactive applications of SORA are unconstitutional. The Court has noted above this lack of evidence, and the fact that several of the factors cut against a finding that SORA imposes punishment in all cases or as a general matter. The most glaring of these is the rational-connection factor, which "is a '[m]ost significant' factor in our determination that the statute's effects are not punitive." *Smith v. Doe*, 538 U.S. at 102 (quoting *United States v. Ursery*, 518 U.S. at 290).

Therefore, the Court finds that it cannot grant Plaintiff's Motion to the extent is makes a facial challenge.

61

2. <u>As-applied Challenge</u>

"[E]ven if each individual restriction passes muster in isolation, Plaintiff's motion for summary judgment has attacked the retroactive lifetime imposition of all of [SORA's] requirements, which have grown since [SORA's] enactment. Consequently, the Court must consider the combined, cumulative lifetime impact of all of [SORA's] requirements on Plaintiff." *Rausch II*, 461 F. Supp. 3d at 768. In *Rausch II*, the Court found that the requirement of lifetime compliance with SORA was punitive as to the plaintiff, reasoning that:

> [SORA] has hampered his employment opportunities, prevented him from finding an alternative residence, and demanded onerous reporting requirements without an individualized assessment of whether those requirements and restrictions are necessary to protect the public from Plaintiff. Defendant has not shown that the benefits of [SORA] to the State of Tennessee outweigh the negative consequences to Plaintiff. Further, Defendant has not provided an individualized justification for the imposition of [SORA's] burdens for the remainder of Plaintiff's life. Further still, Defendant has suggested that ease of parking and helpful law enforcement officers have mitigated [SORA's] burdens, rather than meeting Plaintiff's "clearest proof" of the punitive effects that [SORA] has had. In short, the retroactive imposition of lifetime compliance violates the Ex Post Facto Clause as applied to Plaintiff, and Plaintiff is entitled to summary judgment on this claim.

*Id.* at 768-69; *see also Rausch I*, 382 F. Supp. 3d at 799-800.

Here, the Court similarly finds that the effect of lifetime compliance with SORA is punitive as to Plaintiffs in regards to its public classification and its reporting obligations. The Court has found that all of the factors (and subfactors) concerning punitive effect lean in favor of Plaintiffs on their as-applied challenge. Perhaps the Court would reach a different result were the compliance requirements not lifelong. But certainly with lifelong requirements, for the reasons stated above, SORA is violative of the Ex Post Facto Clause due to its punitive effects.

For the reasons discussed, the Court will grant Plaintiff's Motion, to the extent it is based on their as-applied challenge, on ex post facto grounds.

The Court will discuss the resulting relief at the conclusion of this opinion.

62

### h. Plaintiffs' Other Claims

In addition to challenging Plaintiffs' ex post facto claim (discussed above),[38] Defendants also move for summary judgment on all of Plaintiffs' remaining claims (those that survived the November 9 Order), namely: (1) Due Process Violation of the Right to Education and Upbringing of Children (Count IV); (2) First Amendment Violation (Count V); (3) Due Process Violation of Imposing Criminal Liability Without Knowledge (Count VIII); and (4) Due Process Violation for Vagueness and Impossibility of Compliance (Count IX).

#### A. Plaintiffs' as-applied challenges

In addition to Plaintiffs' ex post facto claims, all of Plaintiffs' remaining claims are brought on an as-applied basis (if not also on a facial basis). To reiterate, the claims are: (1) Due Process Violation of the Right to Education and Upbringing of Children,[39] (2) First Amendment

---

[38] The Court has chosen to discuss the Ex Post Facto claim first because 1) it was the only claim discussed in both motions for summary judgment, 2) it was the claim subject to the most fulsome briefing by the parties, and 3) the Sixth Circuit in *Snyder I,* in a case involving similar constitutional issues, began with an assessment of the ex post facto challenge, as discussed above at length. 834 F.3d at 699 ("We begin our analysis with the Ex Post Facto issue.").

[39] Though they never specifically state that this claim is brought solely on as an as-applied basis, Plaintiffs do not assert at any point that they have brought this claim as a facial attack on SORA. Both the Complaint and the Response to Defendants' Motion for Summary Judgment seem to contemplate only an as-applied challenge, using language such as "Plaintiffs' fundamental right" and "their children." (Doc. No. 93 at 14); (Doc. No. 1 at ¶¶ 157-59). Plaintiffs also make passing reference in their response to "all registrants." (Doc. No. 93 at 11, 14). However, as noted they do not make any assertion that they have brought a facial challenge, as they did when addressing the ex post facto claim. (*Id.*). The Court therefore does not believe Plaintiffs to have brought a facial challenge via this claim.

63

Violation,[40] (3) Due Process Violation of Imposing Criminal Liability Without Knowledge,[41] and

(4) Due Process Violation for Vagueness and Impossibility of Compliance.[42]

As discussed above, the Court has found that SORA is unconstitutional under the Ex Post

Facto Clause as applied to Plaintiffs. The Court will not reach these additional as-applied claims,

as the Court has already granted relief to Plaintiffs on ex post facto grounds. "It is a well established

principle governing the prudent exercise of this Court's jurisdiction that normally the Court will

not decide a constitutional question if there is some other ground upon which to dispose of the

case." *Escambia Cty., Fla. v. McMillan*, 466 U.S. 48, 51 (1984); *see also Snyder I*, 834 F.3d at 706

("As we have explained, this case involves far more than an Ex Post Facto challenge. And as the

---

[40] Though Defendants seem to address Plaintiffs' First Amendment Claim only as an as-applied challenge, Plaintiffs specify in their Complaints that "requirements to report information about Internet accounts and activity is invalid under the First Amendment *both on its face and as applied* because it is not narrowly tailored to serve a compelling state interest and because it prohibits a substantial amount of protected speech." (Doc. No. 1 at ¶ 159 (emphasis added)). The Court in this subsection addresses only Plaintiffs' as-applied First Amendment challenge. The Court will address Plaintiffs' facial challenge in the next subsection.

[41] Similar to the Due Process Violation of the Right to Education and Upbringing of Children claim, Plaintiffs are unclear as to whether this is brought as an as-applied or facial challenge in their Complaints, but they do not seem to assert at any point that they bring a facial attack. Therefore, the Court does not believe Plaintiffs to have brought a facial challenge on this claim.

[42] Plaintiffs' Complaints do not make clear whether their vagueness and impossibility claims were intended to challenge SORA facially or as applied to them. But case law indicates that because this particular vagueness challenge does not implicate First Amendment rights, it cannot properly constitute a facial challenge. "Although a vagueness analysis in the context of first amendment rights may involve consideration of hypothetical facts not specifically before the court, 'it is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'" *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001) (quoting *United States v. Powell*, 423 U.S. 87, 92 (1975)) (citations omitted). Here, because Plaintiffs' vagueness challenges do not involve First Amendment rights, Plaintiffs "bear[] the burden of establishing that the statute is vague as applied to [their] particular case, not merely that the statute could be construed as vague in some hypothetical situation." *Id.* (*United States v. Avant*, 907 F.2d 623, 625 (6th Cir.1990)). The Court therefore only addresses this as an as-applied challenge.

district court's detailed opinions make evident, Plaintiff's arguments on these other issues are far from frivolous and involve matters of great public importance. These questions, however, will have to wait for another day because none of the contested provisions may not be applied to the plaintiffs in this lawsuit, and anything we would say on those other matters would be dicta.");[43] *Rausch II*, 461 F. Supp. 3d at 773 (collecting cases and stating "the Court has already addressed constitutionality of [SORA's] lifetime obligation under the Ex Post Facto Clause. As this lifetime obligation is an essential component of Plaintiff's claim that [SORA's] internet identifier requirements are not narrowly tailored, it would be inappropriate and duplicative to address the nature of Plaintiff's as-applied First Amendment claim. Having effectively resolved this claim on ex post facto grounds, the Court will not unnecessarily grant relief on First Amendment grounds as well."); *Simonian v. Hunter Fan Co.*, No. 210CV02771JPMCGC, 2011 WL 13116674, at *3 (W.D. Tenn. May 19, 2011) ("The Court declines to decide the constitutional issue because [the] complaint is subject to dismissal on another ground.").

In short, the Court has granted Plaintiffs' relief on one basis, and it would be unnecessary and inefficient at present for it consider alternatively granting the same relief on any other basis—especially via the resolution of any constitutional claims, which should be avoided whenever possible (as here). Thus, the Court declines to reach the additional as-applied challenges brought by Plaintiffs.

---

[43] The district court here was faced with additional counts—similar to the additional counts asserted by Plaintiffs here in their Complaints—asserting fundamental rights, retroactivity, vagueness, and impossibility under the Due Process Clause and violations of the First Amendment. *John Does 1-4 v. Snyder*, 932 F. Supp. 2d 803 (E.D. Mich. 2013), *rev'd and remanded sub nom. Does #1-5 v. Snyder* [*Snyder I*]*,* 834 F.3d 696 (6th Cir. 2016).

**B. Plaintiffs' facial First Amendment challenge**

In addition to the as-applied challenges discussed above, Plaintiffs bring (in Count V) a facial challenge to the statute based on the First Amendment.[44] Defendants, but not Plaintiffs, have moved for summary judgment as to Plaintiffs' First Amendment claim.

Because a facial challenge by definition seeks relief broader than the kind of relief the Court has afforded Plaintiffs on their as-applied ex post facto claim, the Court will address this facial challenge. In their Complaints, Plaintiffs allege that SORA's requirement that registrants report information relating to their Internet accounts and activity ("Internet identifiers") is invalid under the First Amendment (as incorporated into the Fourteenth Amendment) because it substantially interferes with Plaintiffs' access to the Internet as a forum for speech and eliminates Plaintiffs' opportunities for anonymous Internet speech. (Doc. No. 1 ¶ 158).

Plaintiffs specify in their Complaints that "requirements to report information about Internet accounts and activity is invalid under the First Amendment *both on its face and as applied* because it is not narrowly tailored to serve a compelling state interest and because it prohibits a substantial amount of protected speech." (*Id.* (emphasis added)). Nevertheless, Defendants treat this claim entirely as if it makes only an as-applied challenge, and Plaintiffs never mention their facial challenge in their briefing or correct Defendants' implication that Plaintiffs bring only an as-applied challenge under the First Amendment. In their Response to Defendants' Motions for Summary Judgment, Plaintiffs still focus primarily on their own situation,[45] and they include just

---

[44] As noted, Plaintiffs also brought an as-applied First Amendment challenge.

[45] Essentially, Doe #1 claims that he would like to use the Internet for social media and communication. (Doc. No. 93 at 6). However, Doe #1 does not use the Internet, computers, or social media for fear of violating the law. (*Id.*). Doe #1 also fears that the government will monitor his Internet use. (*Id.*). Doe #1 does not have an Amazon account, an email address, online banking, or a social media account. (Doc. No. 94 at ¶ 30). Doe #1 has indicated that he would like to use

66

a few references to registrants more generally. Plaintiffs do, however, make a few references to registrants more generally and seem to argue beyond the scope of their own set of facts, and so the Court deems them to have made a facial challenge under the First Amendment, though they have not asserted the claim vigorously or effectively.[46]

The Supreme Court has held that "[a]n author's decision to remain anonymous is 'an aspect of the freedom of speech protected by the First Amendment.'" *Signature Mgmt. Team, LLC v. Doe*, 876 F.3d 831, 835 (6th Cir. 2017) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995)). "Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre*, 514 U.S. at 357 (internal citation omitted). The right to speak anonymously includes speech made over the Internet: "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to

---

social media to communicate with his family and with others, but he has not indicated any specific communication he would like to participate in. (*Id.* at ¶ 32).

    Doe #2 does use the Internet, but he is concerned that he must report all of his account information to the government and that the government might use this information. (Doc. No. 93 at 6). Doe #2 uses the Internet for work, research, and reading the news. (Doc. No. 95 at ¶ 17). He has two personal email accounts and conducts banking online. (*Id.* at ¶¶ 18, 19).

[46] Some of the references to registrants more generally include statements such as: "This ambiguity, combined with the threat of felony conviction for non-compliance, chills speech by forcing registrants either to overreport or underuse the internet"; "SORA does not expressly prohibit law enforcement from disclosing registrants' internet account information and immunizes them"; "SORA expressly authorizes law enforcement officers to give registrants' internet account information to third parties"; "SORA imposes an onerous obligation to report any changes in internet account information regardless of a registrant's individual circumstances or the nature of the internet sites or communications involved"; and "SORA is vague as to how quickly a registrant must report changes." (Doc. No. 93 at 15-19).

express themselves freely without 'fear of economic or official retaliation . . . [or] concern about social ostracism.'" *Id.* at 835–36 (citation omitted).

A law is unconstitutional under the First Amendment if it operates as an outright ban or impermissibly burdens anonymous online speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011)[47] ("[T]he distinction between laws burdening and laws banning speech is but a matter of degree . . . . Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." (internal quotation marks and citation omitted)). Although anonymous speech over the Internet merits protection, as with all speech rights under the First Amendment, the right to speak anonymously is not without limits. Indeed, "a state may permissibly infringe upon this right when its interest is important enough and the law is appropriately tailored to meet the stated interest." *Doe v. Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010). Thus, when determining if a law unconstitutionally burdens anonymous speech, courts look at the chilling effect the law's requirement of identification has on those individuals deciding whether to speak. *Id.* at 1225.

As has been discussed, a statute is facially unconstitutional if "no set of circumstances exists under which [the statute] would be valid." *Speet*, 726 F.3d at 872 (quoting *United States v. Stevens*, 559 U.S. at 472). In the context of free speech rights, however, "[t]he Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft*, 535 U.S. at 244. Because of this extra protection, the First

---

[47] The court in *Doe v. Rausch* noted that sex offender registry laws in this area typically fall into two camps: (1) a ban on certain Internet activity, or (2) requirements of reporting Internet account activity. 461 F. Supp. 3d at 770 (collecting cases). However, the difference between a law banning versus a law burdening speech "is but a matter of degree." *Id.* (quoting *Harris*, 772 F. 3d at 572). SORA falls into the second camp: it does not ban speech, but instead burdens speech through registration requirements.

68

Amendment provides "'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. at 473 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 n.6, 128 S. Ct. 1184, 1191, 170 L. Ed. 2d 151 (2008)). The Sixth Circuit has explained the overbreadth doctrine as such:

> in a facial challenge, a plaintiff must show substantial overbreadth: that the statute prohibits " 'a substantial amount of protected speech both in an absolute sense and relative to [the statute's] plainly legitimate sweep[.]' " *Carey v. Wolnitzek*, 614 F.3d 189, 208 (6th Cir.2010) (quoting *Connection Distrib. Co.*, 557 F.3d at 336). We have acknowledged that "[T]he concept of 'substantial overbreadth' " has "some elusive qualities[.]" *Connection Distrib. Co.*, 557 F.3d at 340; *see also Taxpayers for Vincent*, 466 U.S. at 800, 104 S. Ct. 2118 ("[t]he concept of 'substantial overbreadth' is not readily reduced to an exact definition."). But the doctrine of substantial overbreadth "involves an inquiry into the 'absolute' nature of a law's suppression of speech." *Connection Distrib. Co.*, 557 F.3d at 340. A facial challenge based on substantial overbreadth "describe[s] a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest." *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 966 n. 13, 104 S. Ct. 2839, 81 L.Ed.2d 786 (1984) (citing *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637–639, 100 S. Ct. 826, 63 L.Ed.2d 73 (1980) (rest of citation omitted)). As the Supreme Court has explained, the point of an overbreadth challenge "is that there is no reason to limit challenges to case-by-case 'as applied' challenges when the statute on its face and therefore in all its applications falls short of constitutional demands." *Joseph H. Munson Co., Inc.*, 467 U.S. at 966 n. 13, 104 S. Ct. 2839. If we determine that a statute is substantially overbroad, we have necessarily determined that there is " 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.' " *N.Y. State Club Ass'n v. City of N. Y.*, 487 U.S. 1, 11, 108 S. Ct. 2225, 101 L.Ed.2d 1 (1988) (quoting *Taxpayers for Vincent*, 466 U.S. at 801, 104 S. Ct. 2118). To succeed in an overbreadth challenge, therefore, a plaintiff must "demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the [statute] cannot be applied constitutionally." *N.Y. State Club*, 487 U.S. at 14, 108 S. Ct. 2225.

*Speet*, 726 F.3d at 872–73.

So a facial challenge in the First Amendment context is (a) necessarily an overbreadth challenge and (b) easier to sustain than a facial challenge in other contexts in that it requires a

69

showing only that the challenged statute will result in a "substantial number" of unconstitutional applications, not a showing that its application would be unconstitutional in every case. Despite facing a lower hurdle than a typical facial challenge, a challenge based on "[t]he overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'" *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). The Sixth Circuit has additionally stated that courts in this Circuit "will not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law." *Speet*, 726 F.3d at 878 (internal quotation marks and citation omitted). The plaintiff bears the burden of showing a court that substantial overbreadth exists. *Id.*

The factual record here reflects a problem similar to the one faced by the court in *Rausch II* when analyzing the plaintiff's challenge to SORA, and such analysis is instructive:

> Here, the factual record before the Court only identifies the effects that [SORA's] internet identifier reporting requirements have had on Plaintiff. Likewise, briefs of the parties have largely failed to address [SORA's] facial constitutionality, instead focusing on Plaintiff's circumstances. This creates two barriers to the Court's adjudication of Plaintiff's facial attack.

> First, "the parties fail[ed] to describe the instances of arguable overbreadth of the contested law," *Speet*, 726 F.3d at 878 (quoting *Wash. State Grange*, 552 U.S. at 450 n. 6, 128 S. Ct. 1184); *see Glenn*, 690 F.3d at 422 (finding that the record was " 'utterly barren about whether some, many, indeed any, [other people] [were] affected by . . . application of the statute.' " (quoting *Connection Distrib. Co.*, 557 F.3d at 338–39)); *Connection Distrib. Co.*, 557 F.3d at 336 (stating that the plaintiff bears " 'the burden of *demonstrating* . . . substantial overbreadth.' " (quoting *Hicks*, 539 U.S. 113, 122, 123 S. Ct. 2191, 156 L.Ed.2d 148 (2003)) (emphasis added)); *United States v. Coss*, 677 F.3d 278, 289 (6th Cir. 2012) (stating that a plaintiff " 'must demonstrate from the text of the statute *and from actual fact* that a substantial number of instances exist in which the law cannot be applied constitutionally.' ") (quoting *Am. Booksellers Found. for Free Expression v. Strickland*, 601 F.3d 622, 627 (6th Cir. 2010)) (emphasis added); *accord Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013) (comparing the ample record before the court to instances where the record was insufficient for facial review for First Amendment overbreadth). Accordingly, without evidence that the statute is

70

overbroad in relation to other registrants, the Court certainly cannot conclude that it is *substantially* overbroad.

Second, though "[l]itigation by hypothetical" is "sometimes required in free-speech cases," *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (citations omitted), Plaintiff's arguments are limited to cursorily comparing [SORA] to two related, yet distinguishable cases—*Shurtleff* and *Packingham* . . .

To be sure, [SORA's] internet identifier reporting requirements may be amenable to review for substantial overbreadth since there is an attendant threat of criminal sanctions. Though the Court's ruling on Plaintiff's ex post facto claim also alleviates Plaintiff's specific First Amendment concerns, as discussed *infra*, "[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 37 L.Ed.2d 830 (1973). Likewise, [SORA's] internet identifier reporting requirements are not a paragon of statutory draftsmanship. *See Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *17. But the Court will not "answer abstract questions" with only the undersigned's "judicial imagination" as a guide, *Connection Distrib. Co.*, 557 F.3d at 341 (citing *United States v. Raines*, 362 U.S. 17, 22, 80 S. Ct. 519, 4 L.Ed.2d 524 (1960)), and this "contextual vacuum . . . counsels in favor of choosing discretion over valor." *Id.* (citing *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14, 108 S. Ct. 2225, 101 L.Ed.2d 1 (1988)). Thus, without concrete evidence that [SORA's] internet identifier reporting requirements are substantially overbroad or a sufficient basis for abstract constitutional review, Plaintiff's facial First Amendment attack cannot survive summary judgment. *See generally Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) (stating that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." (quoting *Citizens United v. FEC*, 558 U.S. 310, 331, 130 S. Ct. 876, 175 L.Ed.2d 753 (2010))).

461 F. Supp. 3d at 771-73. The undersigned would add, as indicated above, that the ultimate burden is on Plaintiffs to establish that a statute is facially overbroad under the First Amendment. In the context of a motion for summary judgment, this means that if a defendant-movant meets its initial burden under Rule 56, the burden shifts to the plaintiff to show why there is a genuine issue of material facts to be decided at trial, that defendant is not entitled to judgment as a matter of law based on the facts not in dispute, or both. It behooves a plaintiff to whom such burden has shifted

to be quite intentional in seeking to meet such a burden. And yet Plaintiffs, to whom such burden did shift as explained below, have been anything but intentional about it here.

Defendants argue that they are entitled to judgment on Plaintiffs' First Amendment Claim because the content-neutral regulation withstands intermediate scrutiny.[48] (Doc. No. 74 at 14).

In its November 9 Order denying in part and granting in part Defendants' Motion to Dismiss, this Court applied intermediate level scrutiny and denied Defendants' Motion to Dismiss Plaintiffs' First Amendment claim. (Doc. No. 37 at 36-37). This Court held that without the benefit of a full factual record it was unable to conclude that the provisions in question are sufficiently narrowly tailored to a significant governmental interest. (*Id.* at 37).

---

[48] Notably, Defendants frame their argument in terms of SORA passing intermediate scrutiny, and not in terms of SORA being substantially overbroad. Interestingly, it appears that the relationship between "scrutiny" analysis and "overbreadth analysis" is not widely appreciated or understood. As one commentator has noted, the relationship is indeed (at least largely) "unexplained." Marc Rohr, *Parallel Doctrinal Bars: The Unexplained Relationship Between Facial Overbreadth and "Scrutiny" Analysis in the Law of Freedom of Speech*, 11 Elon L. Rev. 95, 103 (2019). From its review of applicable case law, the best the Court can glean is that if a defendant can show that the challenged statute withstands whatever level of "scrutiny" to which it is subject, then it is not substantially overbroad in regard to a facial challenge. *See e.g.*, *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 392 (6th Cir. 2005) ("In the end, the school district has satisfied all three prongs of the *O'Brien* test [which examined intermediate scrutiny for content-neutral restrictions that incidentally burden free speech], which necessarily establishes that the [Plaintiffs] have not met their burden of showing that they are entitled to 'the strong medicine of overbreadth invalidation.'"); *Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232, 263–64 (S.D. Ohio 2019) ("Plaintiffs have not met their burden of showing the statute is substantially overbroad. Moreover, because the Court finds that Ohio Revised Code § 3517.21(A)(1) is a content-neutral law that survives intermediate scrutiny under *O'Brien*, it is not substantially overbroad."); *State v. Casillas*, 952 N.W.2d 629, 646 (Minn. 2020) (discussing the confusing relationship between scrutiny and overbreadth review and determining that "an overbreadth analysis is needlessly redundant if a statute has already survived strict scrutiny review").

For this reason, the Court finds that Defendants are entitled to judgment as a matter of law on Plaintiff's First Amendment challenge if SORA passes intermediate scrutiny as a matter of law (based on facts not in dispute), irrespective of any separate test intended to otherwise assess whether the statute is substantially overbroad.

72

Under the intermediate scrutiny analysis, a content-neutral regulation that burdens anonymous speech will be upheld under the First Amendment if it: (1) "serve[s] a significant governmental interest;" (2) [is] "narrowly tailored;" and (3) "leave[s] open ample alternative channels for communication of the information." *Phelps-Roper v. Strickland*, 539 F.3d 356, 362 (6th Cir. 2008). "In order to be narrowly tailored, a regulation must 'promote[ ] a substantial government interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further the government's legitimate interests.'" *Crookston v. Johnson*, 841 F.3d 396, 403 (6th Cir. 2016) (quoting *Tucker v. City of Fairfield, Ohio*, 398 F.3d 457, 463 (6th Cir. 2005)). "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests . . . . Narrow tailoring in this context requires, in other words, that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft*, 535 U.S. at 244. "The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions." *Doe v. Harris*, 772 F.3d 563, 578 (9th Cir. 2014).

In support of their argument that SORA withstands intermediate-level scrutiny, Defendants rely almost exclusively on *Doe* v. *Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010). In *Shurtleff*, the Tenth Circuit upheld a Utah statute requiring all sex offenders living in Utah to register their "internet identifiers" which included "any electronic mail, chat, instant messenger, social networking, or similar name used for Internet communication." *Shurtleff*, 628 F.3d at 1221 (citing Utah Code Ann. § 77–27–21.5(1)(j)). The court applied a "narrowing" construction to the statute

and found that the disclosure of registrant's online identifiers to state officials did not unnecessarily interfere with their First Amendment right to speak anonymously. *Id.* at 1226.

In so finding, the court noted that an unconstitutional chilling effect does not arise "merely from the individual's knowledge that a governmental agency was engaged in certain [information-gathering] activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). The court explained that "[i]n evaluating these interests, the Supreme Court has suggested a distinction between the mandatory disclosure in public of a speaker's identity and the requirement that a speaker provide information to the government that could later be used to trace speech back to its source." *Shurtleff*, 628 F.3d at 1222. The court further explained that the Supreme Court has distinguished between a provision that required identification at the time of speech and a provision that just required an individual's name and address to be on file, finding the former provision unconstitutional and the latter constitutional. *Id.* (discussing *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999)). This distinction was because the constitutional statute required disclosure of an offender's identity only sometime after the speech occurred, and not concurrently with the speech. *Shurtleff*, 628 F.3d at 1225.

As the court in *Rausch II* explained, *Shurtleff* is inapposite here because, unlike SORA, the Utah law expressly limited law enforcement's ability to look beyond the anonymity of the Internet identifiers "to assist in investigating kidnapping and sex-related crimes, and in apprehending offenders[.]" Utah Code Ann. § 77–27–21.5(1)(j). SORA here has no similar express limitation. *Rausch II*, 461 F. Supp. 3d at 772. Notably, an earlier version of the Utah statute likewise contained no such restriction, and a district court found that version to infringe on the

74

plaintiff's right to anonymous speech. *Shurtleff*, 628 F.3d at 1221. In response, the Utah legislature amended the statute to place limits on how law enforcement could use the information, and it was the amended version the Tenth Circuit upheld as constitutional in *Shurtleff*. *Id.*

Ultimately, the court in *Rausch II* declined to find SORA facially unconstitutional under the First Amendment because the plaintiffs "ha[d] not provided authority for the notion that this has a facially unconstitutional chilling effect." *Id.* The Court held that "without concrete evidence that [SORA's] internet identifier reporting requirements are substantially overbroad or a sufficient basis for abstract constitutional review, Plaintiff's facial First Amendment attack [could not] survive summary judgment." *Id.* at 773.

As noted above, it appears there is no genuine dispute of material fact as to Plaintiffs' First Amendment challenge. It also appears, subject to Plaintiffs' rebuttal, that Defendants are entitled to judgment as a matter of law on the grounds that SORA passes intermediate scrutiny, as Defendants claim.[49] True, Defendants do little to establish this claim other than to rely, ill-advisedly, on *Shurtleff*. But the Court agrees that they are correct in their (mostly conclusory) assertion that the challenged regulations (1) serve a significant governmental interest (2) are narrowly tailored in that this government interest would be achieved less effectively absent the regulation, and the regulations do not burden substantially more speech than is necessary to further that interest; and (3) leave open ample alternative channels for communication of the information
.

---

[49] Defendants are correct in this regard even though, as noted, they were off the mark in relying on *Shurtleff* for this proposition. To the extent that the Court is relying *sua sponte* on its own rationale, the Court perceives that it has the authority to do so inasmuch as it has the much greater authority to enter summary judgment *sua sponte* so long as the losing party was on notice of the need to come forward with all of its (material) evidence. *See Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995).

75

Plaintiffs do not contest that intermediate scrutiny applies. Nor do they contest the satisfaction of the first and third criteria of intermediate scrutiny, *i.e.*, that SORA's Internet account reporting requirements serve a significant government interest and that there are ample channels for communication open.[50] (Doc. No. 93 at 15-18). Rather, they argue that "Defendants' motion for summary judgment on [their First Amendment] claim should be denied based on the Ninth Circuit's ruling in *Doe v. Harris*, which upheld a First Amendment challenge to California's closely analogous internet account reporting requirements." (Doc. No. 93 at 15-18). The court in *Harris*, similar to Plaintiffs here, skirted the issues of an important government interest and alternative channels of communication, focusing entirely on whether the act at issue was narrowly tailored. *Doe v. Harris*, 772 F.3d 563, 582 (9th Cir. 2014) ("Because we conclude that the Act burdens substantially more protected speech than is necessary, we decline to decide whether California's sex offender registration statute actually advances the government's legitimate interests. We likewise decline to consider whether there are ample alternative channels available for registered sex offenders to speak."). Likewise, Plaintiffs focus their argument on whether SORA is narrowly tailored.

As noted, Plaintiffs do not appear to dispute that the first and third considerations of intermediate scrutiny are met in this case. The Court finds that both are met in this case. The Court has already discussed SORA's legislative findings, and Defendants cite particularly to SORA's stated purpose of keeping the public safe. (Doc. No. 74 at 15). Courts have routinely held that the government has an interest in protecting the public (especially children) from sex offenders online.

---

[50] The Court notes that even if the parties contested the level of scrutiny, it would hold in accordance with other courts examining similar statutes that this is a content-neutral restriction (the statute applies broadly to the Internet and Internet identifiers, without targeting certain kinds of websites or accounts) on speech and thus subject to intermediate scrutiny. *E.g.*, *Shurtleff*, 628 F.3d at 1223; *Doe v. Harris*, 772 F.3d 563, 575-76 (9th Cir. 2014) (collecting cases).

*E.g.*, *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ("Though the issue is not before the Court, it can be assumed that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor."); *Doe v. Jindal*, 853 F. Supp. 2d 596, 605 (M.D. La. 2012) ("There can be no doubt that the state has a wholly legitimate interest in protecting children from sex offenders online."); *Doe v. Snyder*, 101 F. Supp. 3d 722, 726 (E.D. Mich. 2015) ("In so holding, the court found that Michigan has 'a compelling interest in protecting minors from violence and sexual abuse' and later noted that Michigan has 'a robust interest in protecting the individuals, especially children, from online predators.' The parties concede that Michigan has a significant interest in 'investigating and deterring criminal activity[.]'" (discussing previous ruling of the court, internal citations to docket omitted)); *Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608, 613 (E.D. Ky. 2017) (finding statute unconstitutional when it prohibited any speech whatsoever on a social media website but noting the "legitimate interests in protecting children from sexual abuse solicited via the internet"). The Court agrees that protecting the public (especially children) from sex offenders on the Internet is an important government interest. There also appears to be no dispute regarding whether alternative channels of communication are open. Since SORA does not fully deprive registrants of their access to the Internet, it leaves open many channels of communication for registrants (both offline and online). Therefore, the Court finds that these two elements of intermediate scrutiny are met in this case.

In their briefing, though not mentioning their supposed facial challenge, Plaintiffs make two primary arguments in support of their First Amendment claim focused on whether SORA is narrowly tailored. In particular, they assert that SORA violates the First Amendment because it (SORA) is flawed in that it 1) has ambiguous terms and confusing timeframes, and 2) lacks specific disclaimers against law enforcement use of information. In briefing, Plaintiffs rely almost entirely upon the Ninth Circuit's finding in *Doe v. Harris*, arguing that SORA's Internet account reporting

requirements are analogous to those in California's act and "unconstitutionally chill[] anonymous on-line speech to the same or greater extent than California's law," (Doc. No. 93 at 17), but aside from the extensive references to *Harris*, Plaintiffs do not provide the Court with any analysis or discussion of why their facial challenge (as opposed to their as-applied challenge) should survive summary judgment.[51] Among other things, Plaintiffs fail to explain why SORA's two above-

---

[51] In *Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014), the Ninth Circuit preliminarily enjoined provisions of the Californians Against Sexual Exploitation Act ("CASE"), which required its registrants to report to law enforcement "[a] list of any and all Internet identifiers established or used by the person" and "[a] list of any and all Internet service providers used by the person." 772 F.3d at 568 (quoting Cal. Penal Code § 290.015(a)(4), (5)). CASE defined "Internet identifier" as "an electronic mail address, user name, screen name, or similar identifier used for the purpose of Internet forum discussions, Internet chat room discussions, instant messaging, social networking, or similar Internet communication." *Id.* at 568-69 (citing Cal. Penal Code § 290.024(b)). CASE also required registrants to send written notice to law enforcement within 24 hours of any additions or changes to this information. *Id.* The court applied intermediate scrutiny to this content-neutral regulation and concluded that the plaintiffs were likely to succeed on the merits because CASE "unnecessarily chills protected speech in at least three ways: the Act does not make clear what sex offenders are required to report, there are insufficient safeguards preventing the public release of the information sex offenders do report, and the 24–hour reporting requirement is onerous and overbroad." *Id.* at 578.

The Ninth Circuit declined to adopt the district court's narrow interpretation of the challenged reporting requirements, finding that the terms in the statue were ambiguous and arguably inconsistent. *Id.* at 598. Those ambiguities, the court held, had a chilling effect on registrants as it "may lead registered sex offenders either to overreport their activity or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report." *Id.* at 579. "This uncertainty undermines the likelihood that the [Act] has been carefully tailored to the [State's] goal of protecting minors." *Id.* (*Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871 (1997)).

Next, the court found the plaintiffs likely to succeed on their claim that CASE's provisions allowing law enforcement to disclose to the public identifying Internet information "when necessary to ensure the public safety based upon information available to the entity concerning that specific person" is unconstitutional. *Id.* at 580 (quoting Cal. Penal Code § 290.45(a)(1)). In particular, the court took issue with CASE's lack of standards for judging what is necessary to ensure the public safety. *Id.* The court explained that "[w]ithout such standard, the Act impermissibly 'places unbridled discretion in the hands of a government official or agency.'" *Id.* (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)). Thus, "registered sex offenders are unnecessarily deterred from engaging in anonymous online speech." *Id.* at 581.

Finally, the Ninth Circuit found that CASE's 24-hour reporting requirement "undeniably impedes protected First Amendment Activity." *Id.* at 581 (quoting *McIntyre*, 514 U.S. at 355). The

referenced alleged flaws cause it to fail intermediate scrutiny. Plaintiffs provide a few references to registrants generally and the challenges they face (as noted in a prior footnote), but Plaintiffs did not provide the Court with any hypotheticals or examples showing the effect of the statute (other than Plaintiffs' circumstances, also noted in a prior footnote) is overbroad in that it substantially burdens free speech rights. It would have behooved Plaintiffs to have done so, but the Court has been provided with little analysis other than the comparison of the statute at issue here to the statute at issue in *Harris*.

As indicated above, in responding to Defendants' Motions for Summary Judgment, Plaintiffs mention SORA's (supposedly) ambiguous terms and confusing timeframes for registration.[52] (Doc. No. 93 at 18). In denying Defendants' Motion to Dismiss Plaintiff's First

---

court found that "anytime registrants want to communicate with a new identifier, they must assess whether the message they intend to communicate is worth the hassle of filling out a form, purchasing stamps, and locating a post office or mailbox." *Id.* at 582. The court further explained that "[t]he mail-in requirement is not only psychologically chilling, but physically inconvenient, since whenever a registered sex offender obtains a new ISP or Internet identifier, he must go somewhere else within 24 hours to mail that information to the State." *Id.*

[52] Plaintiffs argue that the timeframes for reporting changes to information related to the Internet are confusing:

> SORA is vague as to how quickly a registrant must report changes. One provision requires reporting within three days and does not specify in-person reporting, while another requires reporting a "change in any other information" previously given on a registration form within 48 hours, in person. Since the information included on the registration form includes internet account information, these statutes can be read two ways. They could mean "new" internet account information must be reported in-person within 48 hours but "changes" can be reported within three days and not in person. Or they could mean all internet account information, new or changed, can be reported within three days. Given the criminal penalties for untimely reporting, the safe course is to report "new" internet account information in-person within 48 hours. The breadth of the reporting requirement, combined with its ambiguity and the threat of criminal penalties, unconstitutionally chills Plaintiffs' ability to engage in online speech.

(Doc. No. 93 at 18).

Amendment claim in the November 9 Order, Chief Judge Crenshaw emphasized the grammatical imprecision and confusing nature of the language of the statutory requirements regarding Internet identifiers.[53] (Doc. No. 38 at 35). Judge Crenshaw concluded that it "appears that the intent of the requirement is [] for a registered offender to disclose any username or account he uses for an "Internet communication platform[]." (*Id.*). In *Rausch II*, the court similarly noted that SORA's "internet identifier reporting requirements are not a paragon of statutory draftsmanship." 461 F. Supp. 3d at 772. After reviewing the statute, the Court agrees that the statute is certainly confusing and unclear regarding what is required of registrants.[54] Additionally, Plaintiffs argue that this

---

[53] SORA requires that, under penalty of perjury, registrants shall disclose the following information:

> A complete listing of the offender's electronic mail address information, including usernames, any social media accounts the offender uses or intends to use, instant message, other internet communication platforms or devices, and the offender's username, screen name, or other method by which the offender accesses these accounts or websites

Tenn. Code Ann. § 40-39-203(i)(17).

[54] For example, typically, the word "including" is used to introduce examples of a term mentioned earlier in a sentence, and here that earlier term is "electronic mail address information." Although "usernames" potentially falls within this category (though a better term, perhaps, would be "email address," as many email accounts do not require a "username") the other terms following usernames ("social media accounts," "instant message," "internet communication platforms or devices," "username" (again), and "screen name") do not strike the Court as kinds of "electronic mail address information," and it is unclear where the term "including" is meant to relate to anything after "usernames."

The Court has additional concerns about some of these terms. Registrants must disclose "instant message." Perhaps this is a typographical or grammatical error, but it is unclear what should be disclosed relating to "instant message." As written, this could be all instant messages sent and/or account information related to instant messaging platforms. The statute additionally mentions "other internet communication platforms or devices," and it is unclear what "devices" means—must registrants disclose each laptop, phone, and physical device capable of connecting to the Internet? Finally, the last word in the list is "websites." It is unclear whether websites that do not provide communication tools, those that are used for shopping, or those that the registrant

80

statute contains no prohibition on law enforcement to prevent disclosure of registrants' account information, and it is therefore unconstitutional just as was the statute in *Harris*.[55] (Doc. No. 93 at 17). However, though the statute is confusing, Plaintiffs provide no real analysis of why the statute is substantially overbroad in effectuating its important government purpose, besides generally noting the confusing nature of the registration requirements and the potential disclosure of information.

The court in *Rausch II* found that the plaintiff's citation to merely two cases was insufficient to show that the plaintiff should succeed on a facial challenge.[56] The court there found that "without concrete evidence that [SORA's] internet identifier reporting requirements are substantially overbroad or a sufficient basis for abstract constitutional review, Plaintiff's facial First Amendment attack cannot survive summary judgment" and "as Plaintiff points out, [SORA] does not expressly limit law enforcement's use of internet identifier information . . . But Plaintiff has not provided authority for the notion that this has a facially unconstitutional chilling effect." *Rausch II*, 461 F. Supp. 3d at 771-73. Here, Plaintiffs have similarly provided no concrete evidence

---

owns are included. All in all, suffice it to say what has been said before: these provisions are not a paragon of legislative draftsmanship.

[55] Section § 40-39-203(m) allows law enforcement to transfer some Internet identifiers to "a business or organization that offers electronic communication or remote computing services for the purpose of prescreening users or for comparison with information held by the requesting business or organization." It also prohibits the requesting business or organization from further disseminating the Internet identifiers. SORA contains no provision limiting law enforcement's ability to disclose registrant's Internet identifiers to the public, and nowhere does SORA expressly *prohibit* any law enforcement agency from publishing Internet identifiers to the public.

[56] The Court in *Rausch II* analyzed the facial challenge under the overbreadth analysis, which, as discussed, has a confusing (and perhaps overlapping) relationship with intermediate scrutiny. In analyzing whether SORA is overbroad for purposes of intermediate scrutiny, the Court finds *Rausch II*'s analysis of the alternative question of whether SORA is substantially overbroad to be helpful, though perhaps not directly on point.

(or even argument) regarding the chilling effect of SORA that would constitute a facially unconstitutional chilling effect.

"[T]he Court will not answer abstract questions with only the undersigned's judicial imagination as a guide." *Rausch II*, 461 F. Supp. 3d at 771-73 (internal quotation marks omitted). Though, as the Court has noted, there are obvious grammatical and confusing issues with SORA's Internet reporting requirements, Plaintiffs have advanced no arguments as to how these issues affect registrants or make the statute unconstitutional on its face. Shirking the burden that fell upon them in opposing Defendants' Motions, Plaintiffs have not provided the Court with sufficient argument that SORA is unconstitutional on its face—*i.e.*, fails the applicable intermediate scrutiny—based on the two alleged flaws in SORA (or based on anything else). Therefore the Court will grant summary judgment to Defendants on this claim.

### i. Remedies

Plaintiffs request a permanent injunction, a declaratory judgment, and attorney's fees in their Complaints.

In their Complaints, Plaintiffs ask the Court to issue a permanent injunction restraining the Defendants from retroactively enforcing SORA against Plaintiffs. (Doc. No. 1 at 54). Defendants argue that if the Court finds that some provisions of SORA are punitive under the Ex Post Facto Clause, it should apply the doctrine of elision and sever the parts that are unconstitutional without declaring the entire Act unconstitutional. (Doc. No. 91 at 5). Because the Court has concluded that SORA is unconstitutional under the Ex Post Facto Clause only as applied to Plaintiffs, elision would not be an appropriate remedy. *See Rausch I*, 382 F. Supp. 3d at 800.

In order to obtain a permanent injunction, a plaintiff must satisfy a four-factor test: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

In briefing, neither party addressed any of the factors considered in connection with a request for a permanent injunction. Further, Plaintiffs did not even identify a particular provision of the statute that they wished to enjoin. As has been discussed, in its prayer for relief, the Complaint merely stated "The retroactive application of the Act violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses committed prior to its enactment." (Doc. No. 1). The Plaintiffs then clarified, in their Partial Motion for Summary Judgment, that they were challenging 1) the exclusionary zones, 2) the labelling system, and 3) the registration system. Therefore, it is unclear from the Complaint and the subsequent briefing the scope of the injunction Plaintiffs seek and what provision(s) of SORA should be enjoined. Therefore, the Court will order, in the accompanying Order, supplemental briefing from the parties regarding the scope of the injunction warranted based on the Court's conclusion that SORA is unconstitutional as applied to Plaintiffs.[57]

---

[57] Plaintiffs did not request this Court to have themselves removed from the SOR. Strangely, Plaintiffs state in the Complaint that, "Even upon the clearest proof that Doe is not dangerous, there is no mechanism under the Act that would allow Doe to have his registration obligations eliminated or reduced." (Doc. No. 1 at ¶ 66). But in fact there is such a mechanism. SORA provides that registrants "may file a request for termination of registration requirements with TBA headquarters." Tenn. Code Ann. § 40-39-207(a)(1). Upon receiving this request, "TBI shall review documentation provided by the offender and contained in the offender's file and the [Sex Offender Registry "SOR"], to determine whether the offender has complied with this part." *Id.* at (b). Then, TBI shall remove the registrant from the registry for several reasons, including "[t]he offender has not been convicted of any additional sexual offense of violent sexual offense during the ten-year period and the offender has substantially complied . . ." *Id.* at (c). The Court notes that it "is not in a position to preempt the TBI's evaluation of any future request for removal by Plaintiff." *Rausch II*, 461 F. Supp. 3d at 778. However, none of this is to say that the Court could not possibly order

Plaintiffs also seek declaratory relief under 28 U.S.C. §§ 2201-2202[58] "declaring that retroactive application of the Act violates the prohibition in the United States Constitution against ex post facto laws and issue a permanent injunction restraining the defendants from retroactively enforcing the Act against Doe." (Doc. No. 1 at 54). Neither party has briefed why declaratory relief is appropriate (or inappropriate) in this case. The Supreme Court has held that the Declaratory Judgment Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). When determining whether a district court has properly exercised its discretion under the Declaratory Judgment Act, the Court of Appeals usually considers five factors:

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
> (5) whether there is an alternative remedy which is better or more effective.

*Doe v. Vanderbilt Univ.*, No. 3:18-CV-00569, 2019 WL 4748310, at *11 (M.D. Tenn. Sept. 30, 2019) (citing *Grand Trunk W. R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984)).

Since there is no briefing on this issue or why the Court should or should not issue declaratory

---

as a remedy the cancellation of their registrations, but the Court does not see where Plaintiffs have requested this.

[58] The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C.A. § 2201(a).

relief in its discretion, the Court will defer a decision on whether declaratory relief is appropriate and set a briefing schedule on this issue in its accompanying Order.

Finally, pursuant to 42 U.S.C. § 1988(b), Plaintiffs have requested an award of attorney's fees and costs as a prevailing party under 42 U.S.C. §1983. The Court finds that Plaintiffs are a prevailing party as they have obtained at least some relief on the merits of their claims. *See Rausch II*, 461 F. Supp. 3d at 779 (citing *Farrar v. Hobby*, 506 U.S. 103, 111 (1992)). Neither party has briefed the issue of attorney's fees. The Court will also set a briefing schedule regarding attorney's fees in its accompanying Order.

The Court again emphasizes that this ruling in favor of Plaintiffs is solely on an as-applied basis and grounded solely on the Ex Post Facto Clause. The Court has not granted any relief on any claim attacking the statute on its face, and this holding therefore is confined to the two Plaintiffs, Doe #1 and Doe #2, who are before the Court in this instance.

## CONCLUSION

For the foregoing reasons, the Court will rule as follows:

Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 66) will be granted in part and denied in part. Plaintiff's Motion for Partial Summary Judgment will be denied to the extent Plaintiffs bring a facial challenge under the Ex Post Facto Clause (Count I). Plaintiff's Motion for Partial Summary Judgment will be granted to the extent they bring an as-applied challenge under the Ex Post Facto Clause (Count I).

Defendants' Motion for Summary Judgment Against John Doe #1 (Doc. No. 73) will be granted in part and denied in part. The Motion will be granted to the extent Plaintiffs bring a facial challenge under the Ex Post Facto Clause (Count I). The Motion will be granted to the extent Plaintiffs bring a facial challenge under the First Amendment (Count V). The Motion will be

denied to the extent it argues that Defendants are entitled to judgment on Plaintiffs' claim on their as-applied challenge under the Ex Post Fact Clause (Count I). For the reasons discussed, because the Court has already granted Plaintiffs as-applied relief under the Ex Post Facto Clause, the Court will refrain (for now, at least) from ruling on the additional as-applied claims as to which Defendants seeks summary judgment: (1) Due Process Violation of the Right to Education and Upbringing of Children (Count IV); (2) First Amendment Violation (as-applied) (Count V); (3) Due Process Violation of Imposing Criminal Liability Without Knowledge (Count VIII); and (4) Due Process Violation for Vagueness and Impossibility of Compliance (Count IX).

Defendants' Motion for Summary Judgment Against John Doe #2 (Doc. No. 79) will be granted in part and denied in part. The Motion will be granted to the extent Plaintiffs bring a facial challenge under the Ex Post Facto Clause (Count I). The Motion will be granted to the extent Plaintiffs bring a facial challenge under the First Amendment (Count V). The Motion will be denied to the extent it argues that Defendants are entitled to judgment on Plaintiffs' claim on their as-applied challenge under the Ex Post Fact Clause (Count I). For the reasons discussed, because the Court has already granted Plaintiffs as-applied relief under the Ex Post Facto Clause, the Court will refrain (for now, at least) from ruling on the additional as-applied claims as to which Defendants seeks summary judgment: (1) Due Process Violation of the Right to Education and Upbringing of Children (Count IV); (2) First Amendment Violation (as-applied) (Count V); (3) Due Process Violation of Imposing Criminal Liability Without Knowledge (Count VII); and (4) Due Process Violation for Vagueness and Impossibility of Compliance (Count IX).

As a result of this opinion, no claims remain pending in this case. However, the above-stated issues regarding remedies remain pending, and they shall be addressed by the parties pursuant to the accompanying Order.

86

An appropriate order will be entered.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE